SCANNED

EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------X

Lidia M. Orrego

**AMENDED**
**COMPLAINT**

Plaintiff,

-against-

20  CV  3361  ( GRB ) (AKT )

Kevin Knipfing a/k/a Kevin James, Stephanieanna James-Knipfing
a/k/a Steffiana de la Cruz, Old Westbury  EDDIE  LLC,
Old Westbury LLC, Steve Savitsky, Teresa A. Zantua.

Defendants.

--------------------------------------------------------X

The Plaintiff to Pursuant the Federal Rule Civ. P. 15 (a)  submit "Amended Complaint" with modifications
in the Original Complaint and Exhibits filed on July 23, 2020 pursuant to the Federal Rule Civ. P. 5.2 (a)
according with the letter received from the Pro Se Office on August 08, 2020.

A amended complaint and exhibits is filed with this document.

Respectfully submitted,

Dated: 08/17/2020

Rego Park , New York

_____
Signature

95-08 Queens Blvd. Apart 3E
Address

Rego Park, NY, 11374
City, State, Zip CODE

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ AUG 17 2020 ★

LONG ISLAND OFFICE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

_____

### Lidia M. Orrego

_____

_____

*(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*

**-against-**

Kevin Knipfing a/k/a Kevin James, Stephanieanna James-Knipfing a/k/a Steffiana de la Cruz, Old Westbury EDDIE LLC, Old Westbury LLC, Steve Savitsky, Teresa A. Zantua.

(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)

**Complaint for Employment Discrimination**

Case No. **20-CV-3361 (GRB) (AKT)**
*(to be filled in by the Clerk's Office)*

Jury Trial: ☒ Yes ☐ No
*(check one)*

## I.     The Parties to This Complaint

### A.     The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Lidia M. Orrego |
| Street Address | 95-08 Queens Blvd Apart 3E |
| City and County | Rego Park, Queens |
| State and Zip Code | NY 11374 |
| Telephone Number | (347) 4532234 |
| E-mail Address | liorrego@gmail.com |

### B.     The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title (if known). Attach additional pages if needed. ***See Attachment I – Page 9 Additional Defendants***

Defendant No. 1

| | |
|---|---|
| Name | Kevin Knipfing  a/k/a Kevin James |
| Job or Title (if known) | Employer |
| Street Address | 2 Spring Hill Lane |
| City and County | Old Westbury – Nassau |
| State and Zip Code | NY 11568 |
| Telephone Number | (310) 5692458 |
| E-mail Address (if known) | fullkj@gmail.com |

Defendant No. 2

| | |
|---|---|
| Name | Stephanieanna James - Knipfing a/k/a Steffiana De la Cruz |
| Job or Title (if known) | Employer |
| Street Address | 2 Spring Hill Lane |
| City and County | Old Westbury – Nassau |

| | |
|---|---|
| State and Zip Code | NY 11568 |
| Telephone Number | (818) 4484636 |
| E-mail Address (if known) | steffdelacruz@gmail.com |

## C.     Place of Employment

The address at which I sought employment or was employed by the defendant(s) is:

| | |
|---|---|
| Name | Kevin Knipfing and Stephanieanna James – Knipfing |
| Street Address | 2 Spring Hill Lane |
| City and County | Old Westbury – Nassau |
| State and Zip Code | NY 11568 |
| Telephone Number | (818) 4484636 |

## II.     Basis for Jurisdiction

This action is brought for discrimination in employment pursuant to *(check all that apply)*:

☐     Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin).

*(Note: In order to bring suit in federal district court under Title VII, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

☐     Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 to 634.

*(Note: In order to bring suit in federal district court under the Age Discrimination in Employment Act, you must first file a charge with the Equal Employment Opportunity Commission.)*

☐     Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 to 12117.

*(Note: In order to bring suit in federal district court under the Americans with Disabilities Act, you must first obtain a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.)*

&#9746;     Other federal law *(specify the federal law)*:

*1)RACE Discrimination in violation of Section 1981 of Title 42 of the United*
*States Code ('Section 1981');2) Forgery Crime N.Y.Penal Law §170.00; 170.05.*

&#9746;     Relevant state law *(specify, if known)*:

*1)New York State Human Rights Law ("NYSHRL"); 2) New York Labor Law*
*§195(6); 3) Perjury Under Section 210 of the New York Penal Code.*

&#9746;     Relevant city or county law *(specify, if known)*:

*1) New York City Human Rights Law (NYCHRL)*

## III.     Statement of Claim

Write a short and plain statement of the claim.  Do not make legal arguments.  State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought.  State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct.  If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

A.     The discriminatory conduct of which I complain in this action includes *(check all that apply)*:

&#9633;     Failure to hire me.

&#9746;     Termination of my employment.

&#9633;     Failure to promote me.

&#9633;     Failure to accommodate my disability.

&#9746;     Unequal terms and conditions of my employment.

&#9746;     Retaliation.

&#9746;     Other acts *(specify)*:   *See Attachment II Page 11*

*(Note:  Only those grounds raised in the charge filed with the Equal Employment Opportunity Commission can be considered by the federal district court under the federal employment discrimination statutes.)*

B.     It is my best recollection that the alleged discriminatory acts occurred on date(s)

From March 2018 to July 2020

C.  I believe that defendant(s) *(check one)*:

    ☒   is/are still committing these acts against me.

    ☐   is/are not still committing these acts against me.

D.  Defendant(s) discriminated against me based on my *(check all that apply and explain)*:

    ☒   race **Hispanic/ Latin American/ Guarani**

    ☐   color_____

    ☐   gender/sex _____

    ☐   religion _____

    ☒   national origin  **Paraguayan**_____

    ☐   age. My year of birth is _____. *(Give your year of birth only if you are asserting a claim of age discrimination.)*

    ☐   disability or perceived disability *(specify disability)*

    _____

E.  The facts of my case are as follows.  Attach additional pages if needed.

**_See Attachment III - Page 18_**

_____

_____

_____

_____

_____

_____

_____

_____

(Note:  As additional support for the facts of your claim, you may attach to this complaint a copy of your charge filed with the Equal Employment Opportunity Commission, or the charge filed with the relevant state or city human rights division.)

## IV.  Exhaustion of Federal Administrative Remedies

A.  It is my best recollection that I filed a charge with the Equal Employment Opportunity Commission or my Equal Employment Opportunity counselor regarding the defendant's alleged discriminatory conduct on *January 31, 2019*

The Plaintiff reported 6 employees and the lawyer placed +15 incorrectly, does not apply "Title VII of the Civil Rights Act of 1964".See Exhibit 4 Page 49 Case No. 520 2019 01738

B.  The Equal Employment Opportunity Commission *(check one)*:

☐  has not issued a Notice of Right to Sue letter.

☒  issued a Notice of Right to Sue letter, which I received on *September 20,2019*. Proceeding under Section 1981 does not require filed to the EEOC and not subject to the same limitations period. See Exhibit 5 Page 56 Case No. 520 2019 01738.

*(Note: Attach a copy of the Notice of Right to Sue letter from the Equal Employment Opportunity Commission to this complaint.)*

B.  Only litigants alleging age discrimination must answer this question.
Since filing my charge of age discrimination with the Equal Employment Opportunity Commission regarding the defendant's alleged discriminatory conduct *(check one)*:
☐  60 days or more have elapsed. ☐  less than 60 days have elapsed.

## V.  Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

1- **Lost Wages and Benefits $ 250.000,00.-(Two Hundred and Fifty Thousand Dollars).-** From date Letter Termination Manufactured for unknown Entity and other person in California on November 27, 2018 to the day of trial. Loss of the right to applied for Unemployment Benefits because the Termination Letter establishes that she was fired for a just cause Financial Distress from December 2018 – January 2019.

2- <u>**Compensatory Damages $ 6.000.000,00-(Six Million Dollars).-**</u> For future loss, emotional distress, personal / family pain & suffering, Inability to care for the family, concealment of physical abuse, assault and battery, mental anguish, loss of enjoyment of life and loss of consortium.

Intentionally Infliction Emotional Distress or Recklessly leading to Major Depressive Disorder, Pain Disorder and Post Traumatic Stress Disorder (PTSD) confirm by the Medical Reports dated June 14, 2019 see Exhibit 7 Page 63 and October 17, 2019 see Exhibit 8 Page 66. These disorders caused by race discrimination, retaliation, racial harassment, hostile work environment, victimization, demotion, defamation, phycological harassment, continuous physical aggression and abuse of the Plaintiff was victim based in her race. As a result of all this, the Plaintiff contracted a Premature Ovarian Failure (POI) Disease, which has no treatment for the reversal of damages (permanent damages).

The Infliction Emotional and Financial Distress due to Physical Injuries and Myofascial pain syndrome (chronic pain disorder- Pain persists or worsens) are Excluded in the case filed with Work Compensation Board Case No. Case #G258 4330 see Exhibit 9 Page 79. This claim is currently denied by my Former Employers and their Insurance Company It is still in process and the next Hearing is on October 28, 2020.

3- <u>**Punitive Damages or exemplary damages $ 2.000.000,00.- (Two Million Dollars).- :**</u>

The Plaintiff request the Court and the Honorable Judge exemplary punishment to the Defendants whose conduct was intentionally egregious, intentionally grossly negligent against the Plaintiff based on her race, to deter defendants and others from engaging in similar bullying and torturous behavior in conspiracy with the Plaintiff's co-workers causing the above mention damages and her reputation.

## VI.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

A.     For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: August 17, 2020.

Signature of Plaintiff     _____

Printed Name of Plaintiff    Lidia M. Orrego_____

**B.**     **The Defendant(s) –** *Attachment I*

*Defendant No. 3*

| | |
|---|---|
| Name | Old Westbury Eddie LLC |
| Job or Title | Company / Payroll owner Kevin Knipfing |
| (if known) | |
| Street Address | 2 Spring Hill Lane |
| City and County | Old Westbury – Nassau |
| State and Zip Code | NY 11568 |
| Telephone Number | (310) 5692458 |
| E-mail Address | fullkj@gmail.com |
| (if known) | |

*Defendant No. 4*

| | |
|---|---|
| Name | Old Westbury LLC |
| Job or Title | Unknown Entity under registration in NY State |
| (if known) | |
| Street Address | 2049 Century Park East, Suite 1400 |
| City and County | Los Angeles - Los Angeles County |
| State and Zip Code | CA 90067 |
| Telephone Number | (310) 3156203 |
| E-mail Address | ssavitsky@savco.com |
| (if known) | |

*Defendant No. 5*

| | |
|---|---|
| Name | Steve Savitsky |
| Job or Title | Business Manager, Old Westbury LLC |
| (if known) | |
| Street Address | 2049 Century Park East, Suite 1400 |
| City and County | Los Angeles - Los Angeles County |
| State and Zip Code | CA 90067 |
| Telephone Number | (310) 3156203 |
| E-mail Address | ssavitsky@savco.com |
| (if known) | |

**B.** **The Defendant(s) -** *Attachment I continuation*

Defendant No. *6*

| | |
|---|---|
| Name | Teresa A. Zantua |
| Job or Title | Supervisor |
| (if known) | |
| Street Address | 2 Spring Hill Lane |
| City and County | Old Westbury – Nassau |
| State and Zip Code | NY 11568 |
| Telephone Number | (516) 6475444 |
| E-mail Address | tazland2004@gmail.com |
| (if known) | |

Date of signing: August 17, 2020.


Signature of Plaintiff  _____

Printed Name of Plaintiff  Lidia M. Orrego

### III.    Statement of Claim - *Attachment II*

☒    Other acts *(specify):* ☒ Discrimination _____

☒ Hostile Work Environment _____

1) February 15, 2018 to June 23, 2020: Kevin Knipfing and Stephanieanna James- Knipfing the Plaintiff's employers, discriminated against The Plaintiff for being of the hispanic race, treating her differently than other workers. It is the Plaintiff's information and belief that the current employees of the same race to The Plaintiff are covering up other confidential matters such as the abuse of the family's children that keep them employed. See Exhibit 10 Page 81; Exhibit 11 Page 84 a Report dated May 28, 2020 to the Child Protection Services (CPS). The Plaintiff holds as evidence a Diary listing the events of discrimination. Also, more than 600 pictures and videos taken with the authorization of the former employers, as part of her job and in the presence of her co-workers and other witnesses as well as several pages of text messages and emails. See Exhibit 33 Page 142. _____

2) February 15, 2018 to June 23, 2020: Teresa A. Zantua, the Plaintiff's Supervisor, from the beginning always discriminated against the Plaintiff calling her "stupid Mexican or Paraguayan", via text messages, containing emoticons indicating that the Plaintiff was retarded. The supervisor shared those messages with the Plaintiff's co-workers. Offensive comments making fun of her accent or her physical characteristics were also made. The supporting evidence is listed in her Diary, text messages, recordings, pictures, and videos. See Exhibit 24 Page 115. _____

The supervisor also encouraged the children and co-workers to discriminate against the plaintiff by calling her with derogatory names or imitating her accent when speaking. Teresa A. Zantua abused and consented to the physical abuse against the Plaintiff when for pressuring her to carry heavy items at the home or carry the children during trips to the mall ignoring the Plaintiff's .comments that she was in physical pain. The supervisor responded " You Mexicans eat a lot of corn for that reason your bones are useless. " The plaintiff has a recording of the last physical assault. _____

3) May 5, 2018: Teresa A. Zantua orders all the time to the Plaintiff not speak Spanish in front of the children and always complaining why the Plaintiff's employer hire nannies who only speak Spanish and asking why "The Mexicans" work for American families who speak only English and the Plaintiff shouldn't be working in the USA. _____

### III.    Statement of Claim - *Attachment II continuation*

4) June 02, 2018: When The Plaintiff and her 5 year old daughter met Teresa A. Zantua for a playdate with the children, Teresa A. Zantua told the Plaintiff's daughter that she should not allow "her mommy to speak in Spanish only in English because she is not Mexican" in front of all the kids and Plaintiff's husband. My daughter still doesn't speak Spanish outside of the house because she doesn't want other people thinks she is Mexican. The Plaintiff have pictures as evidence.

5) August 10, 2018: Stephanieanna James- Knipfing discriminated against The Plaintiff at the Concert making a difference with other workers.

6) August 15, 2018 4:17 pm: Stephanieanna James- Knipfing discriminated against the Plaintiff a through her co-workers treating her differently accusing her of acts that never happened, NOT giving the Plaintiff the opportunity to defend herself. As evidence the Plaintiff has the recording.

Stephanieanna James-Knipfing wanted demotion to the Plaintiff's position because she was Hispanic and she had already complained to her about Teresa A. Zantua about discrimination treatment and other abuses but she always ignored her.

7) August 18, 2018 8:00 pm Stephanieanna James-Knipfing gave to Plaintiff a different treatment regarding when contacting her via text message that did not apply with any other person but only against the Plaintiff.

8) August 19-20, 2018: 6:49 pm Teresa A. Zantua harassed and discriminated against the Plaintiff on her day off via text messages and voice calls, while the Plaintiff and the family are in the movies. Ms. Orrego received so many insults in this day for being Hispanic only because the employer misplaced an item.

9) August 20, 2018 5:38 am: Teresa A. Zantua sent a text message to the Plaintiff, again, on Monday at, (Plaintiff's day off), continuing her racial harassment Stephanieanna James- Knipfing via text message in The Group continued the harassment and for the purpose of embarrassing the Plaintiff to encourage the discrimination in the workplace.
If any other worker made a mistake, Stephanieanna James- Knipfing and Teresa A. Zantua never sent these types of groups text messages to ridicule them, the Plaintiff always was a victim of this type of harassment.

10) September 1, 2018: 6:44: Teresa A. Zantua via text message again gives the order to The

### III.    Statement of Claim - *Attachment II continuation*

Plaintiff "ONLY ENGLISH" at the home and hitting the wall because the Plaintiff spoke Spanish continuing.

11) September 5, 2018: Stephanieanna James- Knipfing harasses and discriminates against the Plaintiff in the Text Group, making her look ridiculous and blaming her for errors that she did not make. She never did this with other workers, just did it against Ms. Orrego. The Plaintiff have pictures as evidence.

12) September 8, 2018: Text messages from Teresa A. Zantua in the Plaintiff's after work during dinner with her family harassed the Plaintiff with text messages.

13) September 12, 2018 6: 59 pm: Teresa A. Zantua via text to the Plaintiff indicates to her that she mocks the Plaintiff's accent to other co-workers, specifically with Skylar Testa the House manager. She was always sending to the Plaintiff faces in many texts' messages meaning Ms Orrego is stupid or retarded when she talks and encourages everyone in the house to make fun of her.

14) September 15, 2018: 2:18 pm Teresa A. Zantua complains about why her sister hires people who speak Spanish because this is America and the family can't be a "normal family" as always she start making racial comments.

15) September 20, 2018: 5pm Teresa A. Zantua for a misunderstanding (See Fact No. 26 Page 24) said to the Plaintiff "Mexican stupid"; "you are not in your country"; "I do not care about you Mexicans";"You are in America and here it is a bad word."; "The other nannies too try to use words that we Americans do not use here" once more the Plaintiff was discriminated.. All this was recorded in the cameras of the house and was reported to Kevin Knipfing see Exhibit 24 Page 115.

16) October 02, 2018: Teresa A. Zantua calls and insults Plaintiff again for her race, for not understanding her, and that's why Plaintiff's presence frustrates her when the Plaintiff received conflicting instructions from Teresa A. Zantua and Stephanieanna James- Knipfing.
Stephanieanna James- Knipfing always encouraging this discrimination she also harasses the Plaintiff in front of the other workers, for this reason the Plaintiff reacted again of this victimization wrote a text message to Stephanieanna James- Knipfing.

### III.   Statement of Claim - *Attachment II continuation*

17) October 05, 2018: Teresa A. Zantua via text message admits to the Plaintiff she always calls her "Stupid Mexican or Paraguayan."

18) October 6, 2018: 2pm Teresa A. Zantua instructs children to forbid Plaintiff to speak Spanish. As evidence there is a recording.

19) October 23, 2018: Teresa A. Zantua, for the last time was present in the physical assault always encouraging others against the Plaintiff for being 'Mexican'. As evidence is the recording that belongs to the Plaintiff and in the cameras of the house that was reported to Stephanieanna James-Knipfing and Kevin Knipfing so they can check the fact. This evidence was also presented at the Work Compensation Hearing on March 19, 2020.

20) October 31, 2018: Stephanieanna James-Knipfing again discriminates against the Plaintiff with an order and restriction that only applies to her, never before had she applied these demands to anyone else at work until she was prohibited from that day forward from texting her co-workers which is part of her job. When the Plaintiff questioning these instructions was punish and degraded by Stephanieanna James-Knipfing withdrew access to money for expenses that Ms. Orrego use to receive from Teresa A. Zantua. The employer also ordered the Plaintiff's supervisor to modify the working hours. Anyone else received this treatment at work, only the Plaintiff.

Stephanieanna James-Knipfing ordered to Teresa A. Zantua to Fulfilling her role as Supervisor, texted to the Plaintiff the new schedule for the following day, the initial working conditions changed abruptly and without notice to benefit to another co-worker giving this person more hours. With this new schedule they excluded to Ms. Orrego from the All Saints Parade schedule for the following day. All the employees there invited to participate except Ms. Orrego. The plaintiff holds all the text messages.

21) November 02, 2018: After the Plaintiff placed her complaints via email at 2:30 pm Stephanieanna James-Knipfing in retaliation sent a series of text messages and emails continuing the Intentional Infliction of Emotional Distress attacking the Plaintiff and sabotaging her work or career with unfair treatment, unjustified negative evaluations, humiliating and degrading her, using insensitive terms, continuing with discrimination and harassment. Stephanieanna James-Knipfing requested the Plaintiff via email the medical certificate of Ms. Orrego's reported injuries at her

### III.    Statement of Claim - *Attachment II continuation*

workplace. This evidence will be presented at the WCB Hearing on October 28, 2020 as evidence of PERJURY Under Section 210 of the New York Penal Code perpetrated by Steve Savitsky, Teresa A. Zantua and Skylar Testa to the detriment of Justice. See Exhibit 1 Page 45; Exhibit 26 Page 128;  Exhibit 28 Page 133; Exhibit 29 Page 134; Exhibit 30 Page 136 ; Exhibit 32 Page 139.

22) November 06, 2018: Kevin Knipfing suspended her from going to work until an investigation was completed, but Ms. Orrego was the only employee suspended even though other co-workers were involved in the complaint of Discrimination and Abuse.

Kevin Knipfing and Skylar Testa (House Manager)  mocked the  Plaintiff for being Hispanic, on this date they gave the Plaintiff a SEVEN-Page NDA (see Exhibit 14 Page 89), but initially, Skylar Testa gave the Plaintiff only TWO-Page NDA( the front page and the signature page see Exhibit 12 Page 85; Exhibit 13 Page 87). Kevin Knipfing promised to call her to see the results of the investigation, but he never did. The Plaintiff holds the recording with all the details of this conversation. Intimidation, deception and fraud.

23) November 24, 2018: Stephanieanna James-Knipfing via text message sent to the Plaintiff called her "SLANDER" even though the plaintiff presented all the evidence supporting her complaint. The employers continued their harassment and discrimination.See Exhibit 31 Page 138.

24) November 27, 2018: Steve Savitsky actively participated in retaliation against Ms. Orrego producing a termination letter containing false allegations. The letter was issued by the Old Westbury Company LLC with address: 2049 Century Park East, Suite 1400, Los Angeles, CA 90067 (See Exhibit 3 Page 48) but The Plaintiff received her payroll checks from Kevin and Stephanieanna Knipfing, with address: 2049 Century Park East, Suite 1400, Los Angeles, CA 90067 (See Exhibit 15 Page 97). The discrepancy is to intentionally evade responsibility by the employers from the Plaintiff's complaints of discrimination, physical assault and other abuses. See *Forgery Crime N.Y. Penal Law §170.00; 170.05; New York Labor Law §195(6).*

Kevin Knipfing from New York gave the order to Steve Savitsky, his business manager in California,  to manufacture the Termination Letter dated November 27, 2018 (See Exhibit 3 Page 48) under the name of the unknown Entity Westbury LLC, company not registered in New York State or California. Steve Savitsky signed the letter as "Business Manager, Old Westbury LLC" Steve Savitsky never in the past had contacted or knew of the Plaintiff.

### III.   Statement of Claim - *Attachment II continuation*

The termination Letter was Illegal because it came from an unknown entity who was not the plaintiff's employer. The allegations for the termination were false with the intent to intimidate and force the plaintiff to abandon her place of employment. See *Forgery Crime N.Y.Penal Law §170.00; 170.05; New York Labor Law §195(6).*

Kevin Knipfing, Stephanieanna James-Knipfing and Steve Savitsky discriminated and retaliated against the Plaintiff by immediately canceling her medical plan, denying the Plaintiff work compensation benefits and COBRA benefits while unemployed. A Brazilian co-worker Cristina Coimbra received the health benefits were denied to the Plaintiff. As evidence the Plaintiff holds text messages the dates of the injuries as well as recording see Exhibit 23 Page 114.

25) November 29, 2018: The Health Insurance confirmed that employers did not submit the application for COBRA so the Plaintiff can't be covered by insurance and be able to treat her injuries.

26) December 18, 2018: Kevin Knipfing and Stephanieanna James- Knipfing refused to provide references so the plaintiff could get another job ruining her opportunities and affecting her reputation. The Plaintiff has record.

27) March 02, 2019: After filing the charges with the EEOC, the plaintiff received a Group Text Message from father Chabel which startled the plaintiff. The message was addressed to the employer reporting that all the staff were at the house.

28) November 5, 2019: Kevin Knipfing and Stephanieanna James-Knipfing discriminated and retaliated against the Plaintiff by denying her claim filed with the Work Compensation Board (WCB) even though according to the NOTICE OF DECISION, Judge Barry Greenberg, Case No. Case #G258 4330 states: "I find prima facie medical evidence for the neck back right wrist both knees and major depressive disorder". The Plaintiff has the medical records and forms signed by six (6) doctors from different specialties. See Exhibit 9 Page 79,

29) March 19, 2020: Steve Savitsky committed PERJURY Under Section 210 of the New York Penal Code, when he testified in the Work Compensation Case Hearing and stated under oath that The Plaintiff did not suffer any injuries on the job. On November 2, 2018 the Plaintiff emailed and texted Stephanieanna James-Knipfing and Skylar Testa a request for a sick day, November 5,

**III.    Statement of Claim - _Attachment II continuation_**

2018, for X rays attaching to this note a letter of Complaint and Medical Certificate on the plaintiff' injuries and other complaints. See Exhibit 1 Page 45; Exhibit 2 Page 47; Exhibit 26 Page 128; Exhibit 28 Page 133; Exhibit 29 Page 134.

There are also text messages from Rebeca Uzcategui and Cristina Coimbra, the Plaintiff's co-workers, who confirm they were aware the Plaintiff called out sick on November 5, 2018 because Stephanieanna James-Knipfing informed them. The Plaintiff holds the recording the last physical assault, copy of mails, text messages and medical records. See Exhibit 30 Page 136; Exhibit 32 Page 139.

Also, in the WCB's hearing on this date, Mr. Savitsky who lives in California, misstated that he saw the Plaintiff once but could not set a date. The Plaintiff and Mr. Savitsky never met.

30) June 23, 2020: Teresa A. Zantua committed PERJURY Under Section 210 of the New York Penal Code, when she testified in the Work Compensation Case Hearing under oath that she was not the Plaintiff's Supervisor and she never gave her orders (The plaintiff has a recording). The Plaintiff's evidence shows text messages from Teresa A. Zantua giving her orders, requesting information, setting-up work schedules and activities, updating work schedules, etc. This evidence was also submitted to the Judge of the Work Compensation Case for the next Hearing on October 28, 2020.

Teresa A. Zantua misstated under oath that the Plaintiff did not suffer any injuries on the job or that the Plaintiff informed her about her injuries. There is a recording held by the Plaintiff verifying that Teresa A. Zantua was present in the last physical assault when the Plaintiff asked her for pain killers to relieve her from her physical discomfort and pain. See Exhibit 26 Page 128; Exhibit 28 Page 133; Exhibit 29 Page 134; Exhibit 30 Page 136; Exhibit 32 Page 139.

Date of signing: August 17, 2020 .

Signature of Plaintiff _____

Printed Name of Plaintiff    Lidia M. Orrego

**E.     The facts of my case are as follows.** *Attachment III*

1) January 31, 2018 Lidia M. Orrego, "The Plaintiff", began working for Kevin Knipfing a/k/a Kevin James) and Stephanieanna James-Knipfing a/k/a Steffiana de la Cruz (collectively "The Employer") (See Exhibit 13 Page 87) as a nanny and after assisting the housekeeper in or around this date, a position that the Plaintiff held until her termination on November 27, 2018. During that time, Teresa A. Zantua, Stephanieanna Knipfing's sister, was The Plaintiff's supervisor and the two worked closely together. The Plaintiff was one of approximately six employees who worked within the Knipfings's home. Immediately prior to her hire, "The Employer" gave Ms. Orrego an employment agreement an English version despite the fact that Spanish is her primary language, which contained the last two pages of a non- disclosure agreement (NDA) that she signed. The Plaintiff received from her employer a SEVEN-Page version of the NDA after submitting her a copy of these documents complaint on her injuries and other matters on November 2, 2018. This NDA version is questionable.

2) February 15, 2018: Confirmed the hiring of the Plaintiff, after finishing the background check, The Plaintiff signed the documents for the Payroll Company OLD WESTBURY EDDIE LLC owner Kevin Knipfing a / k / a / Kevin James (See Exhibit 20 Page 102)legal entity under registration in New York State DOS ID #: 4761312 Initial DOS, Filing Date: MAY 20, 2015, County: NASSAU, Jurisdiction: NEW YORK which is the Plaintiff's Payroll Company. This Company appears as an employer in the following documents: W2 (See Exhibit 17 Page 99 with different address), Form 1095-B (See Exhibit 18 Page 100) and Unemployment Letter (See Exhibit 19 Page 101).

All the other documents such as the TWO-Page NDA(See Exhibit 13 Page 87), Direct Deposit Checks(See Exhibit 15 Page 97), Notice of Decision WCB (Exhibit 9 Page 79) and Experian Bureau Credit Report (See Exhibit 16 Page 98) point to Kevin Knipfing a / k / a / Kevin James and Stephanieanna James-Knipfing a / k / a Steffiana de la Cruz as the Employers.

3) February 17, 2018: First videos and pictures taken at 6:56 by the Plaintiff in the girls' room, S.M.K. and S.J.K., where there are cameras installed (Exhibit 21 Page 104). All photos and videos were requested by the family for the "digital album'. The Plaintiff has plenty (600) of pictures and videos in her possession which were emailed and texted to the employers all the time in group messages with Kevin Knipfing, Stephanieanna James-Knipfing, Teresa A.Zantua and other employees but those images were never shared with third parties out of work.  No one in the house

**E.    The facts of my case are as follows.** *Attachment III continuation*

ever had restrictions on taking photos, even the Plaintiff's co-workers posted pictures taken within the home on their social media. The Plaintiff holds copies of these posts by her co-workers, something she never did. See Exhibit 22 Page 107.

4) April 04, 2018: In the appointment with the children's dentist, Teresa A. Zantua ordered to the Plaintiff to take photos and videos, to send them to the employers Kevin Knipfing and Stephanieanna James-Knipfing. The Plaintiff holds plenty of videos and pictures. See Exhibit 33 Page 143.

5) April 9, 2018: The Plaintiff began to write a Diary (on the recommendation of Teresa A. Zantua) for the harassment suffered by Rebecca Uzcategui, but then the Plaintiff decided registered all the dates, time detailing the events of discrimination and victimization that she suffered. As well as the other abuses taken place in the house. As of today, as a result of the medical treatment Ms. Orrego has been able to recollect additional facts on discrimination and physical abuse.

6) May 5, 2018: Teresa A. Zantua orders all the time to the Plaintiff not speak Spanish in front of the children and always complaining why the Plaintiff's employer hire nannies who only speak Spanish and asking why "The Mexicans" work for American families who speak only English and the Plaintiff shouldn't be working in the USA.

7) May 30, 2018: Teresa A. Zantua forced the Plaintiff to inform to Stephannieanna James - Knipfing about Janet Knipfing and Leslie Knipfing (mother and sister of Kevin Knipfing's both are disable) were drinking wine on the last visit because Ms. Orrego saw this and by surprise Stephannieanna James - Knipfing asked her if it was true. Teresa A. Zantua told the Plaintiff, to make her feel guilty, that Kevin Knipfing and Stephanieanna James - Knipfing decided to suspend children's visits to grandmother's house, also forced Janet Knipfing and Leslie Knipfing to attend Alcoholics Anonymous meetings blaming to Ms. Orrego's report. The Plaintiff was shocked for this information and felted awfully bad because Janet Knipfing and Leslie Knipfing were socially sharing with friends, as well her employer, Stephanieanna James - Knipfing usually drank beer at breakfast with the Priests. Teresa A. Zantua and Stephanieanna James - Knipfing blamed Ms. Orrego for the punishment they imposed on Janet Knipfing and Leslie Knipfing. Evidence diary.

8) June 02, 2018: When the Plaintiff and her 5 year old daughter met Teresa A. Zantua for a

**E.  The facts of my case are as follows.** *Attachment III continuation*

playdate with the children, Teresa A. Zantua told the Plaintiff's daughter that she should not allow "her mommy to speak in Spanish only in English because she is not Mexican" in front of all the kids and Plaintiff's husband. My daughter still doesn't speak Spanish outside of the house because she doesn't want other people thinks she is Mexican. The Plaintiff have pictures as evidence.

9) June 3, 2018: First medical consultation to treat back and neck pain. The Doctor gave the Plaintiff the referral for Physical Therapy. From April-May 2018 Ms. Orrego was prescribed pain killers. The Plaintiff does't have any medical history of any pre-existing disease according to the file of the United States Citizenship and Immigration Services (USCIS) and medical records.

10) June 4, 2018: The Plaintiff sought Medical Help because she started developing symptoms of stress throughout resulting from an environment of discrimination and abuse that were affecting aspects of her life, emotional and physical health. Evidence The Plaintiff's medical records.

11) June 16, 2018: In the Carwash, Teresa A. Zantua, ordered the Plaintiff to pay the "Mexicans" who had serviced her vehicle because the "Mexicans" were disgusting to her. She did not want to have any contact with them. The Plaintiff holds pictures and diary entry.

On Chris Weidman's son's birthday, a family friend, Teresa A. Zantua ordered me to take pictures and videos of the children in presence of his wife Marivi Weidman with whom we already shared other activities. This time, K.V.K. (7 y/o) in the car stepped on the Plaintiff's right hand several times and stood on it injuring her wrist. Teresa A. Zantua justified these assaults when the Plaintiff complained of pain: "You Mexicans eat a lot of corn that's why your bones are useless, that's why Stephanieanna James-Knipfing does not allow buying food based in corn". The Plaintiff has pictures and videos. See Exhibit 33 Page 144.

12) June 20, 2018: Text message from Cristina Coimbra - housekeeper, the Plaintiff's co-worker, advising that she took time off because she went to the doctor for her back pain and she had half her body paralyzed because of physical exhaustion and abuse at work. Because of this Ms. Orrego always agreed to help her until two more people were to be hired because it was impossible to do everything alone sometimes 7 days, no days off. Also, from the month of March Ms. Orrego was ordered to work with the Chef Gerardo Guarino carrying items that were heavy in weight. Cristina Coimbra could not take care of cleaning the kitchen and the large and heavy saucepans. The Plaintiff worked most of the time without taking a break. Exhibit 23 Page 114.

**E.** **The facts of my case are as follows.** *Attachment III continuation*

13) August 10, 2018: The Plaintiff went to help for a Concert, when greeting Stephanieanna James-Knipfing she was ignored. The event coordinator arrived and Stephanieanna James- Knipfing introduced all the Plaintiff's co-workers except for her. She kept ignoring her as if the Plaintiff wasn't there, always treating her differently from her co-workers. Evidence diary entry.

14) August 15, 2018 4:17 pm: Stephanieanna James-Knipfing sent a verbal message through Rebeca Uzcategui a/k/a Rebeca Lugo, the other nanny, seriously accusing the plaintiff of something the Plaintiff never did. Ms. Orrego, incredibly surprised, told Rebeca Uzcategui that this was inaccurate and why Stephanieanna James-Knipfing does not tell her directly, as she does with other people in the house. The Plaintiff was very mortified by this situation. Evidence recording of this conversation.

At 9 pm The Plaintiff was offered the permanent position of Housekeeper through Skylar Testa – House Manager who told her that it was because of her excellent work. When the Plaintiff told him that She was not interested she received a threat if she refused the position. Faced with this threat and pressure the Plaintiff felt at that moment she replied she would think about it because she had been hired for the Nanny position and now Stephanieanna James-Knipfing was demoting her because she was Hispanic and Ms. Orrego had already reported on several occasions of the discriminatory treatment and abuse received from her supervisor Teresa A. Zantua.

15) August 18, 2018 8:00 pm: The Plaintiff finished her shift, she went to look for Stephanieanna James- Knipfing to clarify about her verbal message received through Rebeca Uzcategui of August 15, 2018. Stephanieanna James- Knipfing was upset and in a bad manner asked her to leave. The Plaintiff was standing at the door of her bedroom. Everyone else walked in and out of her bedroom all the time as many times they felt like.

A few minutes later Teresa A. Zantua wrote the Plaintiff a text message saying that it was not the right time to speak to our employer. At 8:23 pm Stephanieanna James-Knipfing text to the Plaintiff asking her if everything was fine and the Plaintiff just to prevent, from Stephanieanna James-Knipfing getting angry against her just did replied everything was fine. Stephanieanna James-Knipfing replied her bedroom was "too private a space", indicating that she disliked the Plaintiff crossed that limit, when She never did, even all the Plaintiff's co-workers and Priests going through the door into her bedroom with just knocking and sometimes saw others go to her bedroom without

**E.    The facts of my case are as follows.** *Attachment III continuation*

even knocking and listened to Stephanieanna James-Knipfing talking with all of them in a pleasant way and for a long time, no one else was told about the " Private Space" but just to the her. Teresa A. Zantua, heard what happened telling the Plaintiff that Stephanieanna James-Knipfing was who encouraged the co-workers to harass the Plaintiff. Evidence text messages.

16) August 19, 2018 6:49 pm : Sunday afternoon the Plaintiff's day off, she was with her family when Teresa A. Zantua text her about some boxes, referring to the housekeeping job that The Plaintiff was temporarily  helping and she replied they are in the closet, then the supervisor asked about "breathing things" Ms. Orrego was confused. On that call the employer yelled at Ms. Orrego who replied, "what breathing things You are talking about?" Teresa A. Zantua said to the Plaintiff: "I don't understand you" ; " I feel frustrated because I can't understand you", the Plaintiff, desperate, tried to make Teresa A. Zantua understand that only She placed some bags in the closet, Ms. Zantua replied: "Steff saw that and does not like that you keep things there", so the Plaintiff understood *it was not those boxes they were looking for, without success*, Teresa A. Zantua suddenly hung up on her.

A few minutes later, Ms. Orrego text to Teresa A. Zantua apologizing and explaining to her how nervous she was about the distressing call, not being able to think clearly and to be able to answer her question. In those calls Teresa A. Zantua insulted and started again saying why they hired people who do not speak English and continued to insult her for being Hispanic calling her multiple times that day.

17) August 20, 2018 5:38 am: The Plaintiff's day off: Teresa A. Zantua texted to the Plaintiff, again, she was angry and upset because nobody could find "the black boxes". Stephanieanna James- Knipfing sent a Group text message to embarrass and victimize the Plaintiff by writing: there is a "Ghost" in the house. They knew that Ms. Orrego had kept the "black boxes" that day because Rebeca Uzcategui informed them, the Plaintiff had the boxes on Saturday when she covered Cristina Coimbra, the housekeeper. But Teresa A. Zantua described them like "breathing things" to the Plaintiff and those weren't the ones in the closet. The Plaintiff was confused about all this.

When Stephanieanna James- Knipfing finally sent a picture from the Amazon website of the black boxes, the Plaintiff replied in the text group saying that it was the place that she had communicated

**E.** **The facts of my case are as follows.** *Attachment III continuation*

to Teresa A. Zantua on Sunday, and Ms. Zantua replied, "Ouch calling my name out?!". After a few days, Teresa A. Zantua warned the Plaintiff this would be the last time that she exposed her name and that she was going to regret having done so because she makes her look bad in front our employers. Teresa A. Zantua threatened Ms. Orrego saying that something bad might happen to her and she would blame her brother's illness as an excuse because her brother Ryan is schizophrenic.

If any other worker made a mistake, Stephanieanna James- Knipfing and Teresa A. Zantua never sent these types of groups text messages to ridicule them. the Plaintiff was always a victim of this type of harassment. The Plaintiff holds text messages.

18) August 21, 2018: While the Plaintiff continued temporarily helping in the housekeeping and after the event with Stephanieanna James- Knipfing and Teresa A. Zantua about the boxes, the Plaintiff decided to reject the "housekeeper position" despite the threat of losing her job if she did not accept the demotion. The Plaintiff holds recording.

19) September 1, 2018: 6:44: The Plaintiff was speaking and singing in Spanish to the girl she was in charge of, Teresa A. Zantua who was in the next room started hitting the wall and texting the plaintiff the order "ONLY ENGLISH" mocking face emoticon, insulting the Plaintiff 'Retarded' for being Hispanic. The Plaintiff text message. See Exhibit 27 Page 130.

20) September 5, 2018: Stephanieanna James- Knipfing in order to impose a punishment and humiliate the Plaintiff in front all the Group blaming her about a mistake she didn't make. One day, someone cooked the rice very salty and she thought it was the Plaintiff. Stephanieanna James-Knipfing set aside in the refrigerator a container with the rice and a note that embarrassed the Plaintiff. She never did this type of action against any other worker. The Plaintiff holds pictures and evidence in diary entry.

21) September 6, 2018: The Plaintiff asked Tereza A. Zantua if she and one of the other Hispanic nannies, Rebeca Uzcategui, a Venezuelan national, had reconciled after an argument that had taken place earlier that day. Ms. Zantua responded that she would never apologize to "a Mexican." Evidence in diary entry.

**E.    The facts of my case are as follows. *Attachment III continuation***

22) September 8, 2018: Text messages were received after working hours from Teresa A. Zantua that harassed the Plaintiff. The messages made fun and humiliated her again about the Spanish language and sent her all kind of messages with those gestures or videos of You Tube teasing the Mexicans. The Plaintiff informed her, she was having dinner with her family and sent her a picture of her meal. Teresa A. Zantua did not miss the opportunity to make nasty comments even about what the plaintiff and her family were having for dinner. Evidence text messages.

23) September 11, 2018: Teresa A. Zantua reported to Cristina Coimbra, the housekeeper, another mistreatment of Rebeca Uzcategui against S.S.K. (3 y/o girl) because Ms Uzcategui had grabbed her arm tightly forcing her to go downstairs so S.S.K. wouldn't bother Stephanieanna James-Knipfing. The Plaintiff was also a witness.

24) September 12, 2018 6: 59 pm: Teresa A. Zantua text to the Plaintiff "Sky send me lol I talk like u" Since the Plaintiff did not understand that message, she asked her what it meant and Teresa A. Zantua told her that they always made fun of the Plaintiff with Skylar Testa, House Manager, because the Plaintiff's accent, also, she was always making fun of her with other people and the children imitating her with the stupid face in public places, insults calling her "stupid" and why She work for American family if she doesn't speak English etc, ending with stupid Mexican, also said Paraguay making fun the way and her accent when she pronounce Paraguay.

Teresa A. Zantua was always sending to the Plaintiff faces in many texts' messages meaning She is stupid or when The plaintiff said something to her, she will put that face repeating what the Plaintiff said with her nephew, K.V.K. (7 y/o child). Ms. Orrego knew that, Skylar Testa, House manager, participated in racial jokes about her. See Exhibit 27 Page 130.

25) September 15, 2018 2:18 pm: Teresa A. Zantua complains about why her sister hires people who speak Spanish because this is America and the family can't be a normal family as usually claim, she started making racial comments. Evidence in diary entry.

26) September 20, 2018: When the Plaintiff was playing with S.S.K. referring to Zantua as "grande," which is Spanish for "big person." Zantua was enraged and told the Knipfings' children that "Ms. Orrego is a stupid Mexican." The Plaintiff was referring to Zantua's height. Zantua believed that she was referring to her weight. Teresa A. Zantua then began to scream at Ms. Orrego, stating "I don't care about you stupid Mexicans. You are not in your country, you are in America

**E.** **The facts of my case are as follows.** *Attachment III continuation*

And here that is a bad word." Ms. Orrego attempted to apologize despite the racist outburst from Teresa A. Zantua, but she refused to listen. Further, Ms. Zantua would routinely harass Ms. Orrego by text message with photos and emoticons of bloated, dumbfounded faces to liken her to those images. In the course of the 'Investigation", the Plaintiff reported the day and time that it happened so that they can verify the film from the security cameras. Evidence cameras and diary entry.

27) September 29, 2018: At the door of the NYC Children's Museum, the Plaintiff was with S.S.K., waiting for Teresa A. Zantua who was with the other children in the theater and was to go find the Plaintiff and the baby girl. S.S.K. wanted to go to the bathroom and eat something, so the Plaintiff went to a store one block away and texted her Supervisor that they were in the Store.

A few minutes later Teresa A. Zantua saw the Plaintiff was not at the museum's door. Ms. Zantua called her and was furious asking where the Plaintiff was. Ms. Orrego told her she was on her way out. Teresa A. Zantua told her she had to drive around the block again cursing the Plaintiff because of her race and not paying attention to her orders and as always with all nasty racial comments. Evidence in diary entry.

28) October 02, 2018: Teresa A. Zantua called and insulted the Plaintiff again for her race, for not understanding her, and that's why the Plaintiff's presence frustrates her. Most times this was the result when the Plaintiff received conflicting instructions from Teresa A. Zantua and Stephanieanna James- Knipfing.

Later, Stephanieanna James- Knipfing knew of this event from Ms Zantua and started blaming her and making malicious remarks with her co-workers in Plaintiff's absence. When the plaintiff knew this comment thought her co-worker, immediately, she texted the employer for clarification explaining the reason why Ms. Zantua was upset that morning regarding conflicting instructions received by Ms. Orrego. The Plaintiff holds text message as evidence.

Stephanieanna James- Knipfing always encouraged this discrimination she also harassed the Plaintiff in front of her co-workers.

29) October 4, 2018: Since the discrimination and abuse from Teresa A. Zantua was being unbearable, the Plaintiff considered talking with Rebeca Uzcategui, the other Hispanic nanny, because she all along was trying to meet with the Plaintiff to discuss all the discrimination and

**E.** **The facts of my case are as follows.** *Attachment III continuation*

abuse that was taking place inside the Knipfing's house and solved the problems. Rebeca Uzcategui sent to the Plaintiff a voice message saying: *"Ms. Lidia I want you to know that you are a person with a beautiful heart that nothing that woman says has to hurt you, because she is "Nobody" as my own boss told me, please be patient."*

*"Do not let anything touch you because everything she says is to make you feel bad, she is mentally ill and this has to stop, because it cannot be that she keeps being like that, I will not say anything, do not worry, we have to talk to her, we two, if you want, I do what you want, I want you to be quiet and take care of S.S.K., please."*

*"My boss is taking S.S.K. to school, it seemed so weird that you did not take her with TAZ (Teresa A. Zantua), what happened? But OK, Ms. Li, do not feel bad, understand that she's crazy but we cannot let her treat US like that."* The Plaintiff holds voice message as evidence and sent it to Kevin Knipfing via email as Report 5 dated November 16, 2018 for the employer "Investigation". See Exhibit 24 Page 120.

30) October 05, 2018: Teresa A. Zantua texted to the Plaintiff at 6:55 am asking if she replied to a Group text message. Ms. Orrego explained maybe it happened by mistake that an icon was sent from her phone. Teresa A. Zantua admited calling Ms. Orrego as "Stupid Mexican" or "Paraguayan Stupid" making mention of the Plaintiff's Guarani Race because the Plaintiff was constantly a victim of racist comments and jokes about his race or the Mexicans. The Plaintiff holds text message. See Exhibit 27 Page 130.

31) October 6, 2018 2pm: Teresa A. Zantua instructs the children to forbid the Plaintiff to speak in "Spanish" during a trip to pick apples at HARBES ORCHARD Family Farm. Ms. Orrego asked K.V.K. (7 y/o) why He tells the Plaintiff she shouldn't speak Spanish, the boy gets nervous about it and called Teresa A. Zantua, because she always threatens them that they shouldn't say her name when she says all those discriminatory comments. The threat is the recurring weapon used by Teresa A. Zantua against the children and Ms. Orrego. The Plaintiff holds the recording.

Also, Teresa A. Zantua attacked S.S.K. (3 y/o) because she cried for one of the Hispanic nannies with the comment "I am not your family anymore, your family are those Mexicans, your family is Mexican" with this comment, Teresa A. Zantua got the girl to reject us, S.S.K. panicked and

**E.**    **The facts of my case are as follows.** *Attachment III continuation*

apologized to her aunt for being so attached to her Hispanic nannies. Teresa A. Zantua even trained S.S.K. to tell her Hispanic nannies that she was "big girl" already and didn't need nannies any more.

32) October 08, 2018: Rebeca Uzcategui told the Plaintiff (several occasions) that Stephanieanna James-Knipfing gave sleeping pills to S.S.K. (3 y/o). Ms. Uzcategui informed the reason was Stephanieanna James- Knipfing did not want to take care of the baby girl, so the Plaintiff took Sistien Knipfing every night upstairs to leave her in the bedroom in front the cameras always checked the girl's breathing and temperature in her shift for fear that S.S.K. feel sick because of the pills. There is recording at the home sent to Kevin Knipfing via email as Report 7 dated November 16, 2018 for the "Investigation". See Exhibit 24 Page 126.

Rebeca Uzcategui told the Plaintiff: "We needed protecting S.S.K. from the abuse and mistreatment of Teresa A. Zantua", because the "S.S.K.'s Teachers" told to Ms. Uzcategui that the Baby Girl feels protected by her and the Plaintiff. According with this recording, Rebeca Uzcategui reported to the Plaintiff she was informing to third parties about what was happening in the Knipfing Family and to the Teachers who could not believe what we went through with Teresa A. Zantua. This recording was also emailed to Kevin Knipfing for "Investigation" on November 16, 2018. The Plaintiff holds the recordings that were sent to Kevin Knipfing via email as Report 7 dated November 16, 2018 for the "Investigation". See Exhibit 24 Page 126.

33) October 12, 2018: October 12, 2018: Rebeca Uzcategui told the Plaintiff "we should meet on Sunday and talk about how we are going to act to solve the abuses of Teresa A. Zantua because this can no longer continue and we must protected S.S.K. because she is affected by everything Teresa A Zantua does and insists that S.S.K. changed in a week due to abuses." Rebeca Uzcategui was crying very affected by the whole discrimination and abuse. The Plaintiff holds the recordings and those were sent to Kevin Knipfing via email as Report 7 dated November 16, 2018 for the "Investigation". See Exhibit 24 Page 126.

For the Plaintiff, everything was very confusing because Ms. Uzcategui also participated in S.S.K.'s abuse giving her candies all day, mistreating S.S.K. because she didn't obey her, or fighting and threatening Teresa A. Zantua creating chaos in front of the children.

**E.**    **The facts of my case are as follows.** *Attachment III continuation*

34) October 13, 2018:  S.S.K., 3 years old baby girl, all day long did not want to be alone with Teresa A. Zantua. The Girl hugged Plaintiff all the time and even waited for her at the bathroom door because she did not want to be alone with Teresa A. Zantua, S.S.K. was panicked all day.

S.S.K.'s behavior and what Rebeca Uzcategui told her on October 8, 2018  and October 12, 2018 as she was doing months earlier made the Plaintiff worry more and saw that she needed to protect S.S.K. of the abuses of Teresa A. Zantua and because everything was getting worse, the Plaintiff realized had two big problems, she didn't know how to handle: discrimination/physical abuse against the Plaintiff and abuse against the children. When Rebeca Uzcategui and Teresa A. Zantua argued, yelled, accused, and threatened at each other that there were videos or recordings about all the abuse with the intention of showing who had more power and control. The evidence is the entry in The Plaintiff's diary.

Every time the Plaintiff reported this behavior to Skylar Testa (House-Manager), He did nothing to protect the children, even told The Plaintiff that all was "normal" and all problems with the former nannies were the fault of Teresa A. Zantua because "she is Crazy".

35) October 14, 2018: Meeting between Rebeca Uzcategui and The Plaintiff at the Old Westbury Diner to discuss the discrimination and abuse they were facing from Teresa A. Zantua that was knowledge and allowed by Stephanieanna James- Knipfing.

The Plaintiff and Ms. Uzcategui decided to tell the Knipfing's again about the direct discrimination, harassment, hostile work environment and abuse from Teresa A. Zantua was being carried out in front of their children. In this conversation Rebeca Uzcategui reveals were other victims and complaints before against the discriminatory and violent conduct of Teresa A. Zantua. Also, Ms. Uzcategui revealed to the Plaintiff one of the victims had requested a restraining order against Teresa A. Zantua and that all of this was knowledge by the Director of the School where Ms. Uzcategui worked.

Ms. Uzcategui stated that she possessed the list, names and phone numbers of those victims and if something serious happens she will sue Kevin Knipfing and Sthephanieanna James- Knipfing, but wiht the Group because Ms. Uzcategui can't sue them alone.

**E.** **The facts of my case are as follows.** *Attachment III continuation*

Rebeca Uzcategui declared that Shannon Sha, the teacher, reports to her of all the abuses of Teresa A. Zantua to S.J.K. (11 y/o) and S.M.K. (13 y/o) and her mother Sthephanieanna James - Knipfing doesn't defend them or intervene in these abuses, so she will not waste her time talking to her about our complaint, saying that she must will to talk with both employers. Also, Ms. Uzcategui keeps notes and events (Dairy).

Ms. Uzcategui declared that our employers can NOT do anything against her because she has all the evidence to prove her case against Teresa A. Zantua. In addition, she also declared that both, Ms Uzcategui and Teresa A. Zantua, threaten each other to see who has more evidence. Everyone inside the Knipfing's house collects evidence such as notes, videos, pictures, etc. according to Rebeca Uzcategui's statements. Ms. Uzcategui insists to the Plaintiff that they must protect the girl S.S.K. against Teresa A. Zantua's abuses.

Rebeca Uzcategui states that she met with former "Nanny Gabi", from Guatemala who gave her information on the discrimination and the mistreatment when she worked for the Knipfing's Family in Florida, for years and Stephanieanna James- Knipfing ignored her complaints and Gabi couldn't claim anything because she was illegal. Rebeca Uzcategui clarified that they (Ms. Uzcategui and Ms. Orrego) was a different case because they both "Legally". The Plaintiff also was previously ignored by Stephanieanna James- Knipfing when she commented on Teresa A. Zantua's racism.

Rebeca Uzcategui also revealed Stephanieanna James- Knipfing also sometimes mistreating her and she was covering the abuse of Teresa A. Zantua. Ms. Uzcategui confirmed to the Plaintiff, she would write the complaint to give to Kevin Knipfing and they we must support each other so that all this situation can be solved.

The conversation was recorded in a public place, established by Rebecca Uzcategui via text message, being present a third part that also participates in the conversation. The meeting was recorded with Ms. Uzcategui consent. The Plaintiff holds voice message, text messages, recording, and witness. The Plaintiff holds the recordings and sent to Kevin Knipfing via email as Report 1 dated November 08, 2018 for the "Investigation". See Exhibit 24 Page 115.

36) October 16, 2018: The Plaintiff report to Skylar Testa (House Manager) about everything that

**E.    The facts of my case are as follows.** *Attachment III continuation*

happened with S.S.K. that day and her erratic behavior with panic attacks and crying because Mr.Testa knew about excess candies since the first report in April 2018. He told Ms. Orrego that S.S.K. was addicted to sweets and they can do nothing because Stephanieanna James- Knipfing knew what Rebeca Uzcategui was doing to control the girl and she doesn't care. The Plaintiff holds the recording.

The Plaintiff was given the order from Stephanieanna James- Knipfing in her first day the candies are not allowed in the house, but Teresa A. Zantua ordered Ms. Orrego to give sweets to S.S.K. to control her because nobody cares if affects her health condition as Rebeca Uzcategui does it. For this reason, the Plaintiff fought against this situation and discarded all the candies or unhealthy snacks and the Plaintiff giving them to Teresa A. Zantua in bags. The Plaintiff holds pictures and evidence in diary entry.

37) October 19, 2018: The Plaintiff, Teresa A. Zantua and the children went to E's house, S.M.K. and S.J.K.'s theater lessons classmate. E's mother is fluent in Spanish and spoke to the Plaintiff in Spanish, which bothered Teresa A. Zantua who made gestures to the Plaintiff not to talk to her in Spanish, always saying (stupid) without E's mother noticing. Teresa A. Zantua ordered the Plaintiff to take photos of S.S.K. with E's pet. That day Teresa A. Zantua was drinking wine with E's mother and the Plaintiff started to worry because Ms. Zantua had to drive home. At night Ms. Zantua was drunk and started a message group with E's mother. The Plaintiff holds pictures, text messages and dairy entry.

38) October 22, 2018: Rebeca Uzcategui insists on protecting S.S.K. from Teresa A. Zantua, who is mentally ill. The Plaintiff holds the recordings and sent to Kevin Knipfing via email as Report 7 dated November 16, 2018 for the "Investigation". See Exhibit 24 Page 126.

39) October 23, 2018: The Plaintiff's last physical assault in the kitchen of the Knipfing's house where there are cameras and in the presence of Teresa A. Zantua. The Plaintiff had asked to Teresa A. Zantua for pain killers because she had back pain. The Plaintiff holds the recording and this evidence was also presented at the Work Compensation Board (WCB) Hearing.

The Plaintiff was the victim of several physical assaults (kick or punch her back, hand, neck, shoulders) by Kevin Knipfing's son (K.V.K. 7 y/o) in the car under Teresa A. Zantua's supervision because the kid practice wrestling and he was hitting Ms. Orrego with the consent of Teresa A.

**E.** **The facts of my case are as follows.** *Attachment III continuation*

Zantua according to her hate speech against Mexicans because Ms. Zantua justified these assaults when the Plaintiff complained of pain that "You Mexicans eat a lot of corn that's why your bones are useless, that's why Stephanieanna James- Knipfing don't allow buy food based in corn".

Also, for months, Teresa A. Zantua ordered Plaintiff to spill oil on S.S.K.'s clothes so Rebeca Uzcategui can't take home. When Plaintiff refused to do that because was not correct act, Teresa A. Zantua reproached her "You Mexicans help each other." The Plaintiff holds text message were the clothes picture to be spilled with oil.

Last VIDEO Authorized by Kevin Knipfing for the family album, it was recorded in the classroom where there are cameras duration of 46 seconds, recorded at 6:12 pm. The Plaintiff also has names of witnesses and places that witnessed her being authorized to take photos or videos inside the Knipfing's house. Evidence videos, pictures and text messages. See Exhibit 21 Page 104; Exhibit 33 Page 142.

40) October 24, 2018: Conversation with Cristina Coimbra, the housekeeper, told the Plaintiff K.V.K. all morning was worried about the Plaintiff's condition after He hit her badly the day before and Teresa A. Zantua laughed out loud mocking about Ms. Orrego and Cristina Coimbra told Ms. Orrego shouldn't allow the boy to keep hitting her. That she also suffers from the back problem. This recording was also emailed to Kevin Knipfing for "Investigation" as Report 7 on November 16, 2018. See Exhibit 24 Page 126.

The Plaintiff complained of back pain with Teresa A. Zantua who reproached to the Plaintiff with nasty racial comments about the her bones and corn for being Mexican, as if she were guilty for having pain and not as a consequence the physical abuse like the knocks, carrying the girl all the time, etc.

41) October 30, 2018: At the time of the shift change, Stephanieanna James-Knipfing enters the kitchen and sees The Plaintiff having lunch, and visibly upset asks her what she was waiting or have nothing to do and ask her why she was sitting. She never treated or said thing like this to other workers when they are taking lunch or break, the Plaintiff was the object of these discriminatory treatments. Evidence in diary entry.

**E.** **The facts of my case are as follows.** *Attachment III continuation*

42) October 31, 2018: Stephanieanna James-Knipfing again discriminates against the Plaintiff with an order and restriction that only applies to her, never before had she applied these demands to anyone else at work until she was prohibited from that day forward from texting her co-workers which is part of her job. When the Plaintiff questioning these instructions, she was punished and degraded by Stephanieanna James-Knipfing withdrew access to money for expenses that Ms. Orrego use to receive from Teresa A. Zantua. The employer also ordered the Plaintiff's supervisor to modify the working hours. No anyone else received this treatment at work, only the Plaintiff.

Stephanieanna James-Knipfing ordered to Teresa A. Zantua to Fulfilling her role as Supervisor, texted to the Plaintiff the new schedule for the following day, the initial working conditions changed abruptly and without notice and to benefit Rebeca Uzcategui giving her more hours. With this new schedule they excluded to Ms. Orrego from the "All Saints Parade" schedule for the following day. All the employees there invited to participate except Ms. Orrego. The plaintiff holds all the *text messages and pictures.*

Conversation with Rebeca Uzcategui told the Plaintiff she had the complaint ready to give it to Kevin Knipfing about the discrimination and mistreated from Teresa A. Zantua. The recording emailed to Kevin Knipfing for "Investigation" as Report 7 on November 16, 2018. See Exhibit 24 Page 126.

43) November 01, 2018: The plaintiff received an email from Skylar Testa with TWO-Page NDA, he never explained the content to her before because it was in English and he didn't give her a copy on January 31, 2018 until this day. The plaintiff read the first page where there was no provision affecting her, and on the second page, there was only her signature and the information of Kevin Knipfing without his signature. See Exhibit 12 Page 85; Exhibit 13 Page 87.

The Plaintiff had attended by Dr. Moisey Delman because she had pain in her back and neck as a result of the work and the last physical assault, giving her an X-ray order to be able to start the treatment according to the results because He couldn't prescribe any medication without the results. This query was through the Employer's Health Insurance. The last physical assault is in the medical records by Dr. Moisey Delman. See Exhibit 28 Page 133.

44) November 02, 2018: The Plaintiff starts to get worse her emotional health without being able to handle the long-term stress, the chronic stress since February 2018 has increased the symptoms

**E.** **The facts of my case are as follows.** *Attachment III continuation*

affecting her physical health such as headaches, stomach pain, sleeping problems, illnesses and depression reason why Ms. Orrego decided to go to the Doctor again but this time Dr. Vladimir Morgosky attended her, who also asked for the X-ray results gave her medications in minimal dose for the pain because the Plaintiff had tachycardia according to the results of the electrocardiogram, also the Dr. Morgosky signed the Medical Certificate and wrote the injuries in the Medical Report.

The Plaintiff notified Stephanieanna James-Knipfing and Skylar Testa via text message that she would go to the doctor. Stephanieanna James-Knipfing replied asking if The Plaintiff was fine and could take the time she needed. Skylar Testa also replied to "notify to Steff". This evidence will be presented at the Work Compensation Hearing on October 28, 2020 as evidence of PERJURY perpetrated by Steve Savitsky, Teresa A. Zantua and Skylar Testa to the detriment of Justice ordered for Kevin Knipfing and Stephanieanna James- Knipfing. See Exhibit 28 Page 133; Exhibit 29 Page 134; Exhibit 32 Page 139.

At 2:37 pm – Ms. Rebeca Uzcategui called to Ms Orrego because S.S.K. knew she was sick, the girl wanted to greet her and know how Ms Orrego was. The Plaintiff holds Text Message and Call. See Exhibit 30 Page 136.

Cristina Coimbra also sent a texted to the Plaintiff offering her help because she was reported to be ill from the injuries via email and text message. See Exhibit 30 Page 137.

As Rebeca Uzcategui did not fulfill her promise to make the complaint together, the Plaintiff sent the Complaint via email to Stephanieanna James-Knipfing and Skylar Testa about all direct and indirect race discrimination, physical abuse/assault, verbal abuse, hostile work environment harassment She suffered in the presence of their children for being Hispanic. Also, other abuses and victims that occur in the workplace according to the conversation with Rebecca Uzcategui on October 14, 2018. See Exhibit 1 Page 45.

After the Plaintiff placed her complaints via email at 2:30 pm Stephanieanna James-Knipfing in Emotional Distress attacking the Plaintiff and sabotaging her work or career with unfair treatment, unjustified negative evaluations, humiliating and degrading her, using insensitive terms, continuing with discrimination and harassment. Stephanieanna James-Knipfing requested the Plaintiff via email the medical certificate of Ms. Orrego's reported injuries at her workplace. See Exhibit 26 Page 128; Exhibit 28 Page 133.

**E.    The facts of my case are as follows.** *Attachment III continuation*

Also, via text message demanded to the Plaintiff the date and time to be able to judge from camera footage where the last physical assault occurred in order to make the necessary reprimands as the Plaintiff offered in her Complaint and that she hoped that the Plaintiff is in good health. The Plaintiff never replied to any of the hostile messages because she was surprised and only limited to answering by email and sending the Medical Certificate. See Exhibit 26 Page 128; Exhibit 29 Page 134.

45) November 06, 2018 at 4pm: When the Plaintiff returned to work after finishing the sick days according to her medical certificate and X-rays done the day before, Kevin Knipfing was waiting with two witnesses Cristina Coimbra, the housekeeper, and Mike (Kevin Knipfing's friend).

Kevin Knipfing admits that he knew about all the problems between Teresa A. Zantua and Rebeca Uzcategui, because he had already witnessed fights between them and Rebeca Uzcategui said that she had already filed a complaint against Teresa A. Zantua. So Kevin Knipfing "thanked the Plaintiff for letting him know of all the problems" they had in the house and He was unaware that it involved the Plaintiff.

Also, Kevin Knipfing asked the Plaintiff several times: "what She wanted with the complaint?", every time Ms. Orrego answered she wanted to work in a safe place without discrimination and the children to be safe because they were in the middle of all the fights, abuses and the environment was not healthy for anyone.

Kevin Knipfing inform to Ms. Orrego that an investigation would be opened and according to the complaint the Plaintiff had evidence, so he needed she give him those evidence to do the Investigation. The Plaintiff offered Kevin Knipfing the statement of the witness to whom Rebeca Uzcategui shared all the information on October 14, 2018 about discrimination, abuse, complaints, restraining order against Teresa A. Zantua.

Also, Kevin Knipfing asked the Plaintiff what "can be the solution?", Ms. Orrego replied that he would decide about the solution when the Investigation finished. Later, Kevin Knipfing intimidate the Plaintiff saying "nobody should know anything about her complaint" obviously concerned that it would become public that his sister-in-law is a racist, also the indirect discrimination and abuse. Kevin Knipfing and Skylar Testa (House Manager) mocked the Plaintiff for being Hispanic, they giving her SEVEN- Page NDA (Exhibit 14 Page 89), but initially, Skylar Testa gave the Plaintiff

**E.    The facts of my case are as follows.** *Attachment III continuation*

only TWO-Page NDA via email on November 01, 2018( the front page and the signature page Exhibit 12 Page 85; Exhibit 13 Page 87). Kevin Knipfing promised to call her to see the results of the "Investigation" to decide who stays and who leaves. (but he never did).

Kevin Knipfing suspended her from going to work until an investigation was completed, but Ms. Orrego was the only employee suspended even though other co-workers were involved in the complaint of Discrimination and Abuse. The Plaintiff holds the recording with all the details of this conversation. Intimidation, deception and fraud.

46) November 08, 2018:  The Plaintiff sent via email to Kevin Knipfing all the evidence that supports her complaint Text Messages, Recordings with witnesses Report 1 and Report 2. See Exhibit 24 Page 115.

47) November 09, 2018: In good faith the Plaintiff reported via email to Kevin Knipfing and Skylar Testa more hours than she reported in the Timesheet and she will waited for their instructions to return the money that did not belong to her. The Plaintiff holds recording, email and timesheet were where it appears "sick days", this evidence will be presented also at the Work Compensation Hearing on October 28, 2020 as evidence of PERJURY to the detriment of Justice. See Exhibit 32 Page 139.

48) November 11, 2018: Skylar Testa, House Manager, by order of Kevin Knipfing, texted Ms. Orrego to meet with Investigators in a Starbucks Coffee location in Rego Park, New York, the next day and she was ordered to return to her home and wait for them to contact her to indicate how the process will continue. The Plaintiff holds the text message.

49) November 12, 2018:  The Plaintiff met with the investigators named Tefta and Irma. Ms. Orrego reported Rebeca Uzcategui had been asking her to meet for a while to discuss the problems they had with Teresa A. Zantua. The Investigators told the Plaintiff maybe Rebeca Uzcategui also recorded the meeting and only report what was convenient for Ms. Uzcategui.
The Plaintiff reported the Investigators that she did not want any problems or that Rebeca Uzcategui will include her in the lawsuit against their employers, Ms. Orrego only wanted everything to be solved in the best way as she indicated to her employer Kevin Knipfing.
When the Plaintiff met with the Investigators was not physically or emotionally well, especially

**E.** **The facts of my case are as follows.** *Attachment III continuation*

for the way she was treated by her employer Stephanieanna James-Knipfing, after receiving her complaint. The Plaintiff was very stunned and the Investigators asked if hurt her and Ms. Orrego answered "YES" because she only wanted well-being at work.

The Investigators telling the Plaintiff she was a good person and Ms Uzcategui was a bad person, and if Ms. Uzcategui call her, "Don't answer the call or the Plaintiff would have serious troubles" because Ms. Uzcategui was playing and manipulating everything against Ms. Orrego.

The Investigators asked the Plaintiff if she ever saw the Complaint that Rebeca Uzcategui wrote, her notes or videos. Ms. Orrego reported she never saw any of that evidence, but that Ms. Uzcategui told her about it all the time and threatens Teresa A. Zantua as in the recording on October 14, 2018.

The Plaintiff was also confused when The Investigators asked her if she would continue working with Rebeca Uzcategui when Kevin Knipfing told the Plaintiff that he would call her to find out who was stay or leave. Nothing made sense, but the Plaintiff hoped that with the evidence everything would become clear. The Plaintiff has a recording of this meeting.

Later, the Plaintiff thought the Investigators in deceptive way avoided talk about discrimination and abuse they focused more on the issues between her and Rebeca Uzcategui. Also, it was very strange that the Investigators had reached conclusions without seeing any evidence.

This was the only time the Plaintiff spoked with the Investigators, they never called her again to check all the documentation or the recordings or talked to the witness.

Kevin Knipfing and Stephanieanna James-Knipfing used private investigators to cover the complaint of discrimination and physical assault and others abuses in addition to intimidating the Plaintiff.

50) November 14, 2018: Messages from Skylar Testa requesting the Plaintiff's Diary. The Plaintiff holds text message.

51) November 15, 2018; November 16, 2018: The Plaintiff emailed to Kevin Knipfing, the evidence, Reports 3 to 7 with Pictures, Videos, Voice Messages, Diary with dates and times where

**E.** **The facts of my case are as follows.** *Attachment III continuation*

all acts of discrimination and abuses where they can be corroborated with the recordings of the cameras of the Knipfing's house to check the complaint and nothing was false. See Exhibit 24 Page 117 .

52)  November 24, 2018: When the investigation was still in progress, Stephanieanna James-Knipfing texted to the Plaintiff a picture (meme) with the following: "Inasmuch as you pray with all your soul for the one who has slandered you, so much will God reveal the truth to them who have believed the SLANDER". The plaintiff, very distressed without knowing what it was, only replied "Amen" after two days of receiving that text message. See Exhibit 31 Page 138.

53) November 26, 2018: The Plaintiff texted to Kevin Knipfing, noting that a person named Teague Ryan wants to access the document she sent him via email for the investigation and if she must authorize. Kevin Knipfing replies "Yes" and she authorizes access. Skylar Testa also replied to Ms. Orrego that Ryan Teague is one the investigator's team. The Plaintiff holds text messages.

Ms. Orrego thought that the investigation had not yet been completed because it was the first time that the investigators were opening the emails she sent to Kevin Knipfing.

54) November 27, 2018: The plaintiff received the Termination Letter and she realized that Stephanieanna James- Knipfing was calling Her "SLANDER" even though she presented all the evidence supporting her complaint. Intentional Infliction Emotional Distress by the Employer.

Kevin Knipfing from New York gave the order to Steve Savitsky, his business manager in California to manufacture the Termination Letter dated November 27, 2018 under the name of the unknown Entity Westbury LLC, company not registered in New York State or California. Steve Savitsky signed the letter as "Business Manager, Old Westbury LLC". Steve Savitsky never in the past had contacted or knew of the Plaintiff. (See Exhibit 3 Page 48).

Steve Savitsky actively participated in retaliation and discrimination against Ms. Orrego producing a termination letter containing false allegations. The letter was issued by the Old Westbury Company LLC with address: 2049 Century Park East, Suite 1400, Los Angeles, CA 90067 (See Exhibit 3 Page 48) but The Plaintiff received her payroll checks from Kevin and Stephanieanna Knipfing, with address: 2049 Century Park East, Suite 1400, Los Angeles, CA 90067 (See Exhibit

**E.** **The facts of my case are as follows.** *Attachment III continuation*

15 Page 97). The discrepancy is to intentionally evade responsibility by the employers from the Plaintiff's complaints of discrimination, physical assault and other abuses.

The Termination Letter states the following : "*Old Westbury LLC" is ending your employment effective immediately, this decision is based on several factors, including but not limited to* ", this is FALSE because The Plaintiff has never received all along time she worked for her employers any written warnings or performance reviews related to the content of the Termination Letter and the reviews that she received from Stephanieanna James- Knipfing via text messages from February 7, 2018 to November 1, 2018 describe the Plaintiff as "Fantastic" or "Hard Worker". The Plaintiff holds plenty messages. See Exhibit 25 Page 127.

The Termination Letter stated that the Plaintiff *1)"Breach YOUR NDA"*; but in the two documents TWO- Page NDA and SEVEN- Page NDA (questionable / fraudulent) the Company Old Westbury LLC (Entity Inexistent in NY) is not listed as Employer. See Exhibit 12 Page 85; Exhibit 13 Page 87; Exhibit 14 Page 89.

Continuing with the Termination Letter, the Plaintiff was being Terminate for *2) "Breach your NDA" "a- Recording a conversation with Rebeca Uzcategui in the presence of a member of the public* ", but the recording was intended to demonstrate the Plaintiff's complaint, was not shared with a third party or disclosed. The recording was submit to Kevin Knipfing for "Investigation" see Exhibit 24 Page 115.

Also, Rebeca Uzcategui disclosed information confidential about the Knipfing's Family in a public place and in the presence of a third party, but the "Breach her NDA" was not applied to her as they did to the Plaintiff because she threatened to sue Kevin Knipfing and Stephanieanna James- Knipfing and they keep or retain Rebeca Uzcategui, also Hispanic, only to cover their discrimination and abuses. The Plaintiff holds the recording dated on November 14, 2018.

The Plaintiff was terminated *2) "Breach your NDA" "b- Taking recordings and photographs of the Knifing's House '"* the pictures refers in the Termination Letter belong to the photographs of the candies sent to Kevin Knipfing by email dated November 15, 2018 that the Plaintiff collected since April 2018 that prove the abuse against the girl S.S.K. was affecting her health where Rebeca Uzcategui and Teresa A. Zantua blamed each other. See Exhibit 24 Page 118.

**E.**     **The facts of my case are as follows.** *Attachment III continuation*

The recordings was evidence about the Plaintiff 's Complaint was real, with the purpose of submitting to Kevin Knipfing these recordings were never disclosed to third parties. In addition, Rebeca Uzcategui also confirms that she also has recordings according to her statement dated October 14, 2018 emailed to Kevin Knipfing November 08, 2018. See Exhibit 24 Page 115.

The Plaintiff holds plenty (600) pictures and videos taken with the authorization of her former employers, as part of her job in the presence of her co-workers and other witnesses as well as several pages of text messages and emails (See Exhibit 21 Page 104; Exhibit 32 Page 139). The Plaintiff has texted and sent pictures and videos as their requests to her employers and supervisor since February 15, 2018. All other employees also take pictures inside the Knipfing's House and publish on social platforms until today and they were never fired according to "Breach Their NDA". The Plaintiff has all the evidence pictures, videos and text messages that supports this fact. (See Exhibit 24 Page 115).

Continuing with the Termination Letter, the Plaintiff was terminated by "*2- Your Statement that you were unwilling to continue working with Rebeca Uzcategui*" but according to the recording dated November 12, 2018 was the Investigators who expressed in a very bad way against Rebeca Uzcategui like was a "bad person" " a player" so how could they ask if the Plaintiff "would continue working with Ms. Uzcategui?" Also, Kevin Knipfing on the recording dated November 6, 2018 stated only one will stay at work. The Plaintiff holds the recording.

The Letter of Termination continued "Our conclusion that you made statements in your complaint that you know to be false" but according to all the evidence presented by the Plaintiff "Everything was TRUE".

Another point noted by the Termination Letter "*Your payment of wages through today's date (November 27, 2018) will be paid on the regular payroll date and offset by the nineteen (19) hours you reported were paid incorrectly*" indeed, on November 9, 2018 the Plaintiff reported in good faith to Kevin Knipfing and Skylar Testa , who paid her more hours than the Plaintiff submitted in her email and Timesheet dated November 5, 2018 to "cstan@savco.com" belonging to Charles Stanislaus who processing payments (Payroll Company) and the Plaintiff wanted return them the money but Kevin Knipfing or Skylar Testa never reply. The Plaintiff holds emails and timesheets

**E.    The facts of my case are as follows.** *Attachment III continuation*

The Plaintiff in late June 2020 was able to establish that this payment constituted "Severance Pay" and Ms. Orrego had been terminated even before submitting her evidence dated November 8, 2018 and interviewing investigators dated November 12, 2018. See Exhibit 32 Page 139.

The Termination Letter ends with *"You have Health insurance through United Healthcare and the termination of your health insurance is November 30, 2018, You are eligible for Cobra Continuation Coverage and you will be contacted by the carrier directly."* Kevin Knipfing, Stephanieanna James-Knipfing and Steve Savitsky discriminated and retaliated against the plaintiff by immediately canceling her medical plan, denying the plaintiff work compensation benefits and COBRA benefits while unemployed and the carrier never contacted to Plaintiff. A Brazilian (speaks Portuguese) co-worker Cristina Coimbra received the health benefits were denied to the Plaintiff to treat injuries she contracted on the job. As evidence the Plaintiff holds text messages the dates of the injuries as well as recording. See Exhibit 23 Page 114.

The termination Letter was Illegal because it came from an unknown entity who was not the Plaintiff's employer. The allegations for the termination were false with the intent to intimidate and force Ms. Orrego to abandon her place of employment.

Kevin Knipfing and Stephanieanna James- Knipfing never called the Plaintiff to discuss the outcome of the investigation as Kevin Knipfing had promised according to the recording on November 06, 2018, also never offer the Plaintiff a copy of the "Investigation Report".

55) November 29, 2018: Since the Carrier didn't contact with the Plaintiff, she called and The Health Insurance confirmed that employers didn't submit the application for COBRA so the Plaintiff can't be covered by insurance and be able to treat her injuries. The Plaintiff holds the letter and record.

56) December 18, 2018: Kevin Knipfing and Stephanieanna James- Knipfing refused to provide references so the plaintiff could get another job ruining her opportunities and affecting her reputation. The Plaintiff has record.

57) January 14, 2019: The Agency's Owner confirms to the Plaintiff in her office at 3:40 pm that Skylar Testa never answered the message. On that same date the Plaintiff's was applying a job in

**E.**    **The facts of my case are as follows.** *Attachment III continuation*

other Agency without Kevin Knipfing and Stephanieanna James- Knipfing's reference, the Plaintiff was unable to continue the selection process. This damaged the Plaintiff's reputation for looking for a better job and being able to get health insurance to treat her injuries. The Plaintiff has record .

58) March 02, 2019: After filing the charges with the EEOC through the lawyer, the Plaintiff received a texted Group Text from Father Chabel which startled the Plaintiff. The message was addressed to the employer reporting that all the staff were at the house. Evidence as text message.

59) June 13, 2020: The Plaintiff had a breaking point and took her first step to seek help and to treat her emotional distress illness. She contacted the Vibrant Emotional Health program. The Plaintiff has record .

60) August 26, 2019: Cristina Coimbra, the housekeeper, posted in her profile on Facebook a photograph inside the Knipfing's house in the room TV in the kitchen area. In this room took place the last physical assault and there are cameras. But Kevin Knipfing and Stephanieanna James- Knipfing don't applied "Breach Her NDA" and allow her take photographs to post on Facebook. Exhibit 22 Page 107.

61) September 03, 2019: After 8 months the misleading committed by her lawyer Mr. Alexander Cabeceiras see Exhibit 6 Page 57, the Plaintiff filed the complaint with the WCB. As of September 9, 2019, The Firm Pasternack Tilker Ziegler Walsh Stanton & Romano LLP began their representation and litigating Ms. Orrego's case. The Plaintiff holds complaint, emails, contract and letters.

62) October 4, 2019: The Work Compensation Board's Inspector showed up at the Knipfing's house but the guard informed him that no one was in the house, which is very unusual because the house never runs out of a person in charge especially on a working day. Also, called twice and left a voice message to Stephanieanna James- Knipfing the number (310) 5692458 belonging to Kevin Knipfing who never called back, for that reason the Inspector was unable to check the house and cameras. Record WCB File.

63) October 16, 2019: Another photographs on Facebook taking inside in the Knipfing's house for the 50 years of Cristina Coimbra and Rebeca Uzcategui congratulates her in the post. The employer

**E.    The facts of my case are as follows.** *Attachment III continuation*

don't applied the "Breach Her NDA" see Exhibit 22 Page 107.

64) November 5, 2019: Kevin Knipfing and Stephanieanna James-Knipfing discriminated and retaliated against the Plaintiff by denying her claim filed with the Work Compensation Board (WCB) even though according to the NOTICE OF DECISION, Judge Barry Greenberg, Case No. Case #G258 4330 states: "I find prima facie medical evidence for the neck back right wrist both knees and major depressive disorder". The Plaintiff has the medical records and forms signed by six (6) doctors from different specialties. See Exhibit 9 Page 79.

65) March 19, 2020: Steve Savitsky committed PERJURY *Under Section 210 of the New York Penal Code*, when he testified in the Work Compensation Case Hearing and stated under oath that the Plaintiff did not suffer any injuries on the job. On November 2, 2018 the Plaintiff emailed and texted Stephanieanna James-Knipfing  and Skylar Testa a request for a sick day, November 5, 2018, for X rays attaching to this note a  letter of Complaint and Medical Certificate on the plaintiff' injuries and other complaints. See Exhibit 1 Page 45; Exhibit 26 Page 128; Exhibit 28 Page 133.

There are also text messages from Rebeca Uzcategui and Cristina Coimbra, the Plaintiff's co-workers, who confirm they were aware the Plaintiff she went to the doctor on November 2, 2018 because Stephanieanna James-Knipfing informed them. The Plaintiff holds the recording the last physical assault as evidence her injuries, copy of mails, text messages and medical records. See Exhibit 29 Page 134; Exhibit 30 Page 136; Exhibit 32 Page 139.

Also, in the WCB's hearing on this date, Mr. Savitsky who lives in California, misstated that he saw the Plaintiff once but could not set a date. The Plaintiff and Mr. Savitsky never met.

66) April 5, 2020: The Plaintiff, based on her medical results since January 2019, confirm that she contracted Primary Ovarian Insufficiency (POI) Disease as a consequence of chronic stress (Major Depressive Disorder, Pain Disorder and Post Traumatic Stress - PTSD) anxiety and depression. The Plaintiff is at greater risk for several health conditions problems, this disease has terrible consequences and there is no treatment. The Plaintiff holds medical records.

67) May 28, 2020: The Plaintiff could no longer contain so much anguish and suffering, she decided to report all that abuse and mistreatment to Child Protection Services. Due to Post Traumatic Stress she didn't remember plenty of details until now proceeding to declare and gave

**E.** **The facts of my case are as follows.** *Attachment III continuation*

the evidence to the CPS Social Worker. The Plaintiff asked her former lawyer by email about reporting the abuses who never was give her a Legal Advice correctly and the answer was a misleading explanation via email. See Exhibit 10 Page 81; Exhibit 11 Page 84.

68) June 11, 2020: The Plaintiff received the information she may have been exposed to federal charges because she is "Mandatory Reporter. For this reason, Ms. Orrego sent to Social Worker a list of all attorneys because they not at all gave her any legal advice or encouraged her to the report the Child Abuse. See Exhibit 10 Page 81; Exhibit 11 Page 84.

The Plaintiff before this date discharged these attorneys for misleading and misconduct in handling her case and filed the complaints and sued them in Court. Also, Ms. Orrego filed a second complaint in the Grievance Committee for this discovery about the CPS Report. See Exhibit 6 Page 57. *The Plaintiff didn't receive a reply from any of the attorneys about their misleading and misconduct.*

69) June 16, 2020: The Plaintiff received a call from the Social Worker of Child Protection Services informing her that she would be in contact with her former employers.

70) June 23, 2020: Teresa A. Zantua committed PERJURY *Under Section 210 of the New York Penal Code,* when she testified in the Work Compensation Case Hearing under oath that she was not the Plaintiff's Supervisor and she never gave her orders. The Plaintiff's evidence shows text messages from Teresa A. Zantua giving her orders, requesting information, setting-up work schedules and activities, updating work schedules, etc. This evidence was also submitted to the Judge of the Work Compensation Case for the next Hearing on October 28, 2020.

Teresa A. Zantua misstated under oath that the Plaintiff did not suffer any injuries on the job, or the Plaintiff not reported about her injuries. The Plaintiff hold the recording where Teresa A. Zantua was present in the last physical assault when the Plaintiff asked her for pain killers to relieve her from her physical discomfort and pain. The recording dated October 23, 2018 was also submitted to the Judge of the Work Compensation Case for Hearing on March 19, 2020.

Skylar Testa (House Manager) committed PERJURY *Under Section 210 of the New York Penal Code,* when he testified in the Work Compensation Case Hearing under oath that He was The Plaintiff's supervisor and she only worked 40 hours when she worked up to 70-88 hours according

E.    **The facts of my case are as follows.** *Attachment III continuation*

to checks and Timesheets, but Skylar Testa never knew the work hours because he was not the Plaintiff's supervisor. The work hours were emailed to Charles Stanislaus and Sam Santiago who work at the Company Payroll. Furthermore, Skylar Testa stated, the Plaintiff never needed anyone to give her orders or directions and this is inaccurate.

Skylar Testa stated under oath the Plaintiff didn't ask for permission or went to the Doctor for consultation, but the Plaintiff has text messages and emails about permission to go to the Doctor's office on November 2, 2018 and the Plaintiff sent the Medical Certificate by email. There are also text messages from Rebeca Uzcategui and Cristina Coimbra who confirmed they were notified Ms. Orrego went to the Doctor's office. See Exhibit 28 Page 133; Exhibit 29 Page 134; Exhibit 30 Page 136; Exhibit 32 Page 139.

There was no report directly to Teresa A. Zantua because that same day the Ms. Orrego sent the complaint for discrimination and abuse against her on November 2, 2018 before going to the doctor. This evidence will be presented at the Work Compensation Hearing on October 28, 2020 as evidence of PERJURY. See Exhibit 1 Page 45; Exhibit 26 Page 128; Exhibit 28 Page 133. The Plaintiff holds the Hearings's recording.

Perjury is only one more example there are no limits to discrimination and retaliation by Kevin Knipfing, Stephanieanna James- Knipfing, Steve Savitsky and Teresa A. Zantua in complicity with others workers against the Plaintiff giving false testimony with the intention to mislead the Court, resulting in miscarriages of Justice.

All the Exhibits attached to this Complaint represent only a small portion of all the evidence collected by the Plaintiff from January 2018 to July 2020 such as: Pictures, videos, text messages, diary, etc under The Employers and Supervisor knowledge and authorization. In addition the evidence to support her case such as: diary, notes, recordings, emails, financial documents, direct deposits, Government documents and letters, complaints, reports, forms and medicals records.

Date of signing: August 1?, 2020 .

Signature of Plaintiff

Printed Name of Plaintiff    Lidia M. Orrego

 Gmail

# Exhibit 1

Lidia Orrego <llorrego@gmail.com>

## MY SITUATION A WORK FOR 8 MONTHS
1 mensaje

**Lidia Orrego <llorrego@gmail.com>**                                  2 de noviembre de 2018, 12:25
Para: Steffiana Knipfing Kj <steffdelacruz@gmail.com>
Cc: Skylar Testa <skylartesta@gmail.com>

Good afternoon,

    I am writing to you and to Skylar as house manager, about matters as I previously did on several occasions for different reasons and which I will expose in this email.. I apologize for any mistakes I may have.

    I am writing to you this letter because I have not had the opportunity to speak or explain personally to you because of all the restrictions I have to communicate with you Mrs Steffiana because all instructions I receive are through other persons which is affecting my performance as nanny about situations that affects the care of his daughter S▮▮.

    On October 14, I met with Rebeca to talk about everything that was happening in the house because she does not allow me to perform my job because she was always was giving me instruccionts or ways to do my job in wich I do experience,those days on her way out when I was taking my shift Ms. Rebeca was permanently creating situations to make S▮▮ cried because I think she felt jealous because a day before S▮▮ wave her hands goodbye happy and telling her to leave so I want to ask her to let me deal with S▮▮and to stop harassing me regarding S▮▮ care because i do know how to handle sweet S▮▮t the same time I want to discuss the mistreatment of words and discrimination of which I am frequently a victim of your sister Taz (Teresa) even in my days off when I am initially I sought was kind off funy sending me with racist jokes but it was going everyday day worse when it came up to the insults and humiliations in front of strange people and your children, allowing your son K▮▮ sometimes comes to push me and humiliates me because of my Hispanic status o the way I do pronounce the words, some times mocking me in the car and sometimes even in public places calling stupid mexican and forbidding me to speak in Spanish with S▮▮wich a prefer to do because it is a language that we both nannys speak. It is more the last week in the kitchen K▮▮hits me with all his strength on my back twice wich cause pain until this day ,that happens in front o Miss Tass and she was laughing and minimizing the situation.

    In the opportunity that I meet with Rebecca I was with another person at the Dinner Old Westbury,she start the conversations telling me that she wants me to help her and promise solve the problem with your sister Taz and the discrimination issues we suffer both because she is in control of all of you because you and your husband are afraid of a lawsuit she can do against you, because she has it has been documented with notes and recordings plus she has all the names of other affected people who were teachers, one of them even got a restraining order against Ms Taz , that according to Rebecca Mr. Kevin has no knowledge about that. She also mentioned me aout the testimony of a person named Gaby who never look for legal assistance because she was illegally working for you,she said that Gaby twice spoked with you Mrs Stefiana regardind the discrimination and harassment matters she have from your sister Ms. Taz ibut that you never did anything about it.

    On that occasion, Rebeca, always in the presence of the third person, speaks openly of the situations that concern the family of Mr. Kevin and Mrs. Steffiana, which I will detail here:

    1- First of all, she says that Mr. Kevin and you  Mrs. Stefiana do not want to be with S▮▮ for a second or nothing to do with her,and she told me  that's why S▮▮is always very attached to us because she has no love and afecttion from her parents and that she will protect her from the bad influence of Taz.

    2- That K▮▮ also treats her very bad her under the influence of Taz.

    3- That Taz once treat very very bad yours daughters S▮▮ and S▮▮ in front of you and Professor Shannon and that you did nothing to defend your kids from her and why she is worry about S▮▮ because you will not protec her.

    4- That you  will never do anythinging about the discriminations matters and for that reason she has a note prepared to let Mr. Kevin know what is going on in the house because he is the boss and not you Mrs Steffiana, because talking to you is a waste of time and she is not interested in discussing the matter with you.Actually 1 or 2 days ago in the playroom Ms. Rebecca told me that any moment she will  give the letter to  Mr. Kevin to help us.

    These are more important points that she mentioned at that time asking me to Join her collecting evidence for a lawsuit between all affected people teachers and nannys including Gaby to go against your husband in this discrimination situation created by your sister Ms Taz. That day in the dinner she met we met for an hour and a half or so.Also mention that Gaby situation was very different because she was illegal but both of us not because we do have documents to works here in this country.

    From that date on, she mentions that she was going to speak with Mr. Kevin and that she was going to call me to give my testimony and corroborate what she says in that letter and the evidence she has endure an employment discrimination and harassment.

    I let you know that I feel at this time devastated by everything that happened these days, because I work with such care and dedication sometimes restlessly always accommodating and all the needs of the family with professionalism, often worried about S▮▮ for the excessive consumption of sweets,S▮▮ is very smart  and at night in Ms. Rebecca's room she shows me where is the sweets telling me not to tell her dad about it because is a secret, couple of time I did let Skylar knows about the situations and he told me that you Mrs. Steffiana are full knowledge also Taz told me the same,this day Ms Rebecca  where telling I can give to her 1 or 2 candies wich I do not agree with it because S▮▮depends of it all the time and her behavior also changes when I tell her she have enough sweets during the day.

    Even S▮▮shows me the sweets that she eats since 9 in the morning when she goes to school and in front of Ms. Rebeca, which Ms Rebecca  tells me that Taz always gives them to S▮▮in one opportunity Ms Rebecca told S▮▮ that if she brush ther teeth she gives her a bubble gum as a reward  wich I don't agree with that practice.Ms Rebecca also uses keywords in Spanish about the way she promess the candies to S▮▮ so nobody will understand.

    One opportunity happening at noon, S▮▮ in her innocence came to me and shows me a bubble gum that Ms. Rebecca gave her at the moment Ms Rebecca shook S▮▮ very hard yelling "NO" pushing her immediately into her bedroom and slammed the door on my face, Ms. Rebecca was furious with S▮▮ it got me very concern and worried because S▮▮can be hurt ibecause she wass shook in such hard way!I This episode I communicate immediately to Skylar because those days you restricted me to go to your room even to exchange a word with you Mrs

Steffiana  and that happens around the time I asked you If I can have few words because I did not want to be responsible if something happens to ▮▮▮.

These are some of the situations that for all this time I have been coping with and wonder what's happening in these days starting with your claim that for the first time 8 months that I was helping in housekeeping I have never mentioned the inconvenience that It caused the cleaning of the masterbedroom,that I have to clean your bedroom in 45 minutes that was something completely new and unexpected for me beside that I told Ms. Cristina few times that I really fell bad going into your bedroom to do cleaning  without explainig to her of my real feeling  the truth is that im very uncomfortable being in your room because of the way you treat me o look at me makes me feel miserable and uncomfortable and is a very stressful situation when  I was there to clean and not to do other things and the other day when you  Mrs Steffiana saw me texting that was a text for Ms Cristina to ask for a water bottle and Mrs Cristina mention it the phone usage, the phone I used when is need it as everybody in the house  do to communicate,also I have a daughter and a sick mother that im responsible for and if they call I need to take the call wich rarely happens .

After that, now my hours have change unexpectely , which doesn't allow me to do the hours I was promised thu the agency wit,wich it was  guarantee when you Mrs. Steffiana hired me and it was 32 hours with the possibility of more hours to work even if they will not need or traveling traveling, now i dont know what to expect because i receive instructions about the hours o days I have to work from Ms Rebecca because she told me that nov 6 she will work my hours taking S▮▮▮to a birthday party  and i think is not right and i expect to be paid what wasin the agreement you text me when the paper works to hire me was almost finished.

And the last thing that happens is that you give special instruction(not me) no to have the wallet wich is fine but it is very strange if you have a doubt of me misusing or stealing your money please let me know because there  is zero possibility for that to happens and Ms Recca told me not to take personally but I do take it in that way because I will never touch one penny of other people money or used for my benefit  and I feel very very disappointed that all that is being talks on my back and the explanations Ms Rebeca tried to make me doesn't make sense at all.

All this situations affects in all the way me a lot of not knowing what is happening  and why.

Mrs. Steffiana, I am an honest person who brings bread home every day with honest work without ever offending anyone, without abuse, insults or humiliation, neither I never gout of your house and talk about private things that happens in your house that is why I felt so surprise when Ms Rebecca start talk about you and your husband in front a third person in a public place saying your and your husband name very comfortable knowing that you both are know by the press and could generate I a very negative publications.

As I told you Mrs Stefianna previously I pray so much for this to improve but not so sadly is getting every day worse,the harassment , humiliation and discrimination and harassment makes and unhealthy environment but going thru all this situations I  have never missed a day of work because I need to bring food to my house,lots of time I work without taking even a break and everybody see that in the house,when I need a permission to be late always I was letting you know in advance by text.

All this that I write in this letter every word, EVERYTHING, is supported by evidence, documents and witnesses, which are irrefutable, for which I am fully responsible.

If telling the truth is a reason to be fired will be not correct but I cant be quiet anymore and I don't like people to gossip on my back trying to ruin me in my jobs or my conduct at work less much to have issues over money, now writting this e mail trying to adress this issues in the right way, because what I will not allow to continue talking behind my back with complaints and comments without fundaments that surely will harm my good name.

Today again I will go to the doctor I dont feel well and will ask him a report to send you ,i will like to take for the firts time my sick days for today and tomorrow, reincorporating me again on Tuesday, November 6 at 4pm.

This letter is long I understand, but it is months of accumulation and it explaining all the situations i was going thru and i apologize for it.

Any change that is made and affects me, please let me know as soon as possible.

Regards,

Lidia Orrego

 Gmail

# Exhibit 2

Lidia Orrego <liorrego@gmail.com>

---

## MY SITUATION A WORK FOR 8 MONTHS

**Lidia Orrego** <liorrego@gmail.com>            2 de noviembre de 2018, 19:28
Para: Steffiana Knipfing Kj <steffdelacruz@gmail.com>
Cc: Skylar Testa <skylartesta@gmail.com>

Good evening this is the doctor note and just to make clear I don't have any rough week at home just the normal routine.
Thank you and have a very nice weekend. Blessings

[El texto citado está oculto]

---

📄 **CERTIFICATE.pdf**
    201K

# Exhibit 3

**OLD WESTBURY, LLC**
c/o Savitsky Satin Bacon & Bucci
2049 Century Park East, Suite 1400
Los Angeles, CA 90067

November 27, 2018

**VIA CERTIFIED MAIL & VIA EMAIL**

Lidia M. Orrego
95-08 Queens Boulevard, Apt. 3E
Rego Park, NY 11374

Ms. Lidia Orrego,

Old Westbury, LLC is ending your employment effective immediately. This decision is based on several factors, including but not limited to:

1. Breach of your Non-Disclosure Agreement, such as;

    a. Recording a conversation with Rebeca Uzcategui in the presence of a member of the public, and

    b. Taking recordings and photographs of the Knipfing's home.

2. Your statement that you were unwilling to continue working with Rebeca Uzcategui.

3. Our conclusion that you made statements in your complaint that you know to be false.

Your payment of wages through today's date (November 27, 2018) will be paid on the regular payroll date and offset by the nineteen (19) hours you reported were paid incorrectly.

You have health insurance through United Healthcare and the termination of your health insurance is November 30, 2018. You are eligible for COBRA Continuation Coverage and you will be contacted by the carrier directly.

Regards,

Steve Savitsky,
Business Manager Old Westbury, LLC

SS/ew

# Exhibit 4

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | |

_____ and EEOC

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| Ms. Lidia Orrego | | |

| Street Address | City, State and ZIP Code |
|---|---|
| 95-08 Queens Blvd, Apt 3E | Rego Park, New York 11374 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| OLD WESTBURY LLC | 15+ | N/A |

| Street Address | City, State and ZIP Code |
|---|---|
| 2 Spring Hill Lane | Old Westbury, NY 11568 |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| OLD WESTBURY EDDIE, LLC | | |

| Street Address | City, State and ZIP Code |
|---|---|
| 2 Spring Hill Lane | Old Westbury, NY 11568 |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☒ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION
☐ OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **2018**  Latest **2019**

☒ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

**\*\*\*SEE ATTACHED CHARGE\*\*\***

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

01/30/2019
**Date**  **Charging Party Signature**

NOTARY – When necessary for State and Local Agency Requirements

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.
SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
*(month, day year)*
1/33/19

ZACHARY L HOLZBERG
Notary Public – State of New York
No.02HO6342270
Qualified in New York County
My Commission Expires 5/23/2020



# DEREK SMITH
## LAW GROUP, PLLC
### Employment Lawyers Representing Employees Exclusively

January 31, 2019

<u>Via Fax (212) 336-3790 & Certified Mail/Return Receipt</u>
Equal Employment Opportunity Commission
33 Whitehall Street, 5th Floor
New York, NY 10004

## **CHARGE**

| | | |
|---|---|---|
| Re: | **Our Client** : | LIDIA M. ORREGO |
| | **Nature of Complaint:** | RACE DISCRIMINATION, NATIONAL ORIGIN DISCRIMINATION, HOSTILE WORK ENVIORNMENT, RETALIATION |

Claimant,

-against-

OLD WESTBURY, LLC, OLD WESTBURY
EDDIE, LLC, KEVIN and STEPHANIEANNA
KNIPFING

Respondents.

Dear Sir or Madam:

The following is a charge of discrimination based on race, national origin, and retaliation that this office is filing on behalf of LIDIA ORREGO against all of the above Respondents OLD WESTBURY, LLC, OLD WESTBURY EDDIE, LLC, KEVIN and STEPHANIEANNA KNIPFING ("Respondents").

Ms. ORREGO's address and telephone number are:

95-08 Queens Blvd, Apt 3E
Rego Park, New York 11374
347-453-2234

The name and address of the business(es) against whom the charge is made is:

OLD WESTBURY, LLC
c/o SAVITSKY SATIN BACON & BUCCI

NYC Office: One Penn Plaza, Suite 4905, New York, NY 10119 | (212) 587-0760
Philadelphia Office: 1845 Walnut Street, Suite 1600, Philadelphia, PA 19103 | (215) 391-4790
NJ Office: 73 Forest Lake Drive, West Milford, NJ 07421 | (973) 388-8625
Website: www.discriminationandsexualharassmentlawyers.com

2 Spring Hill Lane
Old Westbury, NY 11568

OLD WESTBURY EDDIE, LLC
c/o SAVITSKY SATIN BACON & BUCCI
2 Spring Hill Lane
Old Westbury, NY 11568

KEVIN AND STEPHANIEANNA KNIPFING
c/o SAVITSKY SATIN BACON & BUCCI
2 Spring Hill Lane
Old Westbury, NY 11568

The exact number of employees at the above entity is unknown, but upon information and belief, there are well more than the statutory minimum.

**A Statement of Facts is as follows:** Upon information and belief, Claimant alleges as follows:

1. At all times material, Claimant LIDIA ORREGO ("Claimant" or "ORREGO") was and is an individual woman residing in the State of New York, County of Queens.

2. At all times material, Claimant is of Paraguay descent and speaks with a Paraguayan accent.

3. At all times material, OLD WESTBURY, LLC was and is an unknown entity operating in the State of New York.

4. At all times material, OLD WESTBURY EEDIE, LLC, was and is a domestic limited liability company duly existing by the virtue and laws of the State of New York.

5. At all times material, KEVIN AND STEPHANIEANNA KNIPFING (KNIPFING's) was and is an unknown entity operating in the State of New York.

6. At all times material, Respondents were joint employers of Claimant.

7. In or around January of 2018, Respondents hired Claimant as a Nanny and Housekeeper.

8. At the time of her hire, Respondents gave Claimant a Non-Disclosure Agreement (NDA) which consisted of 2 pages.

9. At all times material, Claimant worked closely with TERESA A. ZANTUA, a/k/a Taz ("TAZ"), sister of STEPHANIEANNA KNIPFING and sister-in-law of KEVIN KNIPFING.[1]

10. At all times material, Claimant worked closely with REBECCA UZCATEGUI ("UZCATEGUI"), a fellow nanny.

11. Throughout her time of employment, Respondents subjected Claimant to constant verbal abuse on the part of Respondents' Supervisor TAZ, who would discriminate against Claimant on the basis of her race and national origin, saying, among other things, "Why do they hire nannies who only speak Spanish?" and that "Mexicans who work in this country should speak English."

12. Throughout her time of employment, Respondents' Supervisor TAZ would refer to Claimant as "Mexican" and "Stupid Mexican."

13. On or about September 6, 2018, Claimant asked Respondents' Supervisor TAZ if she had apologized to UZCATEGUI over an argument they had earlier. TAZ replied that she would never apologize to "the Mexican."

14. On or about September 20, 2018, Claimant was playing with one of the children and referred to Respondents' Supervisor TAZ as "grande," (Spanish for 'big'), in terms of height, which TAZ took as an insult regarding her weight. She became enraged and told the children that "Ms. Lidia is bad," and that she is a "stupid Mexican." She went on to yell at Claimant, stating, among other things, "I don't care about you stupid Mexicans. You are not in your country. You are in America and here it is a bad word." Claimant tried to apologize to TAZ and explain that she was referring to her height in comparison to the child's but TAZ would here none of it.

15. Throughout her time of employment, TAZ would mock Claimant's face and facial expressions,

---

[1] At all times material, Kevin Knipfing uses the stage name "Kevin James."

send Claimant pictures and emoticons of blank, expressionless faces and silly faces, to imply that this was how Claimant looked.

16. On or about October 14, 2018 Claimant and her mother met with UZCATEGUI at a diner. UZCATEGUI told Claimant that she was in possession of recordings of TAZ making racist comments and further told Claimant that she has evidence of TAZ being mentally and emotionally abusive to the children and verbally abusive to the staff.

17. At the conclusion of this conversation UZCATEGUI and Claimant came to an agreement that they would bring the abuse they and the children endured to the attention of the KNIPFING's.

18. On or about November 2, 2018, Claimant decided to send the KNIPFING's an email to shine light on some the issues going on in the house. Claimant reported (i) Respondents' Supervisor TAZ's racial and insensitive comments; (ii) TAZ's mistreatment of the children as well as TAZ's reckless driving with the children in the car; and (iii) overall abusive nature towards Claimant and the rest of the staff.

19. On or about November 6, 2018, Claimant spoke with KEVIN KNIPFING and two others about the email. At this point in time Claimant was given an NDA with several more pages than were given to Claimant at the beginning of her employment. Respondents never asked Claimant to re-execute the NDA or discussed the terms of the revised NDA with Claimant. Additionally, Respondents told Claimant an internal investigation will be conducted in regards to her claims.

20. On or about November 12, 2018, Respondents instructed Claimant to meet with investigators in the parking lot of a Burger King.

21. At this meeting, the investigators urged Claimant to stay away from UZCATEGUI and to turn in all pictures, recordings, text messages and emails with UZCATEGUI or anyone else regarding Respondents' Supervisor TAZ or any of the abusive and discriminatory practices

going on in the house.

22. Over the next few days, Claimant sent all relevant information to KEVIN KNIPFING via email.

23. In a letter dated November 27, 2018, Respondents' terminated Claimant.

24. The termination letter stated that the reasons for termination was for breaching the NDA by recording a conversation with UZCATEGUI and a member of the public, taking recordings and photographs of the KNIPFING's home, Claimant's unwillingness to work with UZCATEGUI, and KNIPFING's conclusion that Claimant made false statements in her complaint.

25. At all times material, Claimant was often asked to take pictures and videos of the children in which she cared for. These pictures and videos were requested by Respondents for the purpose of saving them to a family album.

26. At all times material, taking photos and recordings was common practice amongst Respondents' employees. These employees would often publish these photos on social media or other internet platforms.

27. The above are just some examples of the unlawful discrimination and retaliation to which Respondents subjected Claimant.

28. As a result of Respondents' discriminatory and intolerable treatment, Claimant suffered and continues to suffer from anxiety and severe emotional distress.

29. Because of the acts and conduct complained of herein, Claimant has suffered and will continue to suffer the loss of income, bonuses, benefits and other compensation which such employment entails. Claimant has also suffered pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

30. As Respondents' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Claimant demands Punitive Damages against all Respondents jointly and severally.

31. The above are just some of the examples of the unlawful employment practices that Respondents subjected Claimant.

Please contact me if you have any questions or require any additional information. Thanking you for your courtesy and cooperation in the matter.

Date:   New York, New York
        January 31, 2019

Very truly yours,

**DEREK SMITH LAW GROUP, PLLC**

*/s/Alexander G. Cabeceiras*
Alexander G. Cabeceiras Esq.

# Exhibit 5

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

To   Lidia Orrego
C/O Alexander G. Cabeceiras Derek Smith Law Group, Pllc
One Penn Plaza, Suite 4905
New York, NY 10119

From:   New York District Office
33 Whitehall Street
5th Floor
New York, NY 10004

[ ]   *On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No | EEOC Representative | Telephone No. |
|---|---|---|
| 520-2019-01738 | Debra L. Richards, Investigator | (212) 336-3768 |

*(See also the additional information enclosed with this form.)*

NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

[X]   More than 180 days have passed since the filing of this charge.

[ ]   Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X]   The EEOC is terminating its processing of this charge.

[ ]   The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

[ ]   The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court **WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ]   The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Kevin J. Berry,
District Director

09/20/2019

*(Date Mailed)*

Enclosures(s)

cc:
Kevin Knipfing/Owner
OLD WESTBURY EDDIE, LLC
c/o Savitsky Satin Bacon & Bucci
2 Spring Hill Lane
Old Westbury, NY 11568

Alexander G. Cabeceiras, Esq.
DEREK SMITH LAW GROUP, PLLC
One Penn Plaza, Suite 4905
New York, NY 10119

# Exhibit 6

June 15, 2020

<u>Via First-Class and Electronic Mail</u>

Mr. Derek Smith, Esq.
Mr. Alexander Cabeceiras, Esq.
Derek Smith Law Group, PLLC
One Pennsylvania Plaza, Suite 4905
New York, NY 10119
Tel: (212) 587-0760
email: derek@dereksmithlaw.com
email: alexc@dereksmithlaw.com

Re: Remove an Invalid Lien for misconduct and discharge for Good or Just Cause

According to my email dated October 29, 2019 the Firm Derek Smith Law Group, PLLC was fired for "Good Cause" breach of a contract for the following reasons:

- Mr. Alexander Cabeceiras, Esq., and Derek Smith Law Group, PLLC violated <u>Rules of Professional Conduct</u> Failed to file a claim with the EEOC since I had informed them that there were no more than 6 employees at my workplace. Mr. Alexander Cabeceiras, Esq. - Derek Smith Law Group, PLLC with all this information decided to fill out the Complaint indicating that in my workplace there were more than 15 employees, which was not true and it was not necessary to file the complaint in the EEOC and **wasted more than 9 months without making any type of strategy, negotiation, plan or preparing any lawsuit** despite my constant request via email in pursuit of my claims or in defense of my interests without having the minimum capacity or interest to negotiate according to the facts that support my case, totally apathetic and poor representation. Also file a claim for $ 975k in the EEOC when the Limits on Compensatory and Punitive Damages only allows up to $ 50k which also shows that Mr. Cabeceiras was lying to me the whole time according with Remedies for Employment Discrimination - EEOC. All this was corroborated by the lawyer who reviewed my case, document and information from the EEOC that supports this information and emails.. For this reason, Mr. Cabeceiras had threatened by email to not contact the EEOC without his consent. See American Bar Association's <u>Rules of Professional Conduct</u>; Rule 1.1: Competence; Rule 3.2 Rule 1.3 Diligence

- Mr. Alexander Cabeceiras, Esq., Mr. Derek Smith, Esq. and Derek Smith Law Group PLLC acted Unethical Behavior, failure to present all the facts in my case handling in order for me to obtain the full advantage of legal system such as Lost wages and Benefits, Compensatory and Punitive Damages (no caps) and Attorney's Fees under Section 1981 - Race Discrimination in violation of the American Bar Association's <u>Rules of Professional Conduct</u>. See Rule 1.1: Competence; Rule 3.2 Rule 1.3 Diligence

- Mr. Alexander Cabeceiras, Esq. and Derek Smith Law Group, PLLC has put my Work Compensation case is in serious jeopardy, because until on August 20,2019 Mr. Cabeceiras never told me that I should look on my way for an attorney to help me in that case, seriously damaging the case which until today has been denied. On date 01-29-2019 I request by

email to include my injuries in the EEOC Charges which Mr. Cabeceiras have refused to include them and now the attorney for the Insurance Company has used the EEOC charges against me saying why I am claiming my lawyer that included those injuries, for all this they are denying my benefits and payment of my medical expenses having a temporary disability of 100%. Also, because of all these injuries I have acquired a disease whose treatment is cost to be able to reverse this disease without guarantee of full recovery.

I have submitted to the WCB Judge all emails and documents showing that Mr. Alexander Cabeceiras has been aware of all of these injuries since January 2019 and has never referred me to a WC attorney as promised and all of this is specified in the emails and documents for the next hearing this June 2020. This was also one of the reasons for the first complaint to the Grievance Committee.

- Mr. Alexander Cabeceiras, Esq., Mr. Derek Smith, Esq. and Derek Smith Law Group, PLLC failed to recommend report and inform me the Forgery Crime (Deceive with the creation of false or fraudulent documents) about the Termination Letter Date November 27, 2018 to containing false information, it also contains a false Company name, because The Legal Name is OLD WESTBURY EDDIE LLC under registration in New York State and being mailed this false document in the United States it becomes a Federal Crime. Also failed demonstrate the creation of the false W2 document in the name of Old Westbury Eddie LLC as an employer but all other documents such as NDA, Direct Deposit Checks and Bureau Credit Report point Kevin and Stephanieanna Knipfing as an employer. See Forgery; Termination Letter under NYC law; DOS Department of State with the Company Legal Name; Right to Sue Letter– EEOC with the Company legal name and Owner Kevin Knipfing; Checks and emails with the Company Legal Name; NYC Law Section 195. See Rule 1.1: Competence; Rule 3.2.

- Mr. Alexander Cabeceiras, Esq. - Derek Smith Law Group PLLC when I informed you about the Child Abuse and Maltreatment, and, YOU, the Firm did not make the REPORT for me and You did not tell me that I'm Mandated Reporter and had the obligation to report all the facts to the Child Protection Services, now the Report has been made to this Government Institution and is under investigation, they already have the evidence and my statement as well as the list of firms and attorneys who have never advised me or been alerted to commit a CRIME BY OMISSION. On the other hand, this would be Complaint No. 2 you to the Grievance Committee.

- Alexander Cabeceiras and Derek Smith Law Group PLLC HAVE BREACHED "Provision 3 of the Employment Law Retainer Agreement" by refusing to pay the cost of Copies of my Medical Records, very important documents that are conclusive evidence of the injuries I have suffered in the workplace and that I declare in my Complaint to my former boss in Date November 2,2019. All this to ensure that I was a victim of Discrimination and Retaliation and the Firm promised to cover those expenses. The lawyer never informed me that they refused to pay for these copies which I discovered by Collecting all my documents from the different doctor's offices after I discharged Derek Smith Law Group PLLC. The

expensive cost of the copies was only $ 35.00, which shows no interest in filing a lawsuit in Court.

Consequently, the Lien the firm Derek Smith Law Group PLLC imposed irregularly in the Letters dated October 15, 2019 is **Invalid** Under New York's statutory charging lien, see N.Y. Judiciary Law § 475 (McKinney 1983) Derek Smith Law Group PLLC **who was discharged for "Good Cause or Just Cause" lose the right of Charging Lien.** See, eg, McDermott v. Great Am. Alliance Ins. Co., No. 5:02 Civ. 0607 ( NAM / DEP), 2006 US Dist. LEXIS 52878, 2006 WL 2038452, at * 2 (NDNY July 18, 2006); Hill v. Baxter, No. 98 Civ. 4314 (SJF) (ASC), 2005 US Dist. LEXIS 7157, 2005 WL 465429, at * 2 (EDNY Feb. 7, 2005); Petition of Harley & Browne, 957 F. Supp. 44, 48 (SDNY 1997); Rankel v. Tracey, No. 84 Civ. 3412 (KMW ), 1991 US Dist. LEXIS 10673, 1991 WL 156324, at * 7 (SDNY Aug. 2, 1991); Klein v. Eubank, 87 NY2d 459, 663 NE2d 599, 600, 640 NYS2d 443 (NY 1996).

Until the process of Grievance Committee and Child Protection Services, review of your work and legal advice have finished, Derek Smith Law Group PLLC MUST COMPLETELY REFRAIN from claiming any amount on which you can reach a settlement before or after any litigation, otherwise, Derek Smith Law Group, PLLC will be committing excessive abuse professional in the relationship between lawyer and client, continuing violating American Bar Association's Rules of Professional Conduct. See DR 2-106 -Fees for Legal Services; Rule 1.5; Rule 1.5a.

When the investigations from the two Government Organizations are finalized a JUDGE will decide whether I owe you or you owe me and how much for all your negligence, BAD FAITH, as well as serious violations of professional conduct and economic / health damages that You have caused me.

Regards,



Lidia Orrego

June 15, 2020

<u>Via First-Class and Electronic Mail</u>

Michael J. Borrelli, Esq.
Matthew J. Farnworth, Esq.
Borrelli & Associates, P.L.L.C.
910 Franklin Avenue, Ste. 200
Garden City, NY 11530
email: mjb@employmentlawyernewyork.com
email: mjf@employmentlawyernewyork.com

<div align="center">Re: Lidia Orrego's Statement</div>

About your "Statement", In any case, according to my letter dated 06-04-2020, I discharged Borrelli & Associates PLLC with "Good or Just Cause" N.Y. Judiciary Law § 475 (McKinney 1983) (see attach) which means that you are the ones who should pay me for all the damage you did to me and this amount is nothing comparing the risk of Federal Charges that YOU exposed ME when I did informed you about the Child Abuse and Maltreatment, and, YOU, the Firm Borrelli & Associates PLLC did not make the REPORT for me and You did not tell me that I'm Mandated Reporter and had the obligation to report all the facts to the Child Protection Services, now the Report has been made to this Government Institution and is under investigation , they already have the evidence and my statement as well as the list of firms and attorneys who have never advised me or been alerted to commit a CRIME BY OMISSION. This also constituted damage to my case if I filed the lawsuit without having made the report to the authorities.

Mr. Matthew J. Farnworth, Esq. on February 10, 2020 by phone told me that supposedly I had recant the abuse of children when that was absolutely a lie since in the charges of the EEOC is the complaint, also in the email date February 11, 2020 after asking him with all the arguments to see all the evidence in the case, I asked him if he should report the Child Abuse, this was also requested by phone but he never answered me. Again in the email February 19, 2020, I mentioned to him that I never retracted the abuse of children in addition to sending him text messages where it can clearly be indicated that I was reporting the abuse as well as the notes with all the details of what was happening that were evidence of my complaint, again I never received a response. Now I understand why your Firm's attorney (Mr. Matthew J. Farnworth) wrote me in his email dated March 4, 2020 about EXTORTION instead of filing a legal claim for the real damages, your behavior shameful and wasted 6 months of my time.

I could no longer contain so much anguish and suffering to report all that abuse and mistreatment, because it is horrible what they do with them even more now that I remember many more things that were blocked by PTSD and Major Disorder for everything they did to me and now I 'm recovering to be able to defend those children and defend myself also from so much damage they did to me and you never helped or advise me correctly on making the report to Child Protection.

I do not imagine what kind of lawsuit you were going to present or defend me if you do not have the minimum Compassionate Empathy or values to protect children from abuse and mistreatment, even less would you have the empathy to claim my rights and defend me, I was the victim of

discrimination, retaliation and even physical and emotional abuse that have left me a sequel for life for having acquired a disease that can cause me even heart problems and many other problems and that treatment is very expensive to be able to reverse my deteriorating health condition.

Pursuant to "Provision 14. Confidentiality of Dispute Between Client and Firm" of your "Retainer Agreement", you violated the Law by Not Reporting and not giving me notice of possible federal charges by Not Reporting Child Abuse and Maltreatment. Also, you violated provision 14 when you directly gave information about my case to the Peter Romero Firm behind my back and without my consent as this firm ratifies in the note that I have in my possession because I never hired this Law Firm to represent me and they gave me instructions that I should not inform you of our conversation or meetings until defining if they would take the case and I would accept the terms of the representation because just like you they were also lying to me about my case. This call was before I fired you with "Good or Just Cause".

According to "Provision 17. Severability", the provisions 9 - 15 (but no are limited only this provisions) are INVALID because they are absolutely UNETHICALS, UNENFORCEABLE, UNFAIR and EXTREMELY ABUSIVE and NO ONE is above the LAW.

Also, the "Provision 10: Existing Liens" this is totally false because in the initial consultation dated October 21, 2019, I gave Mr. Matthew J. Farnworth, Esq. the copy of the Lien of the Derek Smith Law Group, PLLC dated October 15, 2020, so it was not true that I declared that there was no Lien and the copy I sent by email on November 08, 2019 to Pablo E. Martinez Case Part 20. Derek Smith Law Group, PLLC 's Lien is also INVALID because they were fired just like you for Good or Just Cause.

On the other hand, this would be Complaint No. 2 y No. 3 against you to the Grievance Committee.

Borrelli & Associates PLLC continues with this Harassment, I am going to file a lawsuit with Small Claim Court for $ 10,000.00 by Intentional Infliction of Emotional and Financial Distress. In front of the Judge we will see if I have really "distorted" the facts and " is not worth it" for you to explain your unethical behavior, deliberately misleading, morally reprehensible and violating the basic principles of honesty.

When the investigations from the two government organizations are finalized a Judge will decide whether I owe you or you owe me and how much for all your negligence and BAD FAITH, as well as serious violations of professional conduct and economic / health damages that You have caused me. Until then, STOP the harassment.

"Do the right thing because it is right. (W. Clement Stone): Hypocrisy of Borrelli & Associates PLLC"

Regards,



Lidia Orrego

April 6, 2020

<u>Via First-Class and Electronic Mail</u>

Mr. Peter A. Romero
Mr. David D. Barnhorn
email: promero@romerolawny.com
email: dbarnhorn@romerolawny.com

Good afternoon Mr. Romero and Mr. Barnhorn,

According to our meeting dated March 05, 2020 and my records our meeting was confidential since you and Mr. Barnhorn had to review all the evidence to determine the value of the case. After the meeting, you assured me that everything was kept confidential, according to my records.

On March 10, 2020 at 12:35 p.m. YOU called to let me know that you could get the case but for the sum of 200k (which was not what we talked about at the beginning), I told you that I will let you know my decision about hiring you because I had never confirmed anything, not even my decision to fire the Borrelli & Associates PLLC. If I did not hire you, why you call Mr. Farnworth from Borrelli & Associates PLLC? Again, I wasn't even considering hiring you for giving me contradictory information according to Federal Court Legal Advice.

On the morning of March 10, 2020, I proceed to send the Letter to Borrelli & Associates PLLC on the firing of the firm for JUST cause as indicated by Law.

On March 16, 2020 I received the Letter from the Borrelli Associates PLLC Firm (with the name Peter Romero Law Firm in the letter). Same day I sent you the email with the copy of the letter and you never answered me until March 23 , 2020, but without giving me a clear explanation of why you call the other firm without my authorization and since I had never hired you. Without my consent, you contacted the Borrelli firm, and neither of the 2 firms was authorized to share any information about my case.

If you were not representing me in my case as indicated in your Letter of March 23,2020, why you called to Mr. Farnworth and why Did Borrelli & Associate send you a copy of the letter that they sent to me if I never accept your representation? Your letter does not make any sense, when now after having violated the rule of Confidentiality, you intend to make believe that you do not want to represent me.

In conclusion, Peter Romero Law Firm breached of American Bar Association's <u>Rules of Professional Conduct</u>; Rule of Client-Lawyer Confidentiality by exchanging information between both Firms without my knowledge or authorization, what is a violation of Rule 1.6 Confidentiality of Information, Rule 1.4: Communications; Rule 8.3; Rule 8.4: Misconduct (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation - Comment according to ABA.

Regards,

Lidia Orrego

# Exhibit 7

63

## AFTER VISIT SUMMARY

**NYC HEALTH+ HOSPITALS** | Elmhurst

**Lidia Orrego**  MRN: 5468706        📅 6/14/2019  📍 Elmhurst Psychiatric ED 718-334-3680

## Instructions



**Follow up with EHS Ambulatory Behavioral Health Service**
Contact: 718-334-1503
80-02 41st Avenue, Elmhurst, NY 11373
H Area 3rd Floor Room 145
Appointment on 6/19 @ 8:30am
Priority IIB

## What's Next

You currently have no upcoming appointments scheduled.

## General Emergency Department Discharge Instructions

We appreciate that you chose us as your healthcare provider.

This form provides you with information about the care you received in our Emergency Department and instructions about caring for yourself after you leave the Emergency Department. If you have further questions concerning this visit please call us at the included phone number above on this form. Please keep this form and bring it with you should you need additional treatment. If your symptoms become worse or you are not improving as expected and you are unable to reach your usual health care provider, or get to your follow-up appointment, you should return to the Emergency Department immediately. We are available 24 hours a day.

*It is important that you keep appointments that may have been scheduled. If you are unable to make an appointment, please call the corresponding clinic to reschedule your appointment.*

## Home Medication Information

The list of your home medications is based on the information provided by you (or your representative) during your Emergency Department visit, and/or the information contained in your medical record. In addition, some of your home medications **may have been changed** by the Emergency Department provider who evaluated you. These changes **may** include:

- New medications
- Changes to the amount or how often you take a medication
- Discontinuation of a medication

## Today's Visit

You were seen by Maria de Pena-Nowak, MD, JKRISTINE RENDAL-SATTEM, RN, and Julian Constantin Ungureanu, LCSW.

**Reason for Visit**
Psychiatric Evaluation

**Your End of Visit Vitals**

 Blood Pressure
**140/91**

 Temperature (Oral)
**97.6 °F**

 Pulse
**82**

Respiration
**18**

 Oxygen Saturation
**98%**

**NYC HEALTH+ HOSPITALS** | MYCHART

With MyChart, you can... Message your doctor... Request refills... See test results... See your visit summaries and upcoming appointments and much much more...

To sign up go to **http://mychart.nychealthandhospitals.org**, click "**Sign Up Now**", and enter personal activation code: **V654W-W7TSN** **Expires: 12/11/2019  9:56 PM.**

Additional Information:
If you have questions, you can go to **https://epicmychart.nychhc.org/help** to contact our MyChart staff. Remember, for emergencies, always call 911 - do not use MyChart.

Please review the information below carefully. **Continue all your current medications as you are presently taking, with the exception of the following changes below. If you have questions about any of the medications or the changes, please contact your Primary Care Physician, the Provider who prescribed the medication, or your Pharmacist.**

## Changes to Your Medication List

You have not been prescribed any medications.

## Additional Information

If you, your child, or someone you know are struggling and need to speak to someone immediately, call 1-888-NYC-WELL. They can provide phone support, resources, and treatment options or request a Mobile Crisis Team. The Mobile Crisis Team serves any person in NYC who is experiencing or at risk of a psychological crisis. The Mobile Crisis Team provides urgent assessment, crisis intervention, supportive counseling, information and referrals, linkage with appropriate community based mental health services for ongoing treatment, and follow up. You can also reach out anytime (24/7) to a crisis helpline:

- The National Suicide Prevention Lifeline: 1-800-273-TALK (8255) or text CONNECT to 741741
- NYC Well counseling line at 1-888-NYC-WELL or text "WELL" to 65173

For additional resources in your area contact: Hitesite.org, or go to your local Mental Health Association of New York City Family Resource Center (www.MHAofNYC.org).

## Your Treatment Plan

The treatment you have received during your visit was provided on an **emergency basis only** and is not meant to be a replacement for ongoing medical care. The information provided in these discharge instructions, **including follow up information**, should be followed in order to ensure proper treatment of your condition.

Thank you for being a patient at ELMHURST PSYCHIATRIC ED today. If your prescription was sent to the internal hospital pharmacy, please keep this paper for your records and provide to the pharmacist when you arrive. Thank you again!

**Patient EMPI: 100277019 - For Internal Pharmacy Use Only**

100277019

10100277019

# Acknowledgement of Discharge Instructions

- I understand the treatment received during this visit was provided on an **emergency basis only** and is not meant to be a replacement for ongoing medical care. I also understand the information provided in these discharge instructions, **including follow up information**, should be followed in order to ensure proper ongoing treatment of my complaint/diagosis.

- A member of the Emergency Department staff has reviewed the discharge instructions provided to me and has answered any questions I may have had regarding these instructions.

_____

*Patient/Representative Signature*

_____

*Relationship to Patient*

_____

*Date*           *Time*

_____

*Witness*

_____

*Date*           *Time*

**Lidia Orrego**
**CSN:** 23032400
**DOB:** 3/10/1977
female
  **MRN:** 5468706
  **Adm Date:** 6/14/2019



# Exhibit 8

**STATE OF NEW YORK**
**WORKERS' COMPENSATION BOARD**

SERVICES PROVIDED UNDER WCB PREFERRED PROVIDER ORGANIZATION (PPO) PROGRAM?  YES ☐  NO ☒

*PLEASE TYPE ALL INFORMATION - COMPLETE ALL ITEMS*

SEE ITEM 1 ON REVERSE FOR FILING INSTRUCTIONS

67

| | | |
|---|---|---|
| ☒ 48 HR. INITIAL | ☐ 15 DAY INITIAL | ☐ 90 DAY PROGRESS |

| WCB CASE NO. | CARRIER CASE NO. (IF KNOWN) | DATE OF INJURY & TIME | ADDRESS WHERE INJURY OCCURRED (CITY, TOWN OR VILLAGE) | INJURED PERSON'S SOCIAL SECURITY NUMBER |
|---|---|---|---|---|
| G2589330 | 18P05J084317 | 10/23/2018 | | |

**INJURED PERSON** (First Name) Lidia (Middle Initial) Orrego (Last Name)
ADDRESS (Include Apt. No.) 95-08 Queens Blvd  Apt 3E
Rego Park  NY  11374
TELEPHONE NO. (347) 453-2234
PATIENT'S DATE OF BIRTH 03/10/1977

**EMPLOYER\***

**INSURANCE CARRIER** New York Marine and General Insurance Co
412 Mt Kembel Ave  Ste 300C
Morristown  NJ  07960

**REFERRING PHYSICIAN**
TELEPHONE NO.

*If treatment was under the VFBL or VAWBL show as "Employer" the liable political subdivision and check one:  ☐ VFBL   ☐ VAWBL*

If you have filed a previous report, setting forth a history of the injury, enter the date  09/16/2019   and complete items 3 to 18. If not, complete ALL items.

**H I S T O R Y**

1. Describe incident or occupational history that precipitated onset of related symptoms:
SEE INITIAL SUBMITTED NARRATIVE

2. Has patient given any history of pre-existing psychological impairment? If so, describe specifically.
NO

**E V A L U A T I O N / T R E A T M E N T**

3. Referral was for: ☐ Evaluation Only (Complete Item a)  ☐ Treatment Only (Complete Item b-1,2)  ☒ Evaluation and Treatment (Complete Items a and b-1,2)

a. Your evaluation:
Psychological Injury as a consequential result of the incident

b. (1) Patient's condition and progress:
F32.2 Major depressive disorder, single episode, severe w/o psychotic features F45.42 Pain disorder with related psychological factors

b. (2) Treatment and planned future treatment. If an authorization request is required (see items 4 & 5 on reverse), check box ☐ and explain below. If additional space is necessary, please attach request.
90791 Psych Diag Interview 90834 Individual Psychotherapy 96101 Psychological Testing

4. Date(s) of visits on which this report is based  09/16/2019    Date of First Visit  09/16/2019    Will patient be seen again? ☒ Yes ☐ No  If yes, when: 10/16/2019
If no, was patient referred back to attending doctor: ☐ Yes ☐ No

5. Is patient working? ☐ Yes ☒ No  If yes, date(s) patient resumed limited work of any kind   resumed regular work

**CR**

6. Was the occurrence described above (or in your previous report) the competent producing cause of the injury or disability (if any) sustained? ☒ Yes ☐ No

**R E M A R K S**

7. Enter here additional pertinent information:
Degree of disability: temporary/total (100%)

8. Diagnosis or nature of disease or injury (Relate items 1,2,3 or 4 to item 9E by line.) Enter code and describe nature of injury.
1.  F32.2  MAJOR DEPRESSV DISORD, SINGLE EPSD, SEV W/O PS
2.  F45.42  PAIN DISORDER WITH RELATED PSYCHOLOGICAL FACTO

**B I L L I N G   F O R M**

| 9. Dates of Service | | | | | | B Place of Service | C Leave Blank | D Procedures, Services or Supplies (Explain Unusual Circumstances) CPT/HCPCS | MODIFIER | E Diagnosis Code | F $ Charges | G Days or Units | H COB | Zip Code Where Service was Rendered |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| From MM | DD | YY | To MM | DD | YY | | | | | | | | | |
| 09 | 16 | 19 | 09 | 16 | 19 | 11 | | 90791 | | A B | 254.78 | 1 | | 11374 |

**S I G N A T U R E**

10. Federal Tax I.D. Number  112732830  SSN ☐ EIN ☒
11. WCB Authorization Number  S19963-8W
12. Patient's Account Number  118720
13. Total Charges  254.78
14. Amt. Paid (carrier use only)
15. Bal. Due (carrier use only)

Affirmed Under Penalty of Perjury
*Maria C. Sesin, PhD* 10/16/2019

16. Signature of Treating Psychologist   Date

17. Psychologist's Name, Address & Phone No.
Maria C Sesin PhD
95-08 Queens Blvd
Rego Park  NY  11374
(516) 466-0444

18. Billing Name, Address & Phone Number
HOWARD ROMBOM, Ph.D., P.C.
310 East Shore Road Suite 100
Great Neck, NY 11023
(516) 466-0444

**THE INJURED WORKER SHOULD NOT PAY THIS BILL.**

PS-4 (1-11)
PASTIL

SEE REVERSE SIDE FOR IMPORTANT INFORMATION

www.wcb.ny.gov

ATTENDING PSYCHOLOGIST'S REPORT

STATE OF NEW YORK
WORKERS' COMPENSATION BOARD

| | | | |
|---|---|---|---|
| SERVICES PROVIDED UNDER WCB PREFERRED PROVIDER ORGANIZATION (PPO) PROGRAM? | YES ☐ NO ☒ | | 69 |

| X | INITIAL | 15 DAY | 30 DAY | SEE ITEM 1 ON REVERSE FOR | PLEASE TYPE ALL INFORMATION - COMPLETE ALL ITEMS |
|---|---|---|---|---|---|
| | 48 HR. | INITIAL | PROGRESS | FILING INSTRUCTIONS | |

| WCB CASE NO. | SOCIAL SECURITY NUMBER | ADDRESS WHERE INJURY OCCURRED (CITY, TOWN OR VILLAGE) | | |
|---|---|---|---|---|
| G268893O | INSURED PERSON'S | | CARRIER CASE NO. (IF KNOWN) | DATE OF INJURY |
| | | | 18P05J08431? | 10/23/2018 |

INJURED PERSON
(First Name) Lidia    (Middle Initial)    (Last Name) Ortego

| TELEPHONE NO. (347) 453-2234 | ADDRESS (Include Apt. No.) 95-08 Queens Blvd Apt 3E | | PATIENT'S DATE OF BIRTH 03/10/1977 |
|---|---|---|---|
| | Rego Park NY 11374 | | |

| EMPLOYER | | | |
|---|---|---|---|
| CARRIER INSURANCE | New York Marine and General Insurance Co | 412 Mt Kemble Ave Ste 300C Morristown NJ 07960 | |

REFERRING PHYSICIAN    TELEPHONE NO.

If treatment was under the VFBL or VAWBL, show as "Employer" the liable political subdivision and check one:    VFBL ☐    VAWBL ☐

**H — HISTORY**

If you have filed a previous report, setting forth a history of the injury, enter the date    09/16/2019    and complete items 3 to 18. If not, complete ALL items.

1. Describe incident or occupational history that precipitated onset of related symptoms:

SEE INITIAL SUBMITTED NARRATIVE

2. Has patient given any history of pre-existing psychological impairment? If so, describe specifically.

NO

**E — YOUR EVALUATION**

3. Referral was for:    Evaluation Only (Complete Item a) ☐    Treatment Only (Complete Items b-1,2) ☐    Evaluation and Treatment (Complete Items a and b-1,2) ☒

a. Your evaluation:

Psychological injury as a consequential result of the incident

b. (1) Patient's condition and prognosis:

F32.2 Major depressive disorder, single episode, severe w/o psychotic features F45.42 Pain disorder with related psychological factors

b. (2) Treatment and planned future treatment. If an authorization request is required (see items 4 & 6 on reverse), check box [ ] and explain below. If additional space is necessary, please attach request.

90791 Psych Diag Interview 90834 Individual Psychotherapy 98101 Psychological Testing

**T — TREATMENT/INTERVAL**

4. Date(s) of visits on which this report is based    09/16/2019    09/30/2019    10/31/2019

| Date of first visit 09/16/2019 | Will patient be seen again? Yes ☒ No ☐   If yes, when: 10/31/2019 |
|---|---|
| Is patient working? Yes ☐ No ☒   If yes, date(s) patient resumed limited work of any kind | If no, was patient referred back to attending doctor? Yes ☐ No ☐   resumed regular work |

CAUSAL RELATIONSHIP — Is the condition described above (or in your previous report) the competent producing cause of the injury or disability (if any) sustained?    Yes ☒ No ☐

Degree of disability: temporary/total/total (100%)

7. Enter here additional pertinent information.

8. Diagnosis or nature of injury (Relate items 1,2,3 or 4 to item 8E by line.)   Enter code and describe nature of injury.
1. F32.2 MAJOR DEPRESSIVE DISORD, SINGLE EPSD, SEV W/O PS.
2. F45.42 PAIN DISORDER WITH RELATED PSYCHOLOGICAL FACT.

**B — BILLING FORM**

| 8. | Dates of Service | | | | | Place of Service | Leave Blank | Diagnosis Code | Procedures, Services or Supplies (Explain Unusual Circumstances) | | Days or Units | COB | Zip Code Where Service was Furnished |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | MM | DD | YY | MM | DD | YY | | | | CPT/HCPCS | MODIFIER | $ Charges | | | |
| | | | | | | | | | | ☐ USE WC-06 (9097) | | | | | |
| | 09 | 16 | 19 | 09 | 16 | 19 | 11 | | A B | 90834 | | 165.94 | 1 | | 11374 |
| | 10 | 01 | 19 | 10 | 01 | 19 | 11 | | A B | 96101 | | 1450.62 | 9 | | 11374 |

| 10. Federal Tax I.D. Number | SSN ☐ EIN ☒ | 11. WCB Authorization Number | 12. Patient's Account Number | 13. Total Charges | 14. Amt. Paid (Carrier use only) | 15. Bal. Due (Carrier use only) |
|---|---|---|---|---|---|---|
| 11-2728250 | | S19963-8W | 118720 | 1616.56 | | |

| 16. Affirmed Under Penalty of Perjury | X | 17. Psychologist's Name, Address & Phone No. | 18. Billing Name, Address & Phone Number | |
|---|---|---|---|---|
| | | Maria C Sesin PhD | HOWARD ROMBOM, Ph.D., P.C. | THE INJURED WORKER SHOULD NOT PAY THIS BILL. |
| 18. Signature of Treating Psychologist   Date   10/17/2019 | | 95-06 Queens Blvd Rego Park NY 11374 | 310 East Shore Road Suite 100 Great Neck NY 11023 (516) 466-0444 | |
| (signature) Maria C Sesin, PhD | | (516) 466-0444 | | |



# BEHAVIORAL MEDICINE ASSOCIATES
### 310 East Shore Road | Suite 100 | Great Neck, NY 11023
### Phone (516) 466-7077 | Fax (516) 466-0450 | www.behavemed.com

**Progress Note**

**Client Information**
Client Name: Lidia Orrego                    Account: 118720

**Encounter Information**
Service Date: 9/30/2019 at 11:30 AM
Accident Date: 10/23/2018

☐ Continue monthly plan of care    ○1X  ●2X  ○4X              ●ADULT ○CHILD

**Patient's Current Functioning (0 - 10):**              8   Distress          9   Disability
**Symptoms Status (0 - 10):**

| | | | | | |
|---|---|---|---|---|---|
| | Sleeping | | Panic Attacks | | Suicidal Ideation |
| 8 | Fears | 9 | Employment Adj | | Concentration |
| | Memory | | Avoidance | | Loss of Physical Efficiency |
| | Anger | | Depressed | | Interpersonal Conflict |
| | Headaches | | Flashbacks | 8 | Hypervigilance |
| | Fatigue | | Social Withdrawal | 8 | Anxiety in vehicle |
| 8 | Grief | 8 | Anxiety as Pedestrian | | Loss of Sexual Activity/Enjoyment |
| 8 | Persistent Physical Pain | 8 | General Anxiety | | Anhedonia |

**Degree of Disability:**

☐ PT. IMPROVED        ☐ PT. WORSENED        ☐ NO CHANGE REPORTED        MMI ☐ Yes  ☐ No

**Clinical Interventions Provided:**

☒ Support
☐ Elicited activity scheduling
☐ Conducted Hypnotherapy
☐ Trained in relaxation
☐ Trained in distraction training/attention refocusing
☐ Taught coping techniques
☐ Assisted in identifying and releasing of affect
☐ Encouraged habit modification
☐ Utilized cognitive restructuring
☐ Assisted in emotional reprocessing
☐ Provided mood elevation strategies
☐ Taught thought stopping
☐ Monitored gains
☐ Discussed blocks in progress
☒ Develop therapeutic alliance
☐ Aided in development of list of environmental stress triggers
☐ Enhanced self control

☐ Examined the evidence
☐ Biofeedback
☐ Provided educational materials (audio, reading)
☐ Engaged in parent counseling
☒ Therapeutic imagery
☐ Assisted in contingency management
☐ Rehearsed coping techniques
☐ Educated in decision making and problem solving
☐ Provided tips about mood control
☐ Provided assertiveness training
☐ Trained in graded exposure (in vivo/imagined)
☐ Engaged pt in critical incidence debriefing
☐ Reinforcing past gains
☐ Trained in memory loss coping strategies
☐ Identification of resource people
☐ Taught conflict resolution
☐

☐ Psychiatric Referral              MD Name

☐ Psychiatric Consult    Date:        MD Name:

**Notes:**
Develop therapeutic alliance with client, spoke about harassment at work, her prove s on the phone. Listening of her story was part of session. Spoke about lady only wanted client to speak English. Spoke about her distress, thriving to get better.

**Diagnosis:**                                    Rule Out
                                                  ☐
                                                  ☐
                                                  ☐
                                                  ☐

**Signature**

*Maria C. Sesin, PhD* Signed electronically by Maria C Sesin PhD on 09-30-2019

© Copyright - 2019, Accumedic Computer Systems, Inc.



**BEHAVIORAL MEDICINE ASSOCIATES**
310 East Shore Road | Suite 100 | Great Neck, NY 11023
Phone (516) 466-7077 | Fax (516) 466-0450 | www.behavemed.com

Manhattan • Brooklyn • Bronx • Queens • Staten Island • Nassau • Suffolk • Rockland • Westchester • Buffalo • Syracuse • Kingston • Newburgh

October 1, 2019

TO: Dr. Rosner

## PSYCHOSOCIAL EVALUATION AND CONSULTATION

**RE:** Lidia Orrego

**DATE OF ACCIDENT:** 10/23/2018

**DATE OF INITIAL INTAKE/EVALUATION:** 09/16/2019

**INTAKE INFORMATION**
**(CPT 90791-PSYCHIATRIC DIAGNOSTIC INTERVIEW EXAMINATION)**
Lidia Orrego, a 42-year-old female, was seen for an initial psychosocial evaluation of emotional distress following sustaining injuries in a work-related incident. Ms. Orrego is married and has one daughter (age 6). She currently resides in Rego Park, NY with her husband, daughter, mother, and godfather. Her highest level of education is some college.

Ms. Orrego reported that the following incident occurred on October 23, 2018 while working as a nanny: "Date 10/23/2018, around 7pm I was in the kitchen of the house, where there were cameras and the 7-year-old child hit me twice in the back (this was the last time it happened from various occasions that occurred within 8 months). I fell on the floor because of pain and I asked Teresa A. if she has something for pain. During those days, almost in the last months I worked up to 15 hours daily. I lifted a lot of couches, boxes, and all the heavy jobs in the house." She went on to state that the "child practices wrestling' the abuse from child went on for months. I will tell the aunt about the abuse, she will answer me, 'you Mexicans eat too much corn and your bones are not hard enough' (note: this client is not from Mexico, but from Paraguay)." Ms. Orrego indicated that she "never spoke with anyone about all the problems of discrimination, abuse, and physical lesions" due to being "scared to speak up." When she did complain to her boss, she was reportedly told, "that no one should know anything because [she] also signed a contract."

Ms. Orrego indicated that she experiences pain in her back, hands, wrists, arms, shoulders, knees, and neck. To date, Ms. Orrego has received pain medication and physical therapy for her back pain. She also has received psychological treatment (including medication) to help with her symptoms of anxiety and sleep difficulties. Records from Elmhurst Hospital indicate that Mr. Orrego received a psychiatric evaluation on 06/14/2019. She was prescribed Lexapro (5mg) and Atarax (10mg) and referred for individual therapy.

Following the work incident, she has been experiencing ongoing pain and headaches. She reported that she has difficulty with the following: "cannot lift objects, cannot lift my 6-month-old baby, cannot stand up for long periods, cannot clean regularly cannot drive; in pain; cook; cannot exercise walk long distances; I don't want to have sex or converse with my partner." Ms. Orrego indicated that she did not return to her job due to being "fired." She stated that this is

when things "got worse" because she "fell into a deep depression" and "couldn't find another job with the injury." However, Ms. Orrego was able to eventually get another job and began this job as of 02/23/2019.

Emotionally, Ms. Orrego reported experiencing a variety of psychological concerns. Symptoms endorsed included: disturbance in mood (i.e., depressed, irritable, anxiety), tearfulness, mood swings, panic attacks, disturbance in sleep (i.e., initial/terminal insomnia, frequent waking), fatigue, flashbacks, avoidance (i.e., talking about incident), sense of guilt, decreased appetite, decreased libido and worthlessness. She reported seeing a decrease in motivation and interest. She indicated that she feels as though she has become more argumentative, seclusive, and fearful. Lastly, Ms. Orrego noted that it now takes her longer to do things and has difficulty initiating/completing tasks.

Ms. Orrego was interviewed by Dr. Maria Sesin, who conducted a Mental Status Examination. During the examination, Ms. Orrego was pleasant and cooperative. Her mood was sad/depressed and worried, which was consistent with her affect. Her speech was within normal limits. She was alert and fully oriented. Overall, thought process was goal-directed. She denied experiencing current suicidal or homicidal ideation. There was no evidence of a thought disorder and she denied hallucinations and delusions during the interview. Memory was intact. Insight was fair, judgment was good, and impulse control was good.

Review of prior history is unremarkable. There is no evidence of prior physical, intellectual, emotional, social or vocational history which would account for the current symptoms. Therefore, the symptoms reported as well as the results of this evaluation are *consequentially related* to the incident which occurred on October 23, 2018.

## PSYCHOLOGICAL ASSESSMENT
## (CPT 96101-PSYCHOLOGICAL TESTING; 6 UNITS)
### PTSD CHECKLIST
Ms. Orrego completed the PTSD checklist, which provides a global measure of posttraumatic stress and other psychological sequelae of traumatic events. Overall, Ms. Orrego's responses highlighted symptoms such as: repeated, disturbing dreams and memories of the stressful experience; *suddenly feeling or acting as if the stressful experience is happening again;* avoids external reminders of the stressful experience; having strong reactions when reminded of the incident; feeling upset when something reminds her of the incident; avoids memories, thoughts, and feelings related to the stressful experience; irritability; decreased interest; being watchful; difficulty concentrating; trouble falling and/or staying asleep; and other alterations in arousal and reactivity.

### BECK DEPRESSION INVENTORY-II
On the Beck Depression Inventory, Ms. Orrego's score is in the *severe* range. Symptoms reported included: sadness, discouragement about the future, sense of failure, loss of pleasure, feelings of guilt, feeling of being punished, loss of confidence, increased self-criticism, tearfulness, restlessness, loss of interest, indecisiveness, worthlessness, loss of energy, changes in sleep pattern, irritability, changes in appetite, concentration difficulties, fatigue and decreased libido.

### BECK ANXIETY INVENTORY
On the Beck Anxiety Inventory, Ms. Orrego's score was in the *severe* range. Symptoms endorsed included: numbness/tingling, feeling hot, wobbliness in legs, inability to relax, fear of the worst happening, dizziness/lightheadedness, heart pounding/racing, unsteadiness, terror, nervousness,

choking sensation, trembling, shakiness, fear of losing control, difficulty breathing, fear of dying, feeling scared, abdominal discomfort, feeling faint, face flushing, and sweating (not due to heat).

## BECK HOPELESSNESS SCALE
On the Beck Hopelessness Scale, Ms. Orrego's score is in the *severe* range, which is cause for concern. This is a significant finding. It indicates a need for frequent monitoring and justifies a continuing course of psychological treatment. Ms. Orrego has become desperate and the need for treatment on a regular and consistent basis is strongly recommended.

## BRIEF SYMPTOM INVENTORY
Ms. Orrego completed the Brief Symptom Inventory, which provides a Global Severity Index (GSI) of her overall level of psychological distress. The GSI is a concise, quantitative indication of the patient's current level or depth of psychological dysphoria and is the single best indicator of the patient's overall emotional adjustment. Ms. Orrego's GSI is at the 99th percentile, which is an indication of significant distress. The average range for cut-off is at the 50th percentile.

The Brief Symptom Inventory also has three dimensions which measure somatization, depression and anxiety symptoms. Ms. Orrego's results indicated that all three domains were elevated, signaling psychological distress.

## SCL-90-R
On the SCL-90 Ms. Orrego's profile reveals a pattern and magnitude to be considered in the clinical range, and qualifies her as a positive clinical case. The intensity of Ms. Orrego's psychological distress is extremely high, as a large number of psychological symptoms were endorsed.

The SCL-90-R is a psychological evaluation tool that reflects the psychological symptom pattern of patients. It is based upon data which has the advantage of deriving from the person actually experiencing the psychological problems. Clinical interviews are limited to reporting versions of the patient's experience based upon the behavior and verbal report of the patient. The SCL-90-R is a measure of current point-in-time psychological symptom status; a series of standardized objective statistical analyses are used to arrive at conclusions about patient's psychological conditions. The SCL-90-R can be used as a screening device as well as an outcome measure. It has high levels of reliability and validity; it has been standardized on a large sample. There are internal validity scales which assess intentional distortions to provide a measure of the patient's response patterns. The global indices of the SCL-90-R facilitate an understanding of basic information about the response style and problems being experienced by the patient. When used with additional sources of data the SCL-90-R provides a powerful instrument to assess a patient's current condition and to make recommendations for treatment.

## QUALITY OF LIFE INVENTORY
On the Quality of Life Inventory, Ms. Orrego's responses indicate that her overall satisfaction with life is in the *Very Low* range. This indicates that she is extremely unhappy and unfulfilled in life. Individuals with scores in this range lack enthusiasm for life and feel that their lives lack meaning or purpose. They cannot get their basic needs met and cannot achieve their goals in important areas of their life. People with scores in this range may lack important skills needed for achieving their goals in life. Therefore, Ms. Orrego will benefit from treatment which aims to increase the overall quality of her life.

## COGNITIVE DISTORTION SCALES (CDS)
The Cognitive Distortion Scales assesses five types of cognitive distortions. Ms. Orrego's level

of self-criticism is in the clinical range, indicating a tendency to criticize or devalue oneself, both internally and to others. Levels of helplessness are in the clinical range, which is associated with one's perception of being unable to control or influence important, typically negative, aspects of one's life. Levels of hopelessness are in the clinical range and suggests Ms. Orrego believes that the future is bleak and that she is destined to suffer or fail. Ms. Orrego's level of self-blame is in the clinical range, which suggests she has a tendency to blame herself for negative, unwanted events that have occurred in her life. Lastly, her responses indicate that her preoccupation with danger is in the clinical range, which suggests that Ms. Orrego has a tendency to view the world as a dangerous place, especially in the interpersonal domain.

These distortions/cognitive dysfunctional thinking patterns interfere with optimal functioning and result in emotional distress. The results of the CDS will be used to remediate these faulty attributions and will provide a series of coping skills and cognitive restructuring exercises that will enable Ms. Orrego to become more effective in her daily life and help her avoid and remediate emotional distress.

## GENERALIZED SELF-EFFICACY SCALE
On the Generalized Self-Efficacy Scale, Ms. Orrego's results signaled a decreased sense of self-efficacy. She lacks confidence in her ability to exert control over her life and environment. She requires psychological treatment that will highlight her strengths and capabilities to help increase her sense of self-efficacy and confidence.

Self-efficacy refers to the belief in the ability to deal with challenging encounters. It is one's belief that they have the capacity to organize and execute the necessary course of action to manage situations as they come up. Low self-efficacy affects thought patterns, actions, and physical and emotional states of arousal. Individuals with low self-efficacy experience anxiety, hopelessness, and anger. They find it harder to bounce back after adversity. Therefore, psychological treatment is critical to highlight strengths and challenge negative attributions that are made about the self to increase the level of self-efficacy.

## PSYCHOLOGICAL INFLEXIBILITY IN PAIN SCALE (PIPS)
On the Psychological Inflexibility in Pain Scale (PIPS), the following items were endorsed as being "*always true*."

"I say things like, "I don't have the energy", "I'm not well enough" and/or "I have too much pain;" I need to understand what is wrong in order to move on; I avoid doing things when there is a risk it will hurt or make things worse; it is important to understand what causes my pain; I don't do things that are important to me to avoid pain; I postpone things because of my pain; I would do almost anything to get rid of my pain; It is important that I learn to control my pain; and, **it's not me that controls my life, it's my pain**."

## PAIN EXPERIENCE SCALE
On the Pain Experience Scale, Ms. Orrego reports frustration, irritability, anger and depression as a result of pain. She feels anxious and overwhelmed. She thinks about her pain getting worse and is afraid that it will get worse over time. She wonders what it would be like to never have any pain, wonders how long it will last, finds it difficult to think about anything other than her pain, and thinks "it is so hard to do anything when I have pain." She feels sorry for herself and feels disappointed with herself for giving into the pain. She feels impatient with others, feels like everyone is getting on her nerves, and thinks the pain is driving her "crazy." She worries about her family. Lastly, she wonders whether life is worth living.

**MULTI-DIMENSIONAL PAIN INVENTORY**
The Multidimensional Pain Inventory, a standardized psychological test, consists of 12 pain empirically derived scales which assess the impact of pain on the following issues: pain severity, perceived interference of pain in life activities, affective distress, perceived control over life, support from significant others, responses by significant others, and the performance of a set of common activities. The multidimensional pain inventory required the patient to respond to numerous questions specifically related to their current pain problem these responses were statistically compared to a normative sample of patients experiencing similar symptoms. On the Multidimensional Pain Inventory, Ms. Orrego's responses indicated that she is experiencing a decrease in general activity level.

**CHRONIC PAIN ACCEPTANCE QUESTIONNAIRE**
The Chronic Pain Acceptance Questionnaire assesses for a patient's global acceptance of chronic pain, which includes two factors: activity of engagement and pain willingness. Ms. Orrego's responses indicate that she has a decreased ability to engage in and pursue valued life activities as a result of pain. Additionally, she has a decreased ability to recognize that avoidance and control are unsuccessful in managing chronic pain. These results suggest that Ms. Orrego has not fully accepted her chronic pain.

**SUMMARY**
Lidia Orrego is suffering from symptoms of depression since sustaining injuries in a work-related accident. She is also experiencing pain and disability. She is unable to function the way that she would like to in her daily life due to ongoing difficulties. Psychological will focus on providing supportive care, coping skills training, cognitive restructuring, relaxation training, and other techniques needed to help her take steps towards moving forward in her life.

The symptoms reported, as well as the results of this evaluation, are ***consequentially related*** to the incident which occurred on October 23, 2018.

Therefore, Dr. Sesin will continue to provide a full course of psychological treatment to Ms. Orrego for symptoms of depression.

**DIAGNOSIS**
F32.2    Major Depressive Disorder, Single Episode Severe w/o Psychotic Features
F45.42   Pain Disorder with Related Psychological Factors

Chronic pain/disability

*Maria C. Sesin, PhD*
Maria Sesin, Ph.D.
Psychologist

*Tarryn Moor, PsyD.*
Tarryn Moor, Psy.D
Psychologist

## Rationale for Testing and Test Selection

For clinical psychologists, assessment is second only to psychotherapy in terms of its professional importance. There is significant clinical value in a multimethod assessment. Use of only a clinical interview to obtain information from a patient is likely to lead to an incomplete understanding of a patient and faulty conclusions. In combination with a clinical interview, psychological testing assists in the clearer identification of symptoms that patients are suffering from, as well as patients who may be at higher risk. By using different modalities of assessment, distress is identified more readily which thereby leads to improved medical treatment outcomes, patient satisfaction, and decreased treatment length. Undetected psychological distress leads to worse outcomes, poor treatment response, and potential for increased somatic complaints.

The goal of evaluation and assessment is to identify therapeutic needs, highlight psychological issues and their severity, describe current functioning, recommend forms of intervention, and formulate an empirically informed working treatment plan.

Tests included in this report are psychometrically sound, and normed and standardized allowing for more precise measurement of psychological/emotional/behavioral problems for the purpose identified above.

### PTSD Checklist (PCL-5)
The PCL-5 identifies key symptoms of Posttraumatic Stress Disorder. It clarifies what symptom criteria are met, as well as provides a severity level of the current symptoms.

The PCL-5 is considered the gold standard for monitoring symptom change during and after treatment, screen patients for Posttraumatic Stress Disorder (PTSD) and for the purpose of making a provisional PTSD diagnosis. PCL-5 has been validated for assessing for the emotional sequala of civilian trauma and PTSD.

### Beck Depression Inventory-II (BDI-II)
The BDI-II assesses the presence of depressive-related symptomology, as well as the severity level of associated symptoms.

The Beck Depression Inventory-II is an effective measure of depressed mood whose utility has been repeatedly demonstrated across clinical and research populations. Its use is widespread both clinically and as a dependent measure in outcome studies of psychotherapy and antidepressant treatment. The BDI has been used universally for over 35 years.

Psychometric properties of the BDI-II are sound. Coefficient alpha estimates of reliability for the BDI-II with outpatients was .92 and was .93 for the non-clinical sample. The test-retest reliability coefficient across the period of a week was quite high at .93. Concurrent validity showed moderately high correlation with similar measures of depression (r =.71).

### Beck Anxiety Inventory (BAI)
The BAI assesses the presence of anxiety-related symptomology, as well as the severity level of associated symptoms.

The Beck Anxiety Inventory consists of items measuring physiological and cognitive aspects of anxiety. The BAI has been found to discriminate well between anxious and non-anxious diagnostic groups in a variety of clinical populations. It has also been demonstrated to be responsive to change over time among both psychiatric populations and medical populations.

The BAI has an excellent internal consistency (Cronbach's alpha = .92) and a one-week retest reliability coefficient of .75). In terms of validity, The BAI is moderately correlated with similar anxiety measures (.51).

### Beck Hopelessness Scale (BHS)

The BHS assesses the affective, motivational, and cognitive aspects of hopelessness. The Beck Hopelessness Scale has been the most frequently used instrument for measurement of hopelessness in the past 40 years. Research on the BHS consistently supports a positive relationship between BHS scores and measures of depression and suicidal intent/ideation. This measure is also used to assess those individuals at risk for committing suicide.

The BHS has a Kuder-Richardson-20 internal consistency coefficient of .93 and correlates well (.63) with the pessimism item of the Beck Depression Inventory.

### Brief Symptom Inventory-18 (BSI-18)

The BSI-18 assesses overall psychological distress. The Brief Symptom Inventory is a highly sensitive assessment of psychological distress and psychological disorders in medical and community populations. It has been validated in both community and medically complex samples. It is designed with a high degree of reliability in mind as well as to support clinical decision-making and to monitor progress throughout treatment. The BSI-18 is used in clinical settings to assess for psychological problems at intake, measure progress/change during and after treatment, support treatment planning, and provide outcome measures for treatment programs.

The BSI-18 is composed of three symptom scales – somatization, depression, and anxiety. It also provides a Global Severity Index, which helps measure overall psychological distress level. The symptom scales and global scores correlate highly (> .90) with alternative measures of psychological distress

The psychometric properties of the BSI-18 have been investigated cross-culturally. In each study, the BSI-18 Global Severity Index has shown excellent internal consistency.

### Symptom Checklist 90-Revised (SCL-90-R)

The SCL-90-R evaluates the psychological symptom patterns of psychiatric and medical populations, as well as non-patient populations. It is highly useful in case identification, case conceptualization and treatment planning.

The psychometric properties of the SCL-90-R have been thoroughly researched and each of the nine symptom categories have exhibited good internal consistency (coefficient alpha from .77 to .90) and high concurrent validity with the MMPI.

The assessment of cognitive/affective depression has excellent internal consistency of .89 and the assessment of somatic depression has adequate internal consistency of .62. Validity correlations range from .15-.72 for depression, .48-.59 for anxiety and .44-.71 for interpersonal sensitivity.

### Quality of Life Inventory (QOLI)

The QOLI assesses the individual's perceived quality and satisfaction with their life. The QOLI is theoretically grounded in the perspective that life satisfaction is based on the discrepancy between what an individual has and what the individual desires in valued areas of life. This measure has been used extensively in well-being outcome, descriptive, and case studies with both clinical and non-clinical populations.

Quality of life is an important aspect to assess, particularly for treatment planning. It helps identify the patient's sources of fulfillment. The concept of quality of life has been understood to be related to both physical and emotional well-being and therefore can help increase the likelihood of successful treatment outcomes.

The QOLI has been found to be psychometrically sound, with good reliability and validity. It has also demonstrated sensitivity to change following treatment. The QOLI has concurrent, discriminant, predictive and criterion-related validity in clinical and non-clinical populations.

## Cognitive Distortions Scales (CDS)

The CDS assesses for the presence of cognitive distortions that may interfere with optimal functioning. Dysfunctional thinking patterns include: self-criticism, self-blame, helplessness, hopelessness, and preoccupation with danger. Assessing and understanding cognitive distortions and/or unhelpful thinking patterns that an individual may hold will enable the provision of appropriate treatment planning. A patient's emotional reactions to events are often affected by the mechanisms with which information is processed and negatively biased cognitive processes lead to maladaptive emotional and behavioral consequences. Challenging and eventually altering distorted thinking patterns are an *essential* component of cognitive-behavioral therapy.

The CDS is a valid and reliable measure that has been used in clinical and non-clinical populations to assess for a patient's thinking patterns. Reliability coefficients for the CDS scales among a normative sample ranged from .89 to .97, with an overall mean CDS scale alpha of .93. The scale alphas for the clinical sample ranged from .94 to .98, with an overall mean alpha of .96. Alpha values of this magnitude indicate very high internal consistency reliability. The CDS was also found to have construct, convergent, and discriminant validity in the general population and clinical samples.

## Generalized Self-Efficacy Scale (GSE)

The GSE was administered for the purpose of assessing an individual's beliefs related to their ability to respond to various life circumstances and cope with adversity or setbacks. Perceived self-efficacy facilitates goal-setting, effort investment, persistence in the face of barriers, and recovery from setbacks. Recent pain literature research focuses on the role of self-efficacy in one's ability to manage stressful life experiences.

Identification of the belief in one's ability to react to and control environmental demands helps gain an understanding of a patient's sense of confidence in their ability to successfully manage an illness and/or follow through with behavior change.

In samples from 23 nations, Cronbach's alphas ranged from .76 to .90, with the majority being the high .80s. Criterion-related validity has been documented in numerous correlation studies where positive coefficients were found with favorable emotions, dispositional optimism, and work satisfaction. Negative coefficients were found with depression, anxiety, stress, burnout, and health complaints.

## Pain Experience Scale (PES)

The PES provides qualitative information regarding the individual's pain-related emotional reactions. More specifically, the PES provides a direct personal account of the individual's reaction to their physical pain and highlights the frequency of which this occurs. The PES also allows for a better understanding of the individual's specific affective/cognitive responses to pain to help guide psychological care moving forward.

## Psychological Inflexibility in Pain Scale (PIPS)

The PIPS assesses a patient's psychological inflexibility in the context of pain. The PIPS focuses on two factors of psychological inflexibility: avoidance of pain and cognitive fusion with pain. The concept of psychological flexibility theorizes that psychologically flexible individuals are able to pursue their values and goals despite pain and other discomforts. Research has found that the PIPS mediates the relationship between pain and disability The PIPS is theoretically grounded in Acceptance and Commitment Therapy, which has long demonstrated the effectiveness of treatment chronic pain.

The PIPS has demonstrated good internal consistency with Cronbach's alphas of .90 (avoidance, .75 (fusion) and .89 (total scale). The intercorrelation between the subscales was found to be .46. Concurrent validity was also found to be good.

### Chronic Pain Acceptance Questionnaire (CPAQ)

The CPAQ assesses a patient's global acceptance of chronic pain. Acceptance of pain is associated with a reduction in unsuccessful attempts to avoid or control pain. Behavioral treatment for chronic pain encourages the development of various psychological processes such as acceptance to help patients focus on value-driven behavior and pursing meaningful goals. CPAQ results help to identify fear and avoidance, which are central psychological mechanisms underlying chronic pain and has been shown to predict depression and disability.

The CPAQ is comprised of two factors and demonstrates very good to excellent internal consistency with alphas of .82 and .78. The CPAQ also demonstrates moderate to high correlations with measures of avoidance, distress, and daily functioning. The two factors that comprise the CPAQ have been found to significantly predict pain-related disability and distress, thus demonstrating predictive validity.

### Multidimensional Pain Inventory (MPI)

The MPI assesses the impact of pain on various domains of an individual's life. Responses are statistically compared to a normative sample of patients experiencing similar symptoms. This comparison provides the health care provider with information regarding the patient's perception of pain, as well as highlights situations wherein an individual's affective distress may impact their response to the treatment of their physical health.

The MPI is one of the most commonly and widely used instruments of pain-related variables in medical settings. It has been used both clinically and in research. In clinical settings, the MPI allows clinicians to identify primary issues within the specific chronic pain patient that is being treated.

The median internal consistency of the scales that make up the MPI is .77 and the median 2-week test-retest reliability is .84 in initial validation studies. The subscales have internal reliability coefficients ranging from .70 to .90 and test retest reliabilities ranging from .62 to .91. These scales were also significantly correlated with several criterion measures of anxiety, depression, marital satisfaction, pain severity and health locus of control.

# Exhibit 9

STATE OF NEW YORK
WORKERS' COMPENSATION BOARD
PO BOX 5205
BINGHAMTON, NY  13902-5205
*www.wcb.ny.gov*

(877) 632-4996



**Workers' Compensation Board**

Clarissa M. Rodriguez
Chair

## State of New York - Workers' Compensation Board

## In regard to Lidia M Orrego, WCB Case #G258 4330

### NOTICE OF DECISION
*keep for your records*

At the Workers' Compensation hearing held on 10/31/2019 involving the claim of Lidia M Orrego at the Queens hearing location, Judge Barry Greenberg made the following decision, findings and directions:

DECISION:    Claimant did not appear at the hearing, or was otherwise not prepared to proceed.

Form(s) C-8.1 which raised issues relating to treatment and/or disputed medical bills are resolved in favor of the carrier without prejudice to establishment of the claim.  Place on notice- Cannon Cochrane Management services inc po box 1127 Neptune NJ 07754  as third party administarotor    (T#)100134. I find prima facie medical evidence for the neck back right wrist both knees and major depressive disorder. Claimant is alleging an occupational disease claim, not an accident claim. Claimant to produce C-3 reflecting current claim. The claimant was present, but was not prepared to prosecute the claim.  No further action is planned by the Board at this time.

| | | | |
|---|---|---|---|
| Claimant - | Lidia M Orrego | Employer - | Kevin & Stephanieanna |
| Social Security No. - | | Carrier - | New York Marine & General |
| WCB Case No. - | G258 4330 | Carrier ID No. - | W156665 |
| Date of Accident - | 10/23/2018 | Carrier Case No. - | 18P05J084317 |
| District Office - | NYC | Date of Filing of this Decision - | 11/05/2019 |

ATENCION:

Puede llamar a la oficina de la Junta de Compensacion Obrera, en su area correspondiente, cuyo numero de telefono aparece al principio de la pagina y pida informacion acerca de su reclamacion(caso).

(4850)58478367-1

Copies To:         Case #G258 4330
Claimant:         Lidia M Orrego
Carrier:          ~~New York Marine & General~~
Employer:         Kevin & Stephanieanna
Other:            Pasternack, Tilker, Ziegler
                  Cannon Cochrance Mgmt Servs
                  Yi Luam
Jeffrey Rosner
Stephen Rosell

Lidia M Orrego
95 08 Queens Blvd  #3E
Rego Park, NY  11374

## NOTICE TO INJURED WORKER

1. Any compensation due will be sent to you by check by the employer or insurance carrier.

2. Keep a careful record of the payments received in order that you may have evidence of payment or nonpayment in case of dispute.

3. Do not pay anything to anyone representing you. If you hire a lawyer or licensed representative, the fee will be set by a W.C.Law Judge. The fee will be deducted from your award and paid by separate check directly to the lawyer or licensed representative by the employer or the insurance carrier.

4. Except for Volunteer Firefighters' and Volunteer Ambulance Workers' claims, no lost wage benefits are paid for the first seven days of disability unless the disability extends beyond 14 days.

5. If your case was continued and the Judge directed that your benefits are to continue, the insurance company or self-insured employer must keep paying you until :

   (a) you have another hearing and the Judge stops or changes your benefits

   or

   (b) your employer or insurance company has evidence that you have returned to work at regular pay or a report from your doctor stating you have no disability and submits this evidence to the Workers' Compensation Board.

6. If you wish to apply for administrative review of any part or all of the Judge's decision, your application must be in writing and received by the Board within 30 days of the filing date of this decision. The filing date is on the other side of this form in the lower right-hand corner. You may deliver your application in person to the District office or send it by mail.

7. If you have any further questions, you may contact your district office by mail or by telephone. The address of your district office is:

STATE OF NEW YORK
WORKERS' COMPENSATION BOARD
PO BOX 5205
BINGHAMTON, NY  13902-5205

Phone Number:  (877) 632-4996

EC-23 (4/98)                    **OVER**

(4850)58478367-1

# Exhibit 10

Ⓜ Gmail        Lidia Orrego <liorrego@gmail.com>

---

## CASE REPORT DATE 05-28-2020

---

**Lidia Orrego** <liorrego@gmail.com>             11 de junio de 2020, 16:33
Para: debra.karpf@hhsnassaucountyny.us
Cc: Lidia Orrego <liorrego@gmail.com>

Good afternoon, Mrs. Debra,

My name is Lidia Orrego and I was the one who reported on the Knipfing Family in Old Westbury.

I am fluent in Spanish so I will do my best with the translation.

I give you a detail of the people involved:

**Parents/Nannies:**

- Kevin K. (father)
- Stephanienna K.(mother)
- Teresa A. Z. (TAZ) (my supervisor- nanny children's aunt - Sthephanienna K.'s Sister) She threatens Rebecca with showing videos of her abuse with the 3-year-old girl.
For this reason Teresa discriminates against her as well as me in daily fights in the presence of children. All of this was also entered into my EEOC complaint,
Teresa A. Z's abuse of children.
- Rebeca L /U (other nanny, my coworker , who has a long list of other victims, witnesses, recordings, photos, videos, also told me that Teresa A. Zantua
has a restraining order from another person whom she also discriminated against and abused. All of this I have recordings as evidence. In addition, my mother is also a
witness when Rebeca comments on all the abuse and mistreatment.)

**People who knew about abuse and mistreatment:**

- Skylar T.(house manager)
- Cristina C. (housekeeper)
- Shannon S.(teacher)
- Guest Priests who confessed to the children ███████████████████
There were guest priests who came to stay inside the house for weeks. ████████████

**Other people who have knowledge of some events** or witnessed fighting and threats:

- Gerardo G. (chef)
- Steve S. (manager)
- Mike D. (friend)

**People who know of abuse and mistreatment but they never gave me advice that I should make the report to Child Protection Services:**

- Tefta and Irma (employer's investigators)

*These people even told me that everything was confidential, they did not even allow me to speak to anyone unless they authorized me.
- Alexander C. (former lawyer)
- Derek S. (former lawyer)
- Danny M. (former paralegal)
- Matthew F. (former lawyer)
- Michael B. (former lawyer)
- Pablo M. ( former paralegal)
- Peter R. (former lawyer)
- David B. (former lawyer)
- Deborah R. (Investigator EEOC)
- Debra R. (Investigator EEOC/ Mediator)

I will be sending you emails with all the reports, pictures, recordings, text messages, notes with dates which you can check with the cameras of the house where
you can see many details and which I indicated to investigators in November 2018. About the recordings, many are in Spanish, so I could tell you what it says especially where
it talks about child abuse and mistreatment. I also have the recording of what was discussed with the investigators. Even the last assault and battery I suffered as of October 23, 2018
that I told Stephanieanna that she could check in the cameras by text message and email.

All of these abuses and mistreatments were reported by my attorney to the EEOC on 01-31-2019, but they never told me that I should report to CPS, even the EEOC Investigator, Debra R.
also did not tell me in mediation that I had to report all this so that all the abuses could be investigated and corroborated, attached the EEOC complaint see points 16-17-18.

I attach the formal complaint on November 2, 2018 and EEOC Charges on January 31, 2019.

**Childrens:** age in the year 2018

- S⬛⬛⬛⬛⬛⬛⬛⬛⬛ to whom they gave sleeping pills, tranquilizers, pills for bruises and for constant stomach pain, all over the girl was used to taking pills. When I started
working at home, the girl already had cavities because no one was brushing her. Furthermore, Rebeca told me that no one had ever told her that she should brush her teeth. (see report of the dentist).
Rebeca L. constantly told me to prevent the mother from giving her pills and she also always informed me when the mother gave them, on one of those occasions I was able to record
this statement that I also presented to Mr. Kevin K. for the investigation.
The girl disappeared 6 hours a day (so as not to disturb the parents) with the other babysitter Rebeca and when she returned to the the the girl was sick at home, vomited, had panic attacks,
anxiety, I had also reported bruising on occasions but no one asked why she had the bruises.
The other Nanny Rebeca,gave her candies all day and so that the girl would obey, she would tell her in Spanish that she would give her candies if she obeyed like that, the other employees
did not understand that she was training the girl. Rebeca L. told me all the time that Teresa A. Zantua was doing something to the ⬛⬛⬛⬛ girl and we should protect her, several times
she even cried because she told me that something very bad was happening and that we should report to Kevin K. that we were going to waste time denouncing the mother because she
also participates in these abuses and makes her aware. I always had to check the girl several times when she fell asleep, if she breathed normally or not because I was afraid that something
would happen to her if they were given so many pills.
Everything bad that happened to the girl, Rebeca reported to me that she was Aunt Teresa. But in reality it was both who mistreated the girl. Rebecca even cried desperately saying that we
must protect the girl.
The girl also confirmed that the candies were in Rebecca's car and she always showed me where the candies were hidden in the house in Rebecca's room or in the girl. Which I removed and
threw away because it could harm the girl and make her prone to illness.
The Aunt Teresa A. Z. told me that she should give the girl sweets as Rebecca does. Nobody or her mother cares that they give her sweets, so I should do the same. But on the contrary,
I kept her from eating the candies, so the girl became depressed and cried, so the mother gave her pills that she brought from her room.

- K⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛
⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛
The boy was violent and had no compassion when he inflicted any pain, he always hit me and Aunt Teresa A. Z. justified all this with racist comments when I asked him to stop hitting me.
I also taught her to discriminate saying that they should not allow me to speak in Spanish and she told the child to watch me if I recorded what she was saying, but I have a recording and other
text messages where she orders me not to speak Spanish even when she is not present. All of these abuses were in the car. But one of the abuses occurred in the house and I denounced so
that they could corroborate the cameras on 10-23-2018 and I have the recording of this last physical assault.

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛
⬛⬛⬛ When the boy asked him again, he started crying but he said he couldn't tell me anything.
The dentist had to extract the teeth because they were rotten because the teeth were never cleaned. The dentist has an office in Jericho Gardens.

- S⬛⬛⬛⬛⬛⬛ : This girl had panic attacks and depression, she cried without reason, several times she was mistreated in my presence by her aunt. She always locked herself in her closet with the
⬛⬛⬛⬛⬛⬛ sister. According to Rebeca's statement, her aunt abused and mistreated all the time in front of Shannon (teacher) and her mother, nobody defended her or her sister S⬛⬛⬛

- S▮▮▮▮▮▮▮▮ According to the statements of Rebeca L. S▮▮▮, ▮▮▮▮▮▮▮▮▮▮▮for Aunt Teresa's abuse. This had also been told to me by Cristina Coimbra
who found the bed wet in the morning. When I was working helping the housekeeper I also found S▮▮▮▮'s ▮▮▮▮▮▮▮
▮▮▮▮. She also hides in the closet.

The mother Stephanieanna for days did not take care of the children, especially the▮▮▮▮▮▮▮ whom she avoided all day, so she preferred that the girl not be in the house.Stephanieanna was
locked in her closet every day, nobody knew what she was doing because she doesn't work.

Auntie Teresa A. Z. also encouraged the childrens to discriminate against us and call us "Stupid Mexicans" and other racial or degrading insults all the time and made fun of Hispanic nannies.

Also in that investigation it had denounced that Teresa A.Z. was the driver who repeatedly endangered the children and me for driving with excessive speed, texting or talking on the phone,
crossing a red light, a stop sign and even confronting and cursing other drivers, putting everyone in the vehicle at risk. On one occasion, the police stopped us and she avoided charges against
him saying that she was Kevin K.'s sister-in-law.

As I was also a victim of discrimination, physical and emotional abuse in the Knipfing house, I have pending cases in Court I am until today under physical and emotional treatment
of which I have documentation, my previous lawyers never told me that I had to report all this to the contrary, they were harming me and pressuring me that no one should know
anything about this, everything should be handled confidentially.

The Judge in my Work Compensation case has determined that there is physical evidence of my injuries and all the doctors have determined that my injuries also agree with what happened.
I was diagnosed with PTSD and Major Depression for this reason, a lot of information was blocked or I didn't remember until I started making notes with my psychologist.
Much of this information was given in writing to my former lawyers but none of them encouraged me to make the Report, also They did not report it on my behalf because the abusers
were still with the children.

I could no longer contain so much anguish and suffering to report all that abuse and mistreatment, because it is horrible what they do with them even more now that
I remember many more things that were blocked by PTSD and for everything they did to me  Now I 'm recovering to be able to defend those children and defend myself.
If I as an adult have affected me so much, imagine what some children who stay with these abusers can do throughout this time. They also fired me, the person who made
verbal complaints all the time until I had to get to the complaint in writing to stop those abuses. I got fired with false statements to cover the discrimination and abuse I suffered
as well as the abuse and mistreatment of children intimidating me with investigators and even a false NDA (Non-Disclosure Agreement) telling me that nobody could see the
complaint I sent by email about this whole situation on Nov 2, 2018. All of this will be exposed in my Lawsuit in Federal Court.

Best regards,

Lidia Orrego

---

**2 adjuntos**

📄 **11-02-2018 Gmail - MY SITUATION A WORK FOR 8 MONTHS 11-02-2018.pdf**
131K

📄 **01-21-2018 EEOC CHARGES.pdf**
4151K

 **Gmail** # Exhibit 11    Lidia Orrego <liorrego@gmail.com>

## Email 2
1 mensaje

**Lidia Orrego** <liorrego@gmail.com>                  19 de junio de 2020, 11:06
Para: debra.karpf@hhsnassaucountyny.us
Cc: Lidia Orrego <liorrego@gmail.com>

Good morning Ms. Debra, I send you Email No. 2 - 3 - 4 - 5 and 6 with all the information, if you have any questions please let me know. CASE KNIPFING FAMILY

I apologize if there is any error in the translation, I did my best.

Warm regards,

Lidia Orrego

---

**3 adjuntos**

   📄 **CPS NOTE 2.docx**
       16K

   📄 **CPS NOTE 1.docx**
       14K

   📄 **MESSAGES FROM SKYLAR T.pdf**
       796K

M Gmail                                              Lidia Orrego <liorrego@gmail.com>

# Exhibit 12

---

**Fwd: New Nanny... Lidia**
2 mensajes

---

**Skylar Testa <skylartesta@gmail.com>**                    1 de noviembre de 2018, 18:03
Para: Lidia Orrego <liorrego@gmail.com>

Lidia,

Here is a copy of your NDA (Non Disclosure Agreement).

Best,

Skylar
310.926.7236
SkylarTesta@gmail.com

---

📄 **2018-01-31 22-20.pdf**
     5461K

---

**Lidia Orrego <liorrego@gmail.com>**                    1 de noviembre de 2018, 18:52
Para: Skylar Testa <skylartesta@gmail.com>

Thank you ! Only the paystubs are missing.
[El texto citado está oculto]

### SERVICE PROVIDER CONFIDENTIALITY AGREEMENT

This Agreement is created and entered into effective as of __Lidia M. Orcep__, 2018 between Kevin Knipfing (a/k/a Kevin James) and Stephanieanna James-Knipfing (a/k/a Steffiana de la Cruz) (collectively the "Employer", on the one hand, and _____ ("Employee"), on the other hand (sometimes collectively referred to as the "Parties")

### 1.    CONDITION OF RENDERING SERVICES

As a condition of and in consideration for Employee's employment with, and for good and valuable consideration and benefits, the receipt of which is hereby acknowledged, Employee agrees to the terms of this Confidentiality Agreement ("Agreement") and to strictly comply with each of its terms and conditions

### 2.    CONFIDENTIAL INFORMATION

#### A.    DEFINED TERM

Employee acknowledges and agrees that in connection with Employee's rendering services for the Employer, Employee may obtain, overhear or otherwise become aware of information and/or documents constituting or concerning

(i)    business and/or personal information about the Employer, family members of the Employer, the Employer's past and present friends and associates, and the past and present representatives and employees of the Employer and any companies the Employer owns or controls (including but not limited to Still Eddie, Inc.), whether individually or collectively, and the officers, directors, shareholders, members, managers, agents, and employees of any such companies (referred to collectively as the "[Employer-Related Parties"].

(ii)    private and confidential matters concerning Kevin Knipfing, Stephanieanna James-Knipfing and/or any of the Employer-Related Parties.

(iii)    financial, business, medical, legal and contractual matters of, or pertaining to, Kevin Knipfing, Stephanieanna James-Knipfing, the Employer, and/or any of the Employer-Related Parties.

(iv)    _____ Knipfing, Stephanieanna _____ of the Employer-Related Parties have any past or

(iv)    persons or business entities with whom Kevin Knipfing, Stephanieanna James-Knipfing, the Employer, and/or any of the Employer-Related Parties have any past or present legal, contractual, financial, professional or other business relationship; and

(v)    business records, personal records, letters, memoranda, faxes, e-mails, contracts, photographs, films, videotapes, sound recordings, audio tracks or documents or other writings, including any negatives, prints, or copies thereof, pertaining in any way to Kevin Knipfing, Stephanieanna James-Knipfing, or any of the Employer-Related Parties.

Employee agrees that for purposes of this Agreement, references to "Kevin Knipfing" and "Stephanieanna James-Knipfing" include references to both the private individuals so named

Dated:_____    By:_____
                                        Kevin Knipfing

"EMPLOYEE"

Dated: __1/31/18__    By _____
                    Print Name: __Lidia M. Orcep__
                    Address: __95-08 Queens Blvd__
                               __Apart 3F.__
                    Phone: __718-433-1129__

# Exhibit 13

**TWO-PAGE NDA**

## SERVICE PROVIDER CONFIDENTIALITY AGREEMENT

This Agreement is created and entered into effective as of Lidia M. Orrego.
2018 between Kevin Knipfing (a/k/a Kevin James) and Stephanieanna James-Knipfing (a/k/a Steffiana de la Cruz) (collectively the "Employer), on the one hand, and ("Employee"), on the other hand (sometimes collectively referred to as the "Parties").

## 1. CONDITION OF RENDERING SERVICES

As a *condition of and in consideration for* Employee's employment with, and for good and valuable consideration and benefits, the receipt of which is hereby acknowledged, Employee agrees to the terms of this Confidentiality Agreement ("Agreement") and to strictly comply with each of its terms and conditions.

## 2. CONFIDENTIAL INFORMATION

### A. DEFINED TERM

Employee acknowledges and agrees that in connection with Employee's rendering services for the Employer, Employee may obtain, overhear or otherwise become aware of information and/or documents constituting or concerning:

(i) business and/or personal information about the Employer, family members of the Employer, the Employer's past and present friends and associates, and the past and present *representatives and employees* of the Employer and any companies the Employer owns or controls (including but not limited to Still Eddie, Inc.), whether individually or collectively, and the officers, directors, shareholders, members, managers, agents, and employees of any such companies (referred to collectively as the "[Employer-Related Parties");

(ii) private and confidential matters concerning Kevin Knipfing, Stephanieanna James-Knipfing and/or any of the Employer-Related Parties;

(iii) financial, business, medical, legal and contractual matters of, or pertaining to, Kevin Knipfing, Stephanieanna James-Knipfing, the Employer, and/or any of the Employer-Related Parties;

(iv) persons or business entities with whom Kevin Knipfing, Stephanieanna James-Knipfing, the Employer, and/or any of the Employer-Related Parties have any past or present legal, contractual, financial, professional or other business relationship; and

(v) business records, personal records, letters, memoranda, faxes, e-mails, contracts, photographs, films, videotapes, sound recordings, audio tracks or documents or other writings, including any negatives, prints, or copies thereof, pertaining in any way to Kevin Knipfing, Stephanieanna James-Knipfing, or any of the Employer-Related Parties.

Employee agrees that for purposes of this Agreement, references to "Kevin Knipfing" and "Stephanieanna James-Knipfing" include references to both the private individuals so named

Dated: _____ By: _____

Kevin Knipfing

"EMPLOYEE"

Dated: _1 / 31 / 2018_ By: _____

Print Name: _Lidia M. Orrego_
Address: _85-08 Queens Blvd_
_Apart 3E._
Phone: _347 - 4532234._

# Exhibit 14

89

SEVEN-Page NDA modified and submitted to the Plaintiff on Nov. 06, 2018 from Kevin Knipfing and Skylar Testa.

## SERVICE PROVIDER CONFIDENTIALITY AGREEMENT

This Agreement is created and entered into effective as of _Lidia M. Orrego_. 2018 between Kevin Knipfing (a/k/a Kevin James) and Stephanieanna James-Knipfing (a/k/a Steffiana de la Cruz) (collectively the "Employer), on the one hand, and _____ ("Employee"), on the other hand (sometimes collectively referred to as the "Parties").

## 1. CONDITION OF RENDERING SERVICES

. As a *condition of and in consideration for Employee's employment with*, and for good and valuable consideration and benefits, the receipt of which is hereby acknowledged, Employee agrees to the terms of this Confidentiality Agreement ("Agreement") and to strictly comply with each of its terms and conditions.

## 2. CONFIDENTIAL INFORMATION

### A. DEFINED TERM

Employee acknowledges and agrees that in connection with Employee's rendering services for the Employer, Employee may obtain, overhear or otherwise become aware of information and/or documents constituting or concerning.

    (i)    business and/or personal information about the Employer, family members of the Employer, the Employer's past and present friends and associates, and the past and present *representatives and employees of the Employer* and any companies the Employer owns or controls (including but not limited to Still Eddie, Inc.), whether individually or collectively, and the officers, directors, shareholders, members, managers, agents, and employees of any such companies (referred to collectively as the "[Employer-Related Parties");

    (ii)    private and confidential matters concerning Kevin Knipfing, Stephanieanna James-Knipfing and/or any of the Employer-Related Parties;

    *(iii)*    *financial, business, medical, legal and contractual matters of*, or pertaining to, Kevin Knipfing, Stephanieanna James-Knipfing, the Employer, and/or any of the Employer-Related Parties;

    (iv)    persons or business entities with whom Kevin Knipfing, Stephanieanna James-Knipfing, the Employer, and/or any of the Employer-Related Parties have any past or present legal, contractual, financial, professional or other business relationship; and

    (v)    business records, personal records, letters, memoranda, faxes, e-mails, contracts, photographs, films, videotapes, sound recordings, audio tracks or documents or other writings, including any negatives, prints, or copies thereof, pertaining in any way to Kevin Knipfing, Stephanieanna James-Knipfing, or any of the Employer-Related Parties.

Employee agrees that for purposes of this Agreement, references to "Kevin Knipfing" and "Stephanieanna James-Knipfing" include references to both the private individuals so named

and their public personas and any dealings or undertakings relating to them, including but not limited to the affairs of Kevin James and/or Steffiana de la Cruz. Employee further acknowledges and agrees that all of the information, documents and things described hereinabove which Employee obtains, overhears, learns, has access to and/or acquires ("acquires") (herein collectively referred to as "Confidential Information") is private and confidential, that the Employer-Related Parties have a reasonable expectation of privacy concerning that Confidential Information, and that all of said Confidential Information is solely and exclusively owned by the Employer Related Parties.

**B.**     <u>**AGREEMENT NOT TO DISCLOSE**</u>

Employee expressly agrees that Employee shall not, directly or indirectly, verbally or in writing at any time after the execution of this Agreement, whether before, during or after the term of Employee's employment with the Employer's provision of services to the Family, publish, disseminate, discuss, disclose (collectively "disclose") or cause or induce to be disclosed any Confidential Information to any person, firm or entity whatsoever (including but not limited to the print or electronic media), without Mr. Knipfing's express written consent, except: (i) as necessary to carry out duties in the course of Employee's employment with the Employer 's provision of services to the Family; (ii) if disclosure is required of Employee by Court Order, government decree, and/or subpoena; (iii) in accordance with Employee's rights under state, federal, or local law to communicate with or participate in a proceeding before government agencies or bodies, or to report possible violations of federal, state, or local law to such agencies (Employee) need not provide notice to the Employer prior to exercising such rights); (iv) to seek advice or information concerning Employee's rights and legal obligations relating to Employee's employment provision of services to the Family] from an attorney. Without limiting the foregoing, Employee will not give or participate in any interviews or write or prepare, or assist in the preparation of any books, articles, programs, or other oral or written communications, disclosing or referring, directly or indirectly, to any Confidential Information, nor confirm or deny any information of any kind (whether rumored or known in any way) relating to any of the Confidential Information. If Employee receives a subpoena for disclosure or release of any Confidential Information, Employee shall, to the extent permitted by law, promptly notify the Employer in writing and provide the Employer with a copy of such subpoena.

Pursuant to 18 USC § 1833(b), an individual may not be held criminally or civilly liable under any federal or state trade secret law for disclosure of a trade secret (as defined by 18 USC § 1839): (i) made in confidence to a government official, either directly or indirectly, or to an attorney, solely for the purpose of reporting or investigating a suspected violation of law; and/or (ii) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Additionally, an individual suing for retaliation based on the reporting of a suspected violation of law may disclose a trade secret to his or her attorney and use the trade secret information in the court proceeding, so long as any document containing the trade secret is filed under seal and the individual does not disclose the trade secret except pursuant to court order.

### C.      DISCLOSURE OF CONFIDENTIAL INFORMATION IS WRONGFUL

Employee acknowledges and understands that substantial efforts have been and will be dedicated to protect the privacy and confidentiality of the Confidential Information, and to prevent the sometimes intrusive activities of the tabloid press, other media and other members of the public to obtain confidential personal and business information about Kevin Knipfing a/k/a Kevin James, Stephanieanna James-Knipfing a/k/a Steffiana de la Cruz, and/or the Employer-Related Parties. Employee further acknowledges and understands that Employee's covenant and agreement not to disclose, sell, or exploit any of the Confidential Information is an essential part of the Employer-Related Parties' efforts to maintain the privacy of the Confidential Information and a material condition of the Employer agreeing to employ Employee. Employee further acknowledges that any disclosure by Employee to any third-party of any Confidential Information, obtained as a result of or in connection with Employee's employment with the *Employer or any dealings with the Employer-Related Parties, except as provided in Paragraph* 2(B) above, shall constitute a material breach of the terms of this Agreement, and may also constitute one or more of the following: an invasion of privacy, a disclosure of proprietary business information, a wrongful misappropriation of Kevin Knipfing a/k/a Kevin James's and/or Stephanieanna James-Knipfing a/k/a Steffiana de la Cruz's right of publicity, and other wrongful acts.

## 3.      USE OF NAME AND LIKENESS

### A.      AGREEMENT NOT TO USE NAME AND/OR LIKENESS

Employee acknowledges and understands that Employee shall not, directly or indirectly, verbally or otherwise, either during or at any time after Employee's employment with the Employer use, refer to, or exploit in any manner, Kevin Knipfing a/k/a Kevin James's and/or Stephanieanna James-Knipfing a/k/a Steffiana de la Cruz's name and/or likeness and/or identity (collectively referred to as "Name or Likeness") to promote, demonstrate, describe, display, or exhibit (collectively "promote") Employee's services or products and/or any services or products of any third-party, nor shall Employee disclose, or cause to be disclosed, any mention or reference to the foregoing Name(s) or Likeness(es) to any person, firm or entity whatsoever, (including but not limited to the media), with regard to the use of or to promote any products or services whether it be in a purported editorial use, interview, advertisement, "advertorial" or any other use, in any print or electronic media (including the internet) without the Employer's written consent. *Without limiting the foregoing, Employee will not give or participate in any interviews* (whether oral or written) or write or prepare, or assist in the preparation of any books, articles, programs, or other oral or written communications (including but not limited to dissemination over the Internet), mentioning or disclosing or referring, directly or indirectly, to the Employer's Name(s) or Likeness(es), nor shall Employee confirm or deny any Confidential Information of any kind (whether rumored or known in any way).

### B.      USE NAME AND/OR LIKENESS IS WRONGFUL

Employee acknowledges and understands that the Names and Likenesses of Kevin Knipfing and Stephanieanna James-Knipfing have substantial commercial value in promoting

and/or in association with products and/or services and that substantial efforts have been and will be dedicated to protect the value of these Names and Likenesses. Employee further acknowledges and understands that Employee's compliance with the obligation not to use or exploit either of these Names or Likenesses in promoting any services or products of Employee or of any third-party, whether in an advertisement, interview or any other manner or in any media ("prohibited use"), is an essential part of the Employer-Related Parties' efforts to protect the value of these Names and Likenesses. Employee further acknowledges that each such commercial use or attempt to commercially use either of these Names or Likenesses without the Employer's express written consent shall constitute a material breach of the terms of this Agreement, and may further constitute a wrongful misappropriation of their statutory and/or common law right of publicity as well as a violation of the federal Lanham Act, false advertising, and other wrongful acts.

## 4. PROPERTY RIGHTS

Employee acknowledges the[Employer-Related Parties' substantial and valuable property rights and other proprietary interests regarding their exclusive ownership and use of the Confidential Information, including such Confidential Information acquired by Employee in the course of Employee's employment with the Employer and/or related dealings with the Employer-Related Parties, such as any and all physical material (including without limitation, all copyright, trademark, patent, and other rights therein) relating to Kevin Knipfing a/k/a Kevin James and/or Stephanieanna James-Knipfing a/k/a Steffiana de la Cruz, whether prepared by Employee or otherwise coming into Employee's possession, shall remain the Employer's sole and exclusive property and shall not be used by Employee, other than as may be required in the course and scope of Employee's employment with Employer. Employee further agrees that promptly after the term of Employee's provision of services to the Employer or prior by any demand by the Employer-Related Parties, Employee shall return to the Employer-Related Parties all tangible Confidential Information in [Employee/Contractor]'s possession or control. Without limiting the foregoing, Employee shall not photograph, tape, film, or otherwise record any likenesses, performances or activities of the Employer or Employer-Related Parties, without express permission.

## 5. DAMAGES AND DISGORGEMENT OF MONIES

Breach of this Agreement by Employee's disclosure of Confidential Information to any Third-Party and/or any prohibited use of the Employer's Name(s) or Likeness(es) shall render Employee liable to the Employer-Related Parties for any and all damages and injuries incurred by the Employer-Related Parties as a result thereof, and shall obligate Employee to account to the Employer-Related Parties and turn over to the Employer-Related Parties, any and all monies, profits, or other consideration or benefits, which Employee has received or may receive from any unauthorized disclosure or exploitation of any of the Confidential Information and/or from any prohibited use of the Employer's Name or Likeness, all without prejudice to any other rights or remedies, legal or equitable, that the Employer-Related Parties may have as a result of the violation of the terms hereof.

## 6. LIQUIDATED DAMAGES

Employee agrees that any material breach or violation of this Agreement by Employee's disclosure of Confidential Information to any third-party and/or any unauthorized exploitation or prohibited use of the Employer's Name(s) or Likeness(es) shall result in substantial damages and injury to the Employer-Related Parties, the precise amount of which would be extremely difficult or impracticable to determine, even after the Parties have made a reasonable endeavor to *estimate fair compensation for such potential losses and damages to the Employer-Related* Parties. Therefore, in addition to disgorgement of the full amount of all monies or other consideration received by Employee in connection with any unauthorized disclosure of Confidential Information and/or any unauthorized exploitation or prohibited use of the Employer's Name(s) or Likeness(es) in violation of the terms hereof, Employee further agrees that he/she shall also be obligated to pay, and agrees to pay to the Employer-Related Parties, the total sum of One Hundred Thousand Dollars ($100,000) as a reasonable and fair amount of liquidated damages to compensate the Employer-Related Parties for any loss or damage resulting from each individual material breach of the terms hereof by any unauthorized disclosure of Confidential Information and/or any unauthorized exploitation or prohibited use of the Employer's Name(s) or Likeness(es). The Parties hereto further agree that such sum bears a reasonable and proximate relationship to the actual damages which the Employer-Related Parties will or might suffer from each material breach of the terms of this Agreement and that this amount is not a penalty. The foregoing shall not, however, release any third-party from liability for participating in or inducing a breach of this Agreement, or otherwise violating any rights of Kevin Knipfing a/k/a Kevin James, Stephanieanna James-Knipfing a/k/a Steffiana de la Cruz, or the Employer-Related Parties.

## 7. INJUNCTIVE RELIEF

Employee acknowledges and agrees that any breach of this Agreement due to the unauthorized disclosure or threatened disclosure by Employee to any Third-Party of any *Confidential Information and/or any prohibited use of the Employer's Name(s) or Likeness(es)* will cause irreparable injury to the Employer which cannot be adequately compensated by money damages. Therefore, the Employer-Related Parties shall be entitled to obtain provisional Preliminary Injunctive Relief to prevent the breach or further breach of this Agreement ("Injunctive Relief"), enjoining and restraining (a) any prohibited use of the Employer's Name(s) or Likeness(es) and/or (b) any unauthorized disclosure or use of any Confidential Information protected by the terms hereof, until all such claims for legal and equitable relief have been adjudicated. Resort to such equitable relief, shall not, however, be construed to be a waiver of any other rights or remedies which the Employer-Related Parties may have for damages or otherwise.

## 8. CONFIDENTIAL NATURE OF THIS AGREEMENT

Employee agrees to keep this Agreement, including all of its terms and provisions, strictly confidential, and not to disclose the same to any third-party, except as otherwise provided in Paragraphs 2(B), and 10(C) herein. Employee agrees to treat this Agreement as constituting and containing Confidential Information subject to the terms hereof.

## 9. INTENDED THIRD PARTY BENEFICIARIES

Each of the Employer-Related Parties, as defined hereinabove, is an intended, third-party beneficiary of the terms of this Agreement regarding any unauthorized disclosure of Confidential Information pertaining to any such Employer-Related Party, which disclosure is prohibited by the terms hereof.

## 10. MISCELLANEOUS PROVISIONS

A. Attorneys' Fees: In the event of any breach or anticipated breach by Employee of any of the terms of this Agreement, the prevailing party(s) in any resulting proceeding shall be entitled to recover said party's reasonable attorney's fees and costs incurred in connection with or arising out of any such breach, including but not limited to the attorney's fees and costs incurred in any resulting legal action or proceeding.

B. New York Law: This Agreement and any dispute or controversy relating to the existence, validity, meaning, interpretation, or alleged breach or threatened breach of this Agreement, shall in all respects be interpreted, enforced and governed by the laws of the State of New York.

C. Employee has read this entire Agreement and understands it. Employee is entering into this Agreement freely and voluntarily. Employee has had the opportunity to consult with legal counsel before signing this Agreement. Employee has further had an opportunity to discuss this agreement, to ask questions, and clarify its meaning and interpretations with the Employer.

D. In the event that any provision hereof is deemed to be illegal or unenforceable, such a determination shall not affect the validity or enforceability of the remaining provisions thereof, all of which shall remain in full force and effect. In the event that such any provision shall be deemed invalid due to its scope or breadth, such provision shall be deemed valid to the extent of the scope or breadth permitted by law.

E. This Agreement does not alter in any way the fact the Employee is an employee at will and that Employee's employment may be terminated by Employee or the Employer for any reason or no reason at all.

F. This Agreement may be executed with one or more separate counterparts, each of which, when so executed shall, together, constitute and be one and the same instrument. A facsimile or other copy of a signed counterpart of this Agreement shall be deemed an original. A photocopy or facsimile shall have the same force and effect as if it were a signed original.

By their signatures below, the Parties hereto have approved and executed this Agreement as of the date first written above.

<div align="center">"EMPLOYER"</div>

Dated: _____ By: _____

Kevin Knipfing

"EMPLOYEE"

Dated: _1/31/2018_ By: _____

Print Name: _Lidia M. Orrego_
Address: _85-08 Queens Blvd_
_Apart 3E._
Phone: _347-4532234_

## Two- Page NDA sent by email on November 1, 2018 from Skylar Testa

### SERVICE PROVIDER CONFIDENTIALITY AGREEMENT

This Agreement is created and entered into effective as of __Lidia M. Osreyo__ . 2018 between Kevin Knipfing (a/k/a Kevin James) and Stephanieanna James-Knipfing (a/k/a Steffiana de la Cruz) (collectively the "Employer), on the one hand, and _____ ("Employee"), on the other hand (sometimes collectively referred to as the "Parties")

**1.    CONDITION OF RENDERING SERVICES**

As a condition of and in consideration for Employee's employment with, and for good and valuable consideration and benefits, the receipt of which is hereby acknowledged, Employee agrees to the terms of this Confidentiality Agreement ("Agreement") and to strictly comply with each of its terms and conditions

**2.    CONFIDENTIAL INFORMATION**

## Seven- Page NDA Kevin Knipfing gave the Plaintiff on November 6, 2018

### SERVICE PROVIDER CONFIDENTIALITY AGREEMENT

This Agreement is created and entered into effective as of __Lidia M. Osreyo__ 2018 between Kevin Knipfing (a/k/a Kevin James) and Stephanieanna James-Knipfing (a/k/a Steffiana de la Cruz) (collectively the "Employer), on the one hand, and _____ ("Employee"), on the other hand (sometimes collectively referred to as the "Parties")

**1.    CONDITION OF RENDERING SERVICES**

As a condition of and in consideration for Employee's employment with, and for good and valuable consideration and benefits, the receipt of which is hereby acknowledged, Employee agrees to the terms of this Confidentiality Agreement ("Agreement") and to strictly comply with each of its terms and conditions

**2.    CONFIDENTIAL INFORMATION**

**A.        DEFINED TERM**

**Direct Deposit Account Information**

| Category | Bank Name | Routing Number | Account Number | Account Type | | Amount |
|----------|-----------|----------------|----------------|--------------|--|--------|
| 710 | ▮▮▮▮ | ▮▮▮▮▮▮▮ | ▮▮▮▮ | Checking | Personal | 2,062.42 |

## LIDIA M ORREGO

| REFERENCE NO | DATE | EMPLOYEE ID | SSN | PAY FREQUENCY | PAY PERIOD | FILING STATUS | | NET PAY |
|--------------|------|-------------|-----|---------------|------------|---------------|--|---------|
| SDD 346 | 07-13-2018 | 44638 | ▮▮▮▮ | Weekly | 07/02/18-07/08/18 | S | 000 | 2,062.42 |

**EMPLOYER**
**KEVIN AND STEPHANIEANNA KNIPFING**
**C/O SAVITSKY SATIN BACON BUCCI**
**2049 CENTURY PARK EAST, SUITE 1400**
**LOS ANGELES CA 90067**

| CATEGORY | THIS CHECK | YR TO DATE |
|----------|-----------|------------|
| GROSS WAGES | 1,200.00 | 23,799.90 |
| TIME & 1/2 | 2,193.75 | 25,229.70 |
| DOUBLE TIME | 0.00 | 469.80 |
| FIT | 711.11– | 9,387.15– |
| SOC SEC | 210.41– | 3,068.96– |
| MEDI | 49.21– | 717.74– |
| NEW YORK SIT | 221.61– | 3,022.55– |
| NEW YORK SDI | 0.60– | 12.00– |
| NEW YORK PAID FAMILY LEAVE ACT (NY) | 4.28– | 62.37– |
| NEW YORK CITY TAX | 134.11– | 1,901.45– |
| DIRECT DEPOS TO CKG | 2,062.42 | |

| CATEGORY-EARN | DESCRIPTION | THIS CHECK | HOURS | RATE |
|---------------|-------------|-----------|-------|------|
| GROSS WAGES | Regular Earnings | 1,200.00 | 40.00 | 30.0000 |
| TIME & 1/2 | Time & 1/2 | 2,193.75 | 48.75 | 45.0000 |

| | | | |
|--|--|--|--|
| **GROSS EARNINGS THIS CHECK** | 3,393.75 | 88.75 | |
| **GROSS EARNINGS YTD** | 49,499.40 | 1,361.82 | |

| CATEGORY-OTHER | DESCRIPTION | THIS CHECK |
|----------------|-------------|-----------|

| LEAVE TYPE (HRS) | AVAILABLE | CURRENT ACCRUED | CURRENT USED |
|------------------|-----------|-----------------|--------------|

| | |
|--|--|
| **MISCELLANEOUS ITEMS THIS CHECK** | 0.00 |
| **MISCELLANEOUS ITEMS YTD** | 0.00 |

| | |
|--|--|
| **EMPLOYEE NAME:** | LIDIA M ORREGO |
| **EMPLOYEE ADDRESS:** | 95-08 QUEENS BLVD. #3E |
| | REGO PARK NY 11374 |

# Exhibit 16

## Account Summary



### My Personal Information

**Name**
LIDIA ORREGO

**Also Known As**

**Birth Year**
1977

**Addresses**
9508 QUEENS BLVD #APT 3E
REGO PARK, NY 11374-1151

95 8 QUEENS BLVD # 3 E
REGO PARK, NY 11374

6420 WETHEROLE ST #APT 3
REGO PARK, NY 11374-3043

**Employer(s)**
KEVIN STEPHANIENN

KEVIN STEPHANIENNA K

**Personal Statement(s)**
No Statement(s) present at this time

# Exhibit 17

| | | | |
|---|---|---|---|
| **a** Employee's social security number | OMB No 1545-0008 | Safe, accurate, FAST! Use | **IRS e-file** Visit the IRS website at www.irs.gov/efile |

| | | |
|---|---|---|
| **b** Employer identification number (EIN) 32-0467229 | **1** Wages, tips, other compensation 97,111 | **2** Federal income tax withheld 18,310 |
| **c** Employer's name, address, and ZIP code OLD WESTBURY EDDIE LLC 10880 WILSHIRE BLVD STE 2100 LOS ANGELES        CA  90024 | **3** Social security wages 97,111 | **4** Social security tax withheld 6,021 |
| | **5** Medicare wages and tips 97,111 | **6** Medicare tax withheld 1,408 |
| | **7** Social security tips | **8** Allocated tips |
| **d** Control number | **9** Verification code | **10** Dependent care benefits |
| **e** Employee's first name and initial     Last name     Suff LIDIA M        ORREGO 95 08 QUEENS BLVD REGO PARK        NY  11374 | **11** Nonqualified plans | **12a** See instructions for box 12 |
| | **13** Statutory employee / Retirement plan / Third-party sick pay | **12b** |
| | **14** Other | **12c** |
| | | **12d** |
| **f** Employee's address and ZIP code | | |

| **15** State  Employer's state ID number | **16** State wages, tips, etc | **17** State income tax | **18** Local wages, tips, etc | **19** Local income tax | **20** Locality name |
|---|---|---|---|---|---|
| NY 320467229 | 97,111 | 5,901 | 97,111 | 3,722 | NYC |
| | | | | | |

Form **W-2** **Wage and Tax Statement** **2018**  Department of the Treasury-Internal Revenue Service

Copy B - To Be Filed With Employee's FEDERAL Tax Return.
This information is being furnished to the Internal Revenue Service.
EEA

The information on the Form W-2 was used to prepare the taxpayer's 2018 Federal tax return by ABC BUSINESS SERVICE.

**Form 1095-B**

Department of the Treasury
Internal Revenue Service

# Health Coverage

▶ **Do not attach to your tax return. Keep for your records.**
▶ Go to *www.irs.gov/Form1095B* for instructions and the latest information.

☐ VOID

☐ CORRECTED

OMB No. 1545-2252

**2018**

---

| Part I | Responsible Individual |
|---|---|

| 1 Name of responsible individual–First name, middle name, last name | | | 2 Social security number (SSN) or other TIN | 3 Date of birth (if SSN or other TIN is not available) |
|---|---|---|---|---|
| LIDIA | M | ORREGO | ▓▓▓▓▓ | |

| 4 Street address (including apartment no.) | 5 City or town | 6 State or province | 7 Country and ZIP or foreign postal code |
|---|---|---|---|
| 95-08 QUEENS BLVD APT 3 E | REGO PARK | NY | UNITED STATES 11374 |

8 Enter letter identifying Origin of the Health Coverage (see instructions for codes): . . . ▶ **B**

9 Reserved

| Part II | Information about Certain Employer-Sponsored Coverage (see instructions) |
|---|---|

| 10 Employer name | 11 Employer identification number (EIN) |
|---|---|
| OLD WESTBURY EDDIE LLC | 32-0467229 |

| 12 Street address (including room or suite no.) | 13 City or town | 14 State or province | 15 Country and ZIP or foreign postal code |
|---|---|---|---|
| 2 SPRING HILL LANE | OLD WESTBURY | NY | 11568 |

| Part III | Issuer or Other Coverage Provider (see instructions) |
|---|---|

| 16 Employer name | 17 Employer identification number (EIN) | 18 Contact telephone number |
|---|---|---|
| Oxford Health Insurance, Inc. | 22-2797560 | 800-444-6222 |

| 19 Street address (including room or suite no.) | 20 City or town | 21 State or province | 22 Country and ZIP or foreign postal code |
|---|---|---|---|
| 601 Brooker Creek Blvd | Oldsmar | FL | UNITED STATES 34677 |

| Part IV | Covered Individuals (Enter the information for each covered individual.) |
|---|---|

| (a) Name of covered individual(s) First name, middle initial, last name | | | (b) SSN or other TIN | (c) DOB (if SSN or other TIN is not available) | (d) Covered all 12 months | (e) Months of coverage | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
| 1 LIDIA | M | ORREGO | ▓▓▓ | | ☐ | ☐ | ☐ | x | x | x | x | x | x | x | x | x | x |
| 2 ▓▓▓▓ | | ▓▓▓▓ | ▓▓▓ | | ☐ | ☐ | ☐ | x | x | x | x | x | x | x | x | x | x |

For Privacy Act and Paperwork Reduction Act Notice, see separate instructions.          Cat. No. 60704H          Form **1095-B** (2018)

Exhibit 18



# Exhibit 19

**NEW YORK STATE** Department of Labor
PO BOX 15130
ALBANY NY 12212-5130
www.labor.ny.gov

| | |
|---|---|
| Fecha de Envió: | 01/27/20 |
| # de Seguro Social: | ▮▮▮▮▮ |
| Fecha Efectiva/de Comienzo: | 01/20/20 |
| Fin del Año de Beneficios: | 01/24/21 |
| Tasa Semanal: | $504.00 |

## SEGURO POR DESEMPLEO
### Determinación Monetaria de Beneficios

Si la dirección a la derecha no es su dirección actual, por favor llame al (888) 209-8124. Si usa equipo TTY/TDD, por favor llame al (888) 783-1370.

LIDIA M ORREGO
95-08 QUEENS BLVD 3E
REGO PARK NY 11374

*Retenga este aviso para sus archivos.*

| | |
|---|---|
| **¿Por qué he recibido este aviso?** | Esta NO es una decisión sobre su elegibilidad para beneficios del Seguro por Desempleo. Este aviso le indica la información sobre trabajo e ingresos que tenemos archivada en el estado de Nueva York. Por fa asegúrese de que esta información es correcta, ya que su tasa semanal de beneficios se basa en esta información. |
| | Nuestros archivos indican que usted tiene los ingresos necesarios para calificar para los beneficios del Seguro por Desempleo. Si usted cumple todos los demás requisitos y es aprobado, recibirá la Tasa Semanal indicada arriba. Si no es aprobado, recibirá un aviso escrito por separado que le explicará la razón. |
| | Siga reclamando beneficios por cada semana en la que está desempleado: |
| | • En internet en www.labor.ny.gov. |
| | • Llame al Tele-Servicio al 1-888-581-5812 |
| **Período Básico** | Su Período Básico es: **octubre 01, 2018**   Hasta **septiembre 30, 2019** |
| | Revise la información abajo sobre sus patronos e ingresos que tenemos archivada. |

| NOMBRE DEL PATRONO | Trimestre de Período Básico 10/01 - 12/31 2018 | Trimestre de Período Básico 01/01 - 03/31 2019 | Trimestre de Período Básico 04/01 - 06/30 2019 | Trimestre de Período Básico 07/01 - 09/30 2019 | Trimestre Alterno 10/01 - 12/31 2019 | INGRESOS TOTALES DEL PERÍODO BÁSICO |
|---|---|---|---|---|---|---|
| OLD WESTBURY EDDIE LLC | 22592.25 | .00 | .00 | .00 | | 22592.25 |
| | .00 | 2880.00 | 8580.00 | 13901.78 | | 25361.78 |
| **INGRESOS TOTALES DEL PERÍODO BÁSICO** | 22592.25 | 2880.00 | 8580.00 | 13901.78 | | 47954.03 |

| | |
|---|---|
| **¿Cómo se determinó mi Tasa Semanal de Beneficios?** | Se calculó su Tasa Semanal de Beneficios usando los ingresos del trimestre más alto de arriba. |
| **Aviso: Si quiere usar los ingresos del Trimestre Alterno, tiene que completar y devolver el formulario "Solicitud del Período Básico Alterno" (vea el Manual del Reclamante)** | Tasa semanal de beneficios bruta = $ 504.00 |
| | Menos Reducción de Pensión - 0.00 |
| | Menos Reducción de Compensación al Trabajador - 0.00 |
| | Tasa semanal de beneficios neta $ 504.00 |
| | * Todas las Tasas Semanales de Beneficios que han sido calculadas aparecen en dólares completos. |
| | * Consulte el Apéndice o el manual del reclamante para detalles sobre cómo se calcula su tasa de beneficios. |
| **¿Cuál es la cantidad máxima de beneficios que puedo recibir?** | Su reclamo dura un año (su año de beneficios). Durante ese año usted puede recibir hasta 26 veces su tasa semanal de beneficio neta. |

*¿Se reportó toda su información sobre los ingresos correctamente? Si no, vea el Apéndice adjunto para ayuda.*

Si tiene preguntas sobre este aviso, llame al (888) 209-8124.   Para información adicional, vaya a nuestro sitio web: http://labor.ny.gov/unemploymentassistance.shtm   Para ayuda, lea su Manual del Reclamante.

S402B (10/16)

# Exhibit 20

# NYS Department of State

# Division of Corporations

## Entity Information

The information contained in this database is current through March 12, 2020.

Selected Entity Name: OLD WESTBURY EDDIE, LLC
Selected Entity Status Information

| | |
|---|---|
| **Current Entity Name:** | OLD WESTBURY EDDIE, LLC |
| **DOS ID #:** | 4761312 |
| **Initial DOS Filing Date:** | MAY 20, 2015 |
| **County:** | NASSAU |
| **Jurisdiction:** | NEW YORK |
| **Entity Type:** | DOMESTIC LIMITED LIABILITY COMPANY |
| **Current Entity Status:** | ACTIVE |

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**

OLD WESTBURY EDDIE, LLC
ATTN: STEVEN SAVITSKY
2049 CENTURY PARK EAST, #1400
LOS ANGELES, CALIFORNIA, 90067

**Registered Agent**

NONE

This office does not require or maintain information regarding
the names and addresses of members or managers of
nonprofessional limited liability companies. Professional
limited liability companies must include the name(s) and
address(es) of the original members, however this information
is not recorded and only available by viewing the certificate.

**\*Stock Information**

| # of Shares | Type of Stock | $ Value per Share |
|---|---|---|
| | No Information Available | |

## Name History

| Filing Date | Name Type | Entity Name |
|---|---|---|
| MAY 20, 2015 | Actual | OLD WESTBURY EDDIE, LLC |

A **Fictitious** name must be used when the **Actual** name of a foreign entity is unavailable for use in New York State. The entity must use the fictitious name when conducting its activities or business in New York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results   New Search

Services/Programs   |   Privacy Policy   |   Accessibility Policy   |   Disclaimer   |   Return to DOS Homepage   |   Contact Us

# Exhibit 21

**PHOTOGRAPHS, VIDEOS AND TEXT MESSAGES REQUESTED BY EMPLOYERS**

The Plaintiff holds plenty (600) FAMILY photographs, videos in the Knipfing's House were requested and authorized by employers, sent via text messages to Stephanieanna James-Knipfing, Kevin Knipfing and Teresa A. Zantua.

All the Plaintiff's co-workers also took photographs and videos inside the Knipfing's house. February 17, 2018 at 6:15 pm: The first picturess and videos were taken in the girl's room S.M.K. and S.J.K.







## October 23, 2018:

Last Video 46 seconds at 6:12 pm. The last video requested by Kevin Knipfing (the day Kevin Knipfing's son hit for the last time the Plaintiff) in the classroom. Plaintiff's took photographs and videos inside the Knipfing's house where are cameras.This is one of plenty recordings the Plaintiff holds plus photographs since February 2018 authorized by her Employers.

The Plaintiff has never received all along time she worked for her employers any warning and never they applied " Breach HER NDA" until She file the Complaint emailed dated November 2, 2018 about the horrible environment for discrimination and abuse.



<     **Roslyn Heights**     **Edit**
October 23, 2018  6:12 PM



# Exhibit 22

**CRISTINA COIMBRA – HOUSEKEEPER** (Brazilian – Speaks Portuguese)

August 18, 2019 and October 16, 2019 Cristina Coimbra taking photographs inside the Knipfing's house and posted on her Facebook. The Plaintiff has photos dated earlier. The Knipfing's don't applied "Breach her NDA".



Cristina Coimbra updated her profile picture.
August 18, 2019 · 🌐

Cristina Coimbra updated her profile picture.
October 16 · 🌐

👍😲 87
110 Comments

👍😲😍 77
41 Comments
↪ Share

# October 16, 2019

Rebeca Lugo or Rebeca Uzcategui congratulating to Cristina Coimbra in her Post.



**Rebeca Lugo**
Happy Birthday amiga querida. Todas las bendiciones para ti 🎂🎉🎈 🎊 🎁

37w

**Cristina Coimbra**
**Rebeca Lugo** muchas gracias amiga querida!! 💜🌹

37w

# REBECA UZCATEGUI OR REBECA LUGO – NANNY (Hispanic)

May 21, 2018 Rebeca Uzcategui, taking photographs of S.S.K. sent via text message.
The Employers also always authorized her to take photos and videos inside the Knipfing's house to text them like they did with the Plaintiff. The Knipfing's don't applied "Breach her NDA".

Kevin Knipfing and Stephanie James - Knipfing keep Rebeca Uzcategui working because she threatens to sue them for discrimination and abuse. Recording on October 14, 2018.



**SKYLAR TESTA – HOUSE MANAGER (Italian - American)**

September 28, 2018 Skylar Testa taking photographs like everyone inside the Knipfing's house and sent by text message.

The Knipfing's don't applied "Breach his NDA" .



# GERARDO GUARINO – CHEF (Italian – American)

December 17, 2017 Gerardo Guarino taking photographs and videos inside the Knipfing's house and post on Facebook or Instagram.

But the Knipfing's don't applied "Breach his NDA".



# GROUPS MESSAGES EXCHANGING PHOTOGRAPHS

Photographs taken inside the Knipfing's house and sent to all employees <u>by the Employer</u>.

Teresa A. Zantua is "TAZ".



## LIDIA ORREGO – NANNY (Hispanic)

March 29, 2018 and October 1, 2018 photographs taken inside the Knipfing's house by the Plaintiff and sent via text message Stephanieanna James-Knipfing and Teresa A. Zantua. The Plaintiff never received any warning or notice about any "Breach of NDA" agreement because it was part of her job.

The Plaintiff sent pictures (See Exhibit 24 Page 132 candies and tapes to the Investigation to demonstrate discrimination and abuse. These photographs, videos and recordings were never shared with third parties or published on social platforms.

Kevin Knipfing and Stephanieanna James-Knipfing **applied a "Breach her NDA"** agreement to the Plaintiff through OLD WESTBURY LLC (entity does not exist in New York State and is not listed as an employer on the Two-Page NDA) to terminate her employment re-enforcing the discrimination to which the Plaintiff was subjected before she submitted her Complaint dated November 2, 2018.



# Exhibit 23

**June 8, 2018:** Texting from Cristina Coimbra , when she went to the doctor for back pain and could hardly move or walk for the excess and hard work in the Knipfing's house.



 **Gmail**      # Exhibit 24      Lidia Orrego <llorrego@gmail.com>

## REPORT 1
2 mensajes

**Lidia Orrego** <llorrego@gmail.com>        8 de noviembre de 2018, 12:16
Para: fullkj@gmail.com

Good afternoon Mr Kevin, I sent this part 10-14-2018 Dinner Old Westbury Diner 10:30 am
The conversation is in Spanish, if it translated into English it would take a long time, but I hope the the researchers or people you trust can translate it.

Blessings,

     📄 2018-10-14-10-24_2_1_2 -1.wav

Lidia

---

**KJ** <fullkj@gmail.com>        8 de noviembre de 2018, 12:33
Para: llorrego@gmail.com

This is great, thank you!
[El texto citado está oculto]

 **Gmail**

Lidia Orrego <llorrego@gmail.com>

## REPORT 2
1 mensaje

Lidia Orrego <llorrego@gmail.com>        8 de noviembre de 2018, 14:27
Para: K J <fullkj@gmail.com>

Mr. Kevin, I attached the screenshots of Ms Rebeca's messages via Whatsapp to meet with her to talk because for long time she told me to meet her out of the house,always telling me was the only person that can handle my situation at your house and no to talk with your wife about it beside that I was always afraid to said something to Mrs Steffianna for many reasons.Rebeca was always showing that she has the power to confront and fight with anyone there and I was afraid of her, I saw she was bossing around there and from the beginning she told me that was hired me thanks to her, Skylar was aware of all the situation saying that all the figths were normal happening always.

At one point she told me that if I agree to meet her everything will get better for S███ because she love us,she said that S███ has nobody to protect her from Taz(I never understand why she said that)but she always was telling me that.

I wasn't so sure about to do so but I got to the point of desperation all I wanted was to solve and continue working in peace that when I decided to meet her because everything was worse.

Sometimes Rebeca was nice and ask me to tell her everything that was going on with Taz after she was gone and asking me why I never confront her,she told if I trust her everything she was going to tell you but and the end I saw things were not right and worried very much that she was turning the situation against me because she change her attitude I realized that tried to avoid me,when I ask her if she was available to let you know she just walked away just telling that she was one step away to give you a "letter.

In my life I never expected to go thru all this situation and as everybody I do care about mi job and my reputation because I depend of my job to take care of my family,I wanted to walk out of your house nicely because God see our actions and our hearts and I decide to tell the thruth because I realized her real intentions was just to use me.

If you wonder why I did my record of things that was going on I did because in many occasion Rebeca was on top of me giving me orders ,send me text after she left the house your sister in law told to keep track because something similar happens to Adam Sandler but my intentions was never to get into that kind of situations.

Thank You.


Lidia

---

**3 archivos adjuntos**


**IMG_4742.jpg**
353K

**IMG_4744.jpg**
335K

**IMG_4743.jpg**
318K

# M Gmail

---

## Report 3
1 mensaje

---

**Lidia Orrego &lt;liorrego@gmail.com&gt;**          15 de noviembre de 2018, 14:24
Para: K J &lt;fullkj@gmail.com&gt;

Good afternoon, Mr. Kevin,
I attached my diary and photos.
I will be sending by parts to avoid errors in the email.
Please forward to the investigators.
Thank you.
Lidia

📄 IMG-4765.JPG

📄 IMG-4766.JPG

📄 IMG-4767.JPG

📄 IMG-4770.JPG

📄 IMG-4771.JPG

📄 IMG-4772.JPG

📄 IMG_3692.JPG

📄 IMG_4073.JPG

📄 IMG_4074.JPG

📄 IMG_4077.JPG

📄 IMG_4079.JPG

📄 IMG_4082.JPG

📄 IMG_4103.JPG

📄 IMG_4104.JPG

📄 IMG_4120.JPG

📄 IMG_4187.JPG

📄 shareImage (1).jpg

📄 shareImage (2).jpg

📄 shareImage.jpg

---

📄 **DIARIO.docx**
2122K

**Report 2 : Photographs "CANDIES"emailed to Kevin Knipfing for Investigation and which he mentions in the Termination Letter dated November 27, 2018 that the Plaintiff "BREACH HER NDA".**

20 archivos adjuntos
DIARIO.docx
HAPPY

M Gmail

## REPORT 4
1 mensaje

**Lidia Orrego <liorrego@gmail.com>**
Para: K J <fullkj@gmail.com>

16 de noviembre de 2018, 8:14

Good morning, Mr. Kevin, I attach the correct PDF format of the diary.

Thank you.

Lidia

📎 **DIARIO CORRECT.pdf**
887K

# M Gmail

Lidia Orrego <llorrego@gmail.com>

## REPORT 5
1 mensaje

Lidia Orrego <llorrego@gmail.com>
Para: K J <fullkj@gmail.com>

16 de noviembre de 2018, 8:17

continuation

**17 archivos adjuntos**



**IMG_3301.PNG**
1200K

**IMG_3302.PNG**
1092K

**IMG_3303.PNG**
1234K

**IMG_3304.PNG**
1226K

**IMG_3305.PNG**
1367K

**IMG_3306.PNG**
1462K



**IMG_3307.PNG**
1592K

**IMG_3322.PNG**
1563K

**IMG_3323.PNG**
1473K

**IMG_3321.PNG**
1784K

**IMG_3324.PNG**
1499K

**IMG_3327.PNG**
1395K

**IMG_3328.PNG**
1332K

**IMG-4758.JPG**
722K

**IMG_3329.PNG**
1391K



 **IMG_3330.PNG**
1696K

**00000064-AUDIO-2018-10-04-14-54-13.opus**
162K

# M Gmail

Lidia Orrego <llorrego@gmail.com>

## REPORT 6
1 mensaje

Lidia Orrego <llorrego@gmail.com>
Para: K J <fullkj@gmail.com>

16 de noviembre de 2018, 8:17

continuation

**19 archivos adjuntos**



**IMG_4747 (3).jpg**
370K

**IMG_4890.PNG**
320K

**IMG-4776.JPG**
782K

**IMG-4775.JPG**
638K

**IMG-4774.JPG**
686K

**IMG-4777.JPG**
999K



**IMG-4778.JPG**
961K

**IMG-4779.JPG**
1056K

**IMG-4780.JPG**
1100K

**IMG-4781.JPG**
1179K

**IMG-4782.JPG**
1800K

**IMG_3257.PNG**
709K



**IMG_4464.PNG**
776K

**IMG_4459.PNG**
744K

**IMG_3238.PNG**
771K

**IMG_4860 (1).jpg**
167K

**IMG_4458.PNG**
809K

**IMG_4891.PNG**
567K

**IMG_4892.PNG**
548K

# M Gmail

Lidia Orrego <llorrego@gmail.com>

---

## REPORT 7
1 mensaje

---

Lidia Orrego <llorrego@gmail.com>                                        16 de noviembre de 2018, 9:22
Para: K J <fullkj@gmail.com>

Good morning.

Mr. Kevin & Mrs Steffianna

With this recordings I finish, I want to thank you Mr Kevin and Mrs Steffiana for giving me the oportunity to let you know what was happenig around the kids all the time.
I pray everyday as always por peace and love in your house because I was working as a part of team and no trying to compite with nobody or harm,I always tried to do my best doing my job but I end up in the middle of this war between Rebeca and Taz and both side tried to use me unfortunaly for their purposes.
Have great day and weekend.Love for the kids and many blessings.
Lidia

📄 2018-08-15-16-17-39 Rebeca sobre MB.mp3

📄 2018-10-08 Rebeca pastillas para dormir.wav

📄 2018-10-08-05-18_2_1_3_0 Rebeca proteger a S.wav

📄 2018-10-12-18-30-002_Rebeca conversacion.wav

📄 2018-10-22-15-07-001_0_1 Rebeca sobre problema.wav

📄 2018-10-24-09-09-001_0_1_1 Cristina conversacio...

📄 2018-10-31-15-52-001_1_0 Rebeca hablar con el S...

# Exhibit 25

## Termination Letter Dated November 27, 2018

**1-"Old Westbury LLC" is ending your employment effective immediately.
This decision is based on several factors, including but not limited to: "**

The Plaintiff has never received working for the Knipfing's any written warnings or performance reviews related to the content of the Termination Letter and feedback on their work consistent with Stephanieanna James- Knipfing text messages from February 7, 2018 to November 1 , 2018 describing the Plaintiff in these messages as "Fantastic" or "Hard Worker".



# Exhibit 26

**November 02, 2018: Text MESSAGES FROM STEPHANIEANNA JAMES-KNIPFING**

After the Plaintiff placed her complaints via email at 2:30 pm Stephanieanna James-Knipfing in retaliation sent a series of text messages and emails continuing the Intentional Infliction of Emotional Distress attacking the Plaintiff and sabotaging her work or career with unfair treatment, unjustified negative evaluations, humiliating and degrading her, using insensitive terms, continuing with discrimination and harassment. Stephanieanna James-Knipfing requested the Plaintiff via email the medical certificate of Ms. Orrego's reported injuries at her workplace.

9:57       ‹   **Steffiana Knipfing** ›

Fri, Nov 2,



Good afternoon, Mrs Steff, I am in the doctor but earlier I send a e mail and at the end I request to take my sick days today and tomorrow and be back to work tuesday a 4 pm. Please let me know if you need a note from the doctor I will email you. thanks.

Oh no, are you ok? Yes, please take what you need. That's not a problem.

Prayers for you



amen, thank you

Oh Ms Lidia, I read your email. My sympathy goes to your interpretation of things. I think there is definitely a misinterpretation, maybe it is a language barrier and perhaps insecurities that fuel your views.

9:57       ‹   **Steffiana Knipfing** ›

Also, my suggestions to you were to help you to be professional. There are ways to handle a family and be in their private space and I believe you needed guidance to do so.

All our staff are considered family members. I am saddened and disappointed that anyone we ever open our home to ever feels otherwise. We are guided daily by priests and they have witness to our home situations and know the situations of all. We have a conscience with God and pray you have the same. God Bless you

Also know your style of work did not make us feel most comfortable. I think it is your misinterpretation of things that was coming out in your performance.

S████ did not want to be with

**‹**          Steffiana Knipfing ›

S███ did not want to be with you, that's why I stayed away, otherwise your time here would have been pointless.

Again, I am sorry how you perceive things. Many prayers for us all.

It's all nonsensical troublemaking.

Why would you want to come back on Tues after all the mean things you said? Why would you want to come back on Tues if any of this is true?

Send me your doctor report like you offered. Gracias!

Also, give me dates and times and we will judge from camera footage to make the necessary reprimands. Hope your health is well, I heard you had a rough

**‹**          Steffiana Knipfing ›

Also, give me dates and times and we will judge from camera footage to make the necessary reprimands. Hope your health is well, I heard you had a rough week at home.

I worried about you for a while. Your want of both shifts was too much. My decision was out of mindfulness for your well-being, and it wasn't good to me for you to want housekeep hours and then try to be a nanny to my daughter after that. I could sense the exhaustion.



# Exhibit 27

**TEXT MESSAGES FROM TERESA A. ZANTUA TO THE PLAINTIFF.**





**9:38** ‹ Taz(aunt of S███) ›

Sorry, I did not realize that this happened or even check the notification, I thought it was someone else.You know I'm stupid spanish from Paraguay or Mexico as you always said to me.Sorry 🙏😭

Omg I said Mexico when you said something about me......
lol

I never said nothing about you lol

Fri, Oct 5, 3:05 PM

**9:42** ‹ Taz(aunt of S███) ›

Fri, Aug 24, 2:52 AM

Taz, Ms Steff is here?



# Exhibit 28

MOISEY DELMAN, M.D.

Name: Udie Orreen    Date: 1/21/78    $66⁰⁰ $66⁹⁶

BP: 110/80   RP: _____   TEMP: _____   RR: 18   HR: 78   Weight: _____

| | MEDICATIONS | | |
|---|---|---|---|
| | | | |

Pt complains of low and
upper back pain according
to Pt was hit by child
at work a week ago.
Also complains of dry
throat cough.

A Pt awake, alert anxious
there is mild pharyngeal
congestion.
Lungs clear and
Cor regular S₁ S₂
Abd. soft, nontender
Ext Back tender
limited motions

A/P   Back Pain
         URI
Tylenol      F/o throat dysopil
  PRI

MOISEY DELMAN, M.D.
MEDICAL ATTENDING

 Gmail <span>Lidia Orrego &lt;liorrego@gmail.com&gt;</span>

# Exhibit 29

## MY SITUATION A WORK FOR 8 MONTHS

**Stephanieanna James-Knipfing** &lt;steffdelacruz@gmail.com&gt;    2 de noviembre de 2018, 14:52
Para: Lidia Kj &lt;liorrego@gmail.com&gt;
Cc: Skylar Testa &lt;skylartesta@gmail.com&gt;

YES, please send me your doctors report.

Thank you,

**Steff**
[El texto citado está oculto]

**November 2, 2018: The Plaintiff texted to Skylar Testa notifying that she would go to the doctor that day for back pain according to the medical record of Dr. Moisey Delman. See Exhibit 28 Page 133.**

The Plaintiff don't notified to Teresa A. Zantua because that day she sent the complaint against her. Skylar Testa confirms that he was reading the email with the complaint.



# Exhibit 30

**November 2, 2018: Message in Spanish from Rebeca Lugo, the other nanny.**

Because the Plaintiff reported she was going to the doctor, Rebeca Uzcategui called her because S.S.K. wanted to greet the Plaintiff. Rebeca Uzcategui also knew about the last physical assault against the Plaintiff on October 23, 2018.



10:55

**Miss Rebeca Lugo**
last seen today at 9:44 AM

Voy a orar por nosotras Ms. Li
No te preocupes. Entrégale todo a Dios.
El conoce nuestro corazón y el siempre va estar de nuestro lado.
Que descanses.
Good night

Nov 2, 2018

Missed video call at 2:37 PM

Hola Rebeca me llamaste? estaba en el doctor.

Sii porque S█████te quería saludar
Como sigues??

Yo tambien quiero hablar con ella sweet baby!!! los reportes estaran el lunes o martes aun no lo sé! que se cuide mucho!!!

No puedo hablar en este momento

Esta bien.
Descansa

ty

**November 2, 2018: Message from Cristina Coimbra**

Cristina Coimbra, the housekeeper, who has back injuries from hard and continuous work also texted the Plaintiff because she reported was going to the doctor.



# Exhibit 31

November 24, 2018: Stephanieanna James-Knipfing via text message sent to the Plaintiff called her "SLANDER" even though the plaintiff presented all the evidence supporting her complaint. The employers continued their discrimination and retaliation.



 **Gmail**

# Exhibit 32

Lidia Orrego <liorrego@gmail.com>

## TIMESHEET Lidia Orrego

**Lidia Orrego** <liorrego@gmail.com>
Para: Skylar Testa <skylartesta@gmail.com>
Cc: K.J <fullkj@gmail.com>

9 de noviembre de 2018, 10:07

Good day Skylar, I just realized that I was incorrectly paid for the hours worked last week.

<u>You paid for 71h20m when you only work 52h20m.</u>

I did not realize before because I am working on the reports and do not check the automatic email.

Since I had resent the timesheet, I thought everything was correct.

I await your instructions and confirmation of the amount that I must return to you as soon as possible.

Blessings.

Thank you.

Lidia

---------- Forwarded message ----------
From: **Lidia Orrego** <liorrego@gmail.com>
Date: lun., 5 nov. 2018 a las 4:49
Subject: TIMESHEET Lidia Orrego
To: <cstan@savco.com>

Please find attached timesheet for
Week Ending : 11/4/18

Sent from my iPhone

---

**2 adjuntos**

📄 **2018-10-29_TIMESHEET_Lidia Orrego_.pdf**
    50K

📄 **10-26-2018.PDF**
    11K

# TIMESHEET

liorrego@gmail.com

95-08 Queens Blvd

| Name | : Lidia Orrego | | Client | : K | | |
| --- | --- | --- | --- | --- | --- | --- |
| Phone | : 347-4532234 | | Phone | : 310.315.6200 | | |
| Week Beginning | : 29 Oct 2018 | | Project | : Time-sheet | | |

| | Mon | Tue | Wed | Thu | Fri | Sat | Sun |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Date | Oct 29, 2018 | Oct 30, 2018 | Oct 31, 2018 | Nov 1, 2018 | Nov 2, 2018 | Nov 3, 2018 | Nov 4, 2018 |
| Start | 9:10 am | 9:15 am | 9:45 am | 4:20 pm | 4:00 pm | 8:00 am | |
| Finish | 5:00 pm | 10:00 pm | 9:50 pm | 10:00 pm | 10:00 pm | 4:00 pm | |
| Break | | | | | | | |
| Sub Total | 7h 50m | 12h 45m | 12h 5m | 5h 40m | 6h 0m | 8h 0m | |
| Overtime | | | | | | | |
| Total Hours | 7h 50m | 12h 45m | 12h 5m | 5h 40m | 6h 0m | 8h 0m | |
| Comments | | | | | Sick day | Sick day | |

Signature 

| | |
| --- | --- |
| Total Normal Hours : | 40h 0m |
| *Overtime Hours : | 12h 20m |
| Total Hours : | 52h 20m |

Manager's Signature :

Manager : Rachel / Charles

 

Created with Timesheet Plus

* Overtime For Hours exceeding 40.0

**Direct Deposit Account Information**

| Category | Bank Name | Routing Number | Account Number | Account Type | | Amount |
|---|---|---|---|---|---|---|
| | | | | Checking | Personal | 1,645.55 |

## LIDIA M ORREGO

| REFERENCE NO SDD 431 | DATE 11-09-2018 | EMPLOYEE ID 44838 | SSN XXX-XX-4596 | PAY FREQUENCY Weekly | PAY PERIOD 10/29/18-11/02/18 | FILING STATUS S 000 | NET PAY 1,645.55 |
|---|---|---|---|---|---|---|---|

**EMPLOYER**
KEVIN AND STEPHANIEANNA KNIPPING
C/O SAVITSKY SATIN BACON BUCCI
2049 CENTURY PARK EAST, SUITE 1400
LOS ANGELES CA 90067

| CATEGORY-EARN | DESCRIPTION | THIS CHECK | HOURS | RATE |
|---|---|---|---|---|
| GROSS WAGES | Regular Earnings | 1,200.00 | 40.00 | 30.0000 |
| TIME & 1/2 | Time & 1/2 | 1,404.00 | 31.20 | 45.0000 |

| | | THIS CHECK | | |
|---|---|---|---|---|
| GROSS EARNINGS THIS CHECK | | 2,604.00 | 71.20 | |
| GROSS EARNINGS YTD | | 90,154.95 | 2,494.61 | |

| CATEGORY-OTHER | DESCRIPTION | THIS CHECK |
|---|---|---|

| CATEGORY | THIS CHECK | YR TO DATE |
|---|---|---|
| GROSS WAGES | 1,200.00 | 44,199.90 |
| HOLIDAY | 0.00 | 240.00 |
| TIME & 1/2 | 1,404.00 | 45,245.25 |
| DOUBLE TIME | 0.00 | 469.80 |
| FIT | 498.07– | 17,021.01– |
| SOC SEC | 161.45– | 5,589.61– |
| MEDI | 37.76– | 1,307.25– |
| NEW YORK SIT | 160.02– | 5,485.28– |
| NEW YORK SDI | 0.60– | 22.20– |
| NEW YORK PAID FAMILY LEAVE ACT (NY) | 0.00 | 85.56– |
| NEW YORK CITY TAX | 100.55– | 3,457.28– |
| DIRECT DEPOS TO CKG | 1,645.55 | |

| LEAVE TYPE (HRS) | AVAILABLE | CURRENT ACCRUED | CURRENT USED |
|---|---|---|---|

| | THIS CHECK |
|---|---|
| MISCELLANEOUS ITEMS THIS CHECK | 0.00 |
| MISCELLANEOUS ITEMS YTD | 0.00 |

**EMPLOYEE NAME:** LIDIA M ORREGO
**EMPLOYEE ADDRESS:** 95-08 QUEENS BLVD. #3E

REGO PARK NY 11374

# Exhibit 33

**Photographs inside the Knipfing's House – Witnesses**

**DATE 07-30-2018:** Another witnesses, who always knew that Rebecca Uzcategui and the Plaintiff took pictures of the children, swimming teacher Mrs. Sharon (Jul 2018) and the Italian Teacher (who gave lessons until June 2018).These people were also authorized to take photographs.

Previous employees like Nanny Annie and other housekeeper also took pictures inside the house because Teresa A. Zantua showed the Plaintiff several photos that employees texted her.





**DATE 04-04-2018:** In the appointment with the children's dentist, Teresa A. Zantua ordered to the Plaintiff to take photos and videos, to send them to the employers Kevin Knipfing and Stephanieanna James-Knipfing. The Plaintiff holds plenty of videos and pictures.



**DATE 06-16-2018:** *Chris Weidman's House*

On Chris Weidman's son's birthday, a family friend, Teresa A. Zantua ordered me to take pictures and videos of the children in presence of his wife Marivi Weidman with whom we already shared other activities. This time, K.V.K. (7 y/o) in the car stepped on the Plaintiff's right hand several times and stood on it injuring her wrist. Teresa A. Zantua justified these assaults when the Plaintiff complained of pain: "You Mexicans eat a lot of corn that's why your bones are useless, that's why Stephanieanna James-Knipfing does not allow buying food based in corn". The Plaintiff has pictures and videos.

