UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X

LIDIA M. ORREGO,

                     Plaintiff,

          -against-

KEVIN KNIPFING, *Employer, also known as Kevin James*; STEPHANIEANNA JAMES-KNIPFING, *Employer, also known as Steffiana de la Cruz*; OLD WESTBURY EDDIE LLC, *Company/Payroll owner Kevin Knipfing*; OLD WESTBURY LLC, *Unknown Entity under registration in NY State*; STEVE SAVITSKY, *Business Manager, Old Westbury LLC*; and TERESA A. ZANTUA,

                     Defendants.

**MEMORANDUM & ORDER**
CV 20-3361 (GRB)(AKT)

---------------------------------------------------------------------X

**GARY R. BROWN, United States District Judge:**

    *Pro se* plaintiff Lidia M. Orrego ("plaintiff") brings this case against her former employers, Kevin Knipfing, Stephanieanna James-Knipfing, and two LLCs operated by the Knipfings, Old Westbury Eddie LLC and Old Westbury LLC; the business manager of the Westbury LLCs, Steve Savitsky; and her former supervisor (and Ms. Knipfing's sister), Teresa Zantua (collectively, "defendants"). Before the Court is defendants' motion to dismiss. For the reasons set forth below, defendants' motion is GRANTED as to plaintiff's claims under the NYCHRL, the New York Labor Law, the New York Penal Law, and plaintiff's claims for discrimination under 42 U.S.C. § 1981 and the NYSHRL; additionally, defendants' motion is GRANTED as to plaintiff's retaliation claims against Savitsky and Zantua and plaintiff's hostile work environment claims against Savitsky. Otherwise, defendants' motion is DENIED.

## I. Factual and Procedural History

As set forth in plaintiff's amended complaint (the "Complaint"), the allegations of which are accepted as true for the purposes of this motion, plaintiff began working for the Knipfings as a nanny (and, later on, as a housekeeper) on January 31, 2018.  Complaint, Docket Entry ("DE") 8, at 19.  Plaintiff worked in the Knipfings' home, allegedly located in Nassau County.  *Id.* at 3, 19.  During this time, Ms. Zantua supervised plaintiff and five other employees who worked in the Knipfings' home.  *Id.* at 19.  At the outset of her employment, plaintiff was given an employment agreement and nondisclosure agreement (NDA) – in English, despite Spanish being her primary language; according to plaintiff, the NDA was missing most of the constituent pages (plaintiff apparently signed these documents on February 15, 2018).  *Id.*  Critically for purposes of the present motion, under the NDA, plaintiff agreed not to "publish, disseminate, discuss, disclose . . . or cause or induce to be disclosed" any confidential information, including "photographs, films, videotapes, sound recordings, [or] audio tracks" of anyone in the Knipfing family or any employees of the Knipfings.  *Id.* at 90-91.  The various employment-related documents provided to plaintiff identify different employers: plaintiff's employer is variously identified as the Knipfings, Old Westbury Eddie LLC or Old Westbury LLC.  *See, e.g.*, Complaint, DE 8, at 19, 49, 80, 88, 98-102.  In any case, plaintiff completed her background check and signed these documents on February 15, 2018.  *Id.* at 19.

Plaintiff alleges that she was repeatedly harassed by Zantua for being Hispanic and/or of Paraguayan descent.  For example, plaintiff alleges that Zantua often ordered plaintiff not to speak Spanish in front of the Knipfing children, complained about the Knipfings "hir[ing] nannies who only speak Spanish," and wondered aloud why "Mexicans work for American families who speak only English."  *Id.* at 20, 23, 24, 25, 27, 31.  Zantua also made pejorative comments about

2

plaintiff's race; for example, at a birthday party for a family friend's son, after Zantua "ordered [plaintiff] to take pictures and videos," a child stepped on plaintiff's hand and injured plaintiff; in response, Zantua commented that plaintiff's "bones [were] useless" because "[y]ou Mexicans eat a lot of corn." *Id.* at 21. On occasions where Zantua perceived that she had been slighted by plaintiff, or that plaintiff had fallen short in her responsibilities, Zantua defaulted to insulting plaintiff "because of her race," including by calling her a "stupid Paraguayan." *Id.* at 25-26, 27. Zantua informed plaintiff that she and Skylar Testa, the house manager, "always made fun of the Plaintiff" because of her accent – an activity the Knipfing children also participated in. *Id.* at 25. Even when not directed specifically at plaintiff, Zantua often made pejorative remarks about Latinos, on one occasion ordering plaintiff to pay the "Mexicans" who cleaned her car at a carwash because the "'Mexicans' were disgusting to her," and on another informing plaintiff that "she would never apologize to 'a Mexican.'" *Id.* at 21, 24. Other employees were also subjected to Zantua's race-based harassment. *See id.* at 29. By April 4, 2020, plaintiff began to write a diary documenting these events. *Id.* at 20. Plaintiff alleges that, by August 15, she "had already reported on several occasions of the discriminatory treatment and abuse received from" Zantua. *Id.* at 22. On this date, she "was offered the permanent position of Housekeeper" – apparently a demotion, instigated both by plaintiff's reporting and "because she was Hispanic." *Id.*

Plaintiff also presents certain allegations about Ms. Knipfing's conduct, starting in August 2018. For example, plaintiff alleges that on August 10, she was ignored by Ms. Knipfing when she went to help for a concert; when the event coordinator arrived at some point later, Ms. Knipfing introduced her co-workers, but not plaintiff. *Id.* at 22. Similarly, on August 15, Ms. Knipfing accused plaintiff (via another nanny, a Ms. Uzcategui) of some misstep that apparently was not plaintiff's fault; when plaintiff went to ask about the issue a few days later, Ms. Knipfing asked

plaintiff to leave the room even though "everyone else [was] walk[ing] in and out of" the room. *Id.* Later, toward the end of October, Ms. Knipfing confronted plaintiff when she was sitting down for lunch, asking her "why she was sitting" – a challenge Ms. Knipfing apparently never made to plaintiff's co-workers. *Id.* at 32. The next day, Ms. Knipfing issued an order prohibiting plaintiff "from texting her co-workers" and "withdrew [plaintiff's] access to money for expenses"; Ms. Knipfing also excluded plaintiff from attending the "All Saints Parade" on November 1, 2018 – restrictions that applied only to plaintiff. *Id.* at 32. In sum, plaintiff alleges that she was subject to disparate treatment at the hands of Ms. Knipfing.

However, in contrast to the allegations against Ms. Zantua, plaintiff offers little to suggest this treatment emanated from animosity toward Latinos. But on October 2, Ms. Knipfing learned of an incident where Zantua harassed plaintiff, and "started blaming [plaintiff] and making malicious remarks with her co-workers in Plaintiff's absence" (*id.* at 26).[1] Plaintiff also alleges more generally that Ms. Knipfing "always encourag[ed] this discrimination" and "also harass[ed] the Plaintiff in front of the other workers." *Id.* at 26. Claims of discriminatory animus on the part of Ms. Knipfing are alleged only in the most general fashion.

Plaintiff also alleges that she was subject to physical assault, specifically by one of the Knipfings' children (and, on one occasion, their friends). For example, on June 4, 2018, at a birthday celebration held for the son of a family friend, a child "stepping on the Plaintiff's right hand several time[s] and stood on it injuring her wrist." *Id.* at 21. Another time, on October 23, plaintiff was assaulted in the kitchen, ostensibly by the Knipfings' son. *Id.* at 31. Plaintiff claims

---

[1] Plaintiff further alleges that, in response to plaintiff requesting a sick day to visit a doctor on November 2, Ms. Knipfing "attack[ed] the Plaintiff and sabotage[ed] her work or career with unfair treatment, unjustified negative evaluations, humiliating and degrading her, using insensitive terms, continuing with discrimination and harassment." Complaint, DE 8, at 34. However, the text messages that plaintiff refers to in support of this claim indicate that Ms. Knipfing's response was, in fact, fairly mundane, arguably even sympathetic. *See id.* at 129-30.

4

that she "was the victim of several physical assaults (kick or punch her back, hand, neck, shoulders)" by the child – acts that she claims were instigated by Zantua through "her hate speech against Mexicans." *Id.* at 31-32. Plaintiff also alleges that she developed pain in her back and neck "as a result of the work," for example, "work[ing] with the Chef . . . carrying items that were heavy in weight" and "without taking a break," as well from as the aforementioned assaults. *Id.* at 21, 33. These events led plaintiff to seek medical help for her back and neck pain as well as for the stress "resulting from an environment of discrimination and abuse." *Id.* at 21. Plaintiff first went to a doctor on June 3, where the doctor referred her to physical therapy and prescribed pain killers. *Id.* She saw two other doctors on November 1 and 2, who took an X-ray and apparently diagnosed plaintiff with tachycardia. *Id.* at 34.

Plaintiff further alleges that on November 2, she submitted to Testa and Ms. Knipfing a complaint via email that she and Ms. Uzcategui had drafted, which set forth all of their allegations about "direct and indirect race discrimination, physical abuse/assault, verbal abuse, hostile work environment[, and] harassment . . . for being Hispanic," including complaints about Zantua's behavior. *Id.* at 34, 46. When plaintiff returned from her days off visiting the doctors, she was greeted by Mr. Knipfing, who apparently "admit[ted] that he knew about all the problems between" Zantua and Uzcategui, and "thanked the Plaintiff for letting him know of all the problems" they had in the house; however, he apparently "was unaware that it involved the Plaintiff." *Id.* at 35. Mr. Knipfing then informed plaintiff that "an investigation would be opened" and promised to call her about the results of the investigation, then asked her to "give him [her] evidence to do the Investigation." *Id.* Plaintiff alleges that Mr. Knipfing additionally "intimidate[d]" her by saying that "nobody should know anything about her complaint"; plaintiff interpreted this to suggest that he was "obviously concerned that it would become public." *Id.* At

the conclusion of this conversation, Mr. Knipfing "suspended her from going to work until [the] investigation was completed" – apparently, plaintiff was the only employee subject to a suspension, "even though other co-workers were involved in the complaint." *Id.* Plaintiff further claims that Testa and Mr. Knipfing "mocked [her] for being Hispanic," but without any further detail. *Id.*

Two days later, on November 8, plaintiff sent Mr. Knipfing "all the evidence that support[ed] her complaint." *Id.* at 36. A few days later, Testa texted plaintiff directing her "to meet with Investigators in a Starbucks Coffee location in Rego Park." *Id.* The next day, plaintiff met with the two investigators, but claims that she "was not physically or emotionally well" at the time "especially for the way she was treated" by Ms. Knipfing "after receiving her complaint." *Id.* at 36-37. The investigators also asked if she ever saw the complaint that Uzcategui wrote, or her notes or videos; plaintiff answered that she "never saw any of that evidence," but that Uzcategui had "told her about it all the time." *Id.* at 37. The investigators then asked "if she would continue working with" Ms. Uzcategui, which ultimately led plaintiff to believe that the investigators "avoided talk about and discrimination and abuse [and] focused more on the issues between her and" Uzcategui. *Id.* Thus, plaintiff claims that the Knipfings used the investigators "to cover the complaint of discrimination and physical assault and other[] abuses in addition to intimidating the Plaintiff." *Id.*

On November 14, Testa messaged plaintiff requesting her diary; she emailed Mr. Knipfing over the next two days the evidence she had on hand "with Pictures, Videos, Voice Messages, Diary with dates and times [documenting] all acts of discrimination and abuses." *Id.* at 37. While the investigation was in progress, on November 24, Ms. Knipfing texted plaintiff a photo of a priest or minister overlaid with the message, "Inasmuch as you pray with all your soul for the one who

6

has slandered you so much will God reveal the truth to them who have believed the slander." *Id.* at 38. Plaintiff took this to mean that Ms. Knipfing was accusing plaintiff of slander. *Id.* Plaintiff ultimately received a termination letter on November 27 from Old Westbury LLC; the letter was signed by Steve Savitsky,[2] who identified himself as the business manager of Old Westbury LLC.[3] *Id.* at 38, 49. The letter sets forth the following grounds for her termination: (a) "Breach of [plaintiff's] Non-Disclosure Agreement" including by recording a conversation with Uzcategui in public and taking "recordings and photographs" of the Knipfings' home; plaintiff's "statement that [she was] unwilling to continue working with" Uzcategui; and "[their] conclusion that [she] made statements in [her] complaint that [she] know[s] to be false." *Id.* at 49. The letter also notified plaintiff that she had health insurance through United Healthcare that would be terminated on November 30, and that she was eligible for COBRA benefits. *Id.*

Plaintiff contests the grounds set forth in the termination letter, claiming that she "never received . . . any written warnings or performance reviews related to the content of the Termination Letter." *Id.* at 38. Plaintiff specifically contests that she violated the NDA, observing that (a) the recording she made of her and Uzcategui's conversation "was not shared with a third party or disclosed," and (b) Uzcategui did not seem subject to the same punishment, despite the fact that she "disclosed information . . . about the Knipfing[] Family in a public place and in the presence of a third party[.]" *Id.* Plaintiff also claims that the photographs referred to are "the photographs of the candies" sent to Mr. Knipfing on November 15 "that prove the abuse against" one of the

---

[2] Plaintiff claims that, by sending this letter, Savitsky "actively participated in retaliation and discrimination" against her. Complaint, DE 8, at 38.

[3] Plaintiff therefore claims that this letter was "illegal because it came from an unknown entity who was not the Plaintiff's employer." Complaint, DE 8, at 41. To be sure, as noted above, the Knipfings identified a number of different persons as plaintiff's employer. Nevertheless, plaintiff concedes that she was terminated by the Knipfings on this date, claiming that Mr. Knipfing "gave the order to Steve Savitsky . . . to manufacture the Termination Letter dated November 27, 2018 under the name of the unknown Entity Westbury LLC." *Id.* at 38.

children,[4] but reiterates (as noted above) that other employees also took photographs inside the house (and, apparently, occasionally published those photographs on social media). *Id.* at 39-40, 42. As for the claim that plaintiff was unwilling to work with Uzcategui, plaintiff asserts that the investigators criticized Uzcategui, such that it was unreasonable for them to ask if plaintiff would continue working with her. *Id.* at 40. Finally, plaintiff claims that "according to all the evidence" she had presented, everything in her complaint was true. *Id.*

Following her termination, plaintiff claims that that the Knipfings and Savitsky "discriminated and retaliated against" her by "immediately canceling her medical plan" and denying her COBRA benefits. *Id.* at 41. Plaintiff further alleges that on November 29, two days after her termination, her "Health Insurance [carrier] confirmed that [her former] employers didn't submit the application for COBRA," such that plaintiff could not "be covered by insurance." *Id.* Additionally, the Knipfings "refused to provide reference[s]" for plaintiff to get another job. *Id.* Plaintiff then raises allegations about certain post-termination events that are not relevant here.

Plaintiff filed this action on July 23, 2020, asserting claims for discrimination, retaliation, and hostile work environment under 42 U.S.C. § 1981, the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"); plaintiff also brings claims under New York Labor Law § 195(6), and sections 170 and 210 of the New York Penal Law. Following the submission of a pre-motion letter in anticipation of a motion to dismiss filed by all defendants to this action, the undersigned set forth a briefing schedule for the anticipated motion. *See* Electronic Order of September 22, 2020. The fully briefed motion was filed on December 11, 2020. This opinion follows.

---

[4] In essence, plaintiff alleges that Uzcategui was over-feeding one of the children candy on a regular basis in order to placate the child.

## II. Discussion

It has been well established that "[a] document filed *pro se* is 'to be liberally construed,' and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citations omitted). Nevertheless, many of plaintiff's claims may be dismissed in short order. First, as to plaintiff's NYCHRL claim, "[t]o state a claim under the NYCHRL, plaintiff must allege that the defendant discriminated against her 'within the boundaries of New York City.'" *Robles v. Cox & Co.*, 841 F. Supp. 2d 615, 623 (E.D.N.Y. 2012) (quoting *Shah v. Wilco Sys., Inc.*, 27 A.D.3d 169, 175 (N.Y. App. Div. 1st Dep't 2005). Nearly all of the activities set forth above that are relevant to a NYCHRL claim are alleged to have occurred in the Knipfings' household, which, as asserted in the complaint, is located outside of New York City. While plaintiff does allege that Zantua harassed plaintiff during a trip to the NYC Children's Museum, DE 8 at 26, "[t]he fact that certain acts leading to discrimination may occur in New York City will not necessarily give rise to a claim under the City HRL. *Salvatore v. KLM Royal Dutch Airlines*, No. 98 CIV. 2450 (LAP), 1999 WL 796172, at *16 (S.D.N.Y. Sept. 30, 1999). It is undisputed that the "impact of the offensive conduct" – the lion's share (indeed, all but one incident) of the harassment, as well as the suspension of plaintiff's employment privileges, her alleged demotion, and her ultimate termination – all occurred outside of New York City. *See Robles*, 841 F. Supp. 2d at 62. Accordingly, the NYCHRL claim must be dismissed.

Second, as to plaintiff's New York Labor Law claim, § 195(6) holds that "[e]very employer shall . . . notify any employee terminated from employment, in writing, of the exact date of such termination as well as the exact date of cancellation of employee benefits connected with such termination. In no case shall notice of such termination be provided more than five working days

after the date of such termination."  Plaintiff affirmatively alleges that she was provided such notice

by defendants and attached her termination letter which clearly establishes that defendants met this

requirement.  Although plaintiff contests that this notice was insufficient as § 195(6) also requires

the letter to include the "name of [the] employer" – which, as noted above, plaintiff contests - §

195(6) does not, in fact, contain such a requirement.  Accordingly, plaintiff's New York Labor

Law claim must also be dismissed.

Finally, plaintiff's claims under the New York Penal Law (for forgery and perjury) fail, as

"forgery[] and perjury . . .  are crimes and therefore do not give rise to civil causes of action."

*Luckett v. Bure*, 290 F.3d 493, 497 (2d Cir. 2002).  Furthermore, plaintiff asserts in her opposition

brief that the complaint "requested no relief in connection with" these claims.  DE 22-5 at 26.  For

both reasons, then, plaintiff's claims under the New York Penal Law are dismissed.

Plaintiff's claims under 42 U.S.C. § 1981 and the NYSHRL merit closer examination.

First, as to plaintiff's discrimination claims, "Section 1981[] and NYSHRL discrimination claims

[are analyzed] under the same burden shifting framework as first set forth by the Supreme Court

in *McDonnell Douglas Corp. v. Green*."  *McGill v. Univ. of Rochester*, 600 F. App'x 789, 790 (2d

Cir. 2015).  As the Second Circuit noted in *McGill*:

> Under the *McDonnell Douglas* framework, a "plaintiff bears the initial burden of
> establishing a prima facie case of discrimination." To establish a prima facie case
> of discriminatory discharge, "a plaintiff must show that (1)[s]he is a member of a
> protected class; (2)[s]he was qualified for the position [s]he held; (3)[s]he suffered
> an adverse employment action; and (4) the adverse action took place under
> circumstances giving rise to the inference of discrimination."

*Id.* at 790–91 (citations omitted).  Defendants limit their arguments to the fourth element, as there

can be little dispute that plaintiff's allegations meet the first three.  First, defendants cite the well-

established principle that "[w]hen the same actor hires a person already within the protected class,

and then later fires that same person, 'it is difficult to impute to her an invidious motivation that

would be inconsistent with the decision to hire.'" *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir. 2000) (citation omitted). Likewise, "where the termination occurs within a relatively short time after the hiring there is a strong inference that discrimination was not a motivating factor in the employment decision." *Id.* at 137-38 (collecting cases finding that this inference applies where the time between hiring and firing was under two years). There can be little dispute that the Knipfings were the ones to both hire and fire plaintiff, and that they did both in a period of under a year. Second, defendants contend that plaintiff "has failed to offer *any* non-conclusory facts or evidence demonstrating that the Knipfings . . . harbored any discriminatory animus against her because of her race or national origin." DE 22-3 at 18. The allegations set forth in the complaint do not establish any overt acts of discrimination by the *Knipfings*. "[A]bsent direct evidence of discrimination," then, plaintiff must allege "at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015). Plaintiff fails to meet even this lesser burden: though she alleges disparate treatment at the hands of Ms. Knipfing, any allegations that such treatment was "motivated by discriminatory intent" are, at best, conclusory. Any allegations about Mr. Knipfing's discriminatory motives, to the extent they even exist, are even sparser. Otherwise, the same conclusion appears to apply to the corporate defendants, and plaintiff fails to allege that any other defendant instituted an "adverse employment action" (e.g., demotion, suspension, or termination) against her.[5] Accordingly, plaintiff's discrimination claims must be dismissed.[6]

---

[5] "Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 211 (E.D.N.Y. 2014). To be sure, plaintiff alleges that Savitsky signed her termination letter, but once again, any allegations that his conduct was in any way "motivated by discriminatory intent" are merely conclusory.

[6] Defendants also argue that plaintiff's discrimination claim fails because, "at the time Plaintiff was employed, the Knipfings employed a very diverse group of people, including Uzcategui, who is also Hispanic and remains employed." DE 22-3 at 17. However, "an employer may not escape liability for discriminating against a given

Plaintiff's retaliation claims are analyzed under the same burden-shifting framework. Thus, "to establish a *prima facie* case of retaliation, a plaintiff must demonstrate that (1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the plaintiff suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Guzman v. City of New York*, 93 F. Supp. 3d 248, 261 (S.D.N.Y. 2015) (citation omitted). "As to the first element of the prima facie case, '[t]he term "protected activity" refers to action taken to protest or oppose statutorily prohibited discrimination,' and may take the form of either formal or informal complaints." *Id.* (citations omitted). However, such complaints "qualif[y] as protected activity only if 'the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law.'" *Id.* at 261-62. Defendants only contest the fourth element of this test, claiming that plaintiff "has failed to allege sufficient facts to show that her termination was motivated by" the November 2 email, pointing instead to the rationales set out in the termination letter. DE 22-3 at 25. However, "[p]roof of causation can be shown . . . indirectly, by showing that the protected activity was followed closely by discriminatory treatment." *Hicks v. Baines*, 593 F.3d 159, 170 (2d Cir. 2010). Less than a week elapsed between plaintiff's complaint and her suspension, while less than three weeks elapsed between her complaint and her termination. Moreover, the November 2 email is not the only protected activity alleged by plaintiff: as noted above, plaintiff also alleges that by August 15, she had already "reported on several occasions of the discriminatory treatment and abuse received from" Zantua. It is notable, then, that plaintiff *also* alleges that her disparate treatment at the hands of Ms. Knipfing – including her alleged demotion – began around this time. Given the solicitude granted *pro se* complaints, plaintiff appears to have alleged a sufficient causal connection between her

---

employee on the basis of race simply because it can prove it treated other members of the employee's group favorably." *Graham v. Long Island R.R.*, 230 F.3d 34, 43 (2d Cir. 2000).

protected activity and the adverse employment actions via temporal proximity. *See Littlejohn*, 795 F.3d at 319-20 (finding "allegations that the [adverse employment action] occurred within days after [plaintiff's] complaints of discrimination" to be "sufficient to plausibly support an indirect inference of causation"). Thus, plaintiff has pleaded plausible retaliation claims under § 1981 and the NYSHRL against the Knipfings and the corporate defendants. However, as noted above, plaintiff fails to allege that any other defendant instituted an "adverse employment action" against her, so plaintiff's retaliation claims against Zantua and Savitsky are dismissed.

Finally, "[t]o establish a hostile work environment" claim, "a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Littlejohn*, 795 F.3d at 320–21; *see also Westbrook v. City Univ. of New York*, 591 F. Supp. 2d 207, 232 (E.D.N.Y. 2008). "The incidents complained of must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Littlejohn*, 795 F.3d at 321 (citation omitted). A plaintiff "must show not only that she subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive." *Guzman*, 93 F. Supp. 3d at 263 (quoting *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir.2006)). Additionally, a plaintiff must establish that "'a specific basis exists for imputing' the objectionable conduct to the employer" and, of course, that "the hostile conduct occurred because of a protected characteristic." *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015). In evaluating such claims, a court must consider "the totality of the circumstances, . . . including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Demoret*, 451 F.3d at 149 (quoting *Harris v. Forklift*

*Sys., Inc.*, 510 U.S. 17, 23 (1993)).  However, the Second Circuit "ha[s] repeatedly cautioned against setting the bar too high" in this context, holding that "a plaintiff need only plead facts sufficient to support the conclusion that she was faced with 'harassment ... of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.'"  *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (citation omitted).

Defendants compare plaintiff's allegations to those in another case, in which the hostile work environment claim was dismissed because the conduct at issue entailed, "at most, isolated and sporadic incidents that occurred over the course of a year."  DE 22-3 at 21 (quoting *Alvarado v. Mount Pleasant Cottage Sch. Dist.*, 404 F. Supp. 3d 763, 781 (S.D.N.Y. 2019)).  Indeed, defendants acknowledge that, in *Alvarado*, exactly four incidents occurred.  *Id.*; *see also Alvarado*, 404 F. Supp. 3d at 781 (holding that the plaintiff in that case "ha[d] pointed to four incidents"). These cases are far from comparable. Plaintiff here sets forth a continuing pattern of race-based abuse and harassment at the hands of Zantua, a course of conduct that seems to have prevailed over the duration of plaintiff's tenure in the Knipfing household.  Even more troubling, plaintiff alleges that Zantua encouraged other members of the household staff, and even the Knipfings' children, to participate in this harassment.  Indeed, plaintiff alleges that Zantua's harassment was pervasive enough to drive her to seek assistance from her co-workers in presenting a complaint to the Knipfings – arguably an understandable concern, given that Zantua is Ms. Knipfing's sister – and to complain to the Knipfings on multiple occasions about Zantua's behavior.  At this early juncture, plaintiff seems to have satisfied the pleading standard.

Much of the remainder of defendants' argument hinges on whether Zantua was actually plaintiff's supervisor (or even an employee of the Knipfings).  "For the purpose of vicarious liability under § 1981, a supervisor is a person empowered by the employer to take tangible

14

employment actions against the victim, *i.e.*, to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Lamarr-Arruz v. CVS Pharmacy, Inc.*, 271 F. Supp. 3d 646, 659 (S.D.N.Y. 2017) (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 431 (2013)) (quotations omitted).  To be sure, "[t]his is not a case where supervisory status is readily determinable."  *Id.*  Zantua engaged in none of these activities.  However, this list is merely illustrative, not exhaustive; moreover, plaintiff alleges that Zantua "ordered" her to engage in, or cease, certain conduct – and suggests that Zantua had similar power over other employees.  Thus, at this early stage, particularly in light of the liberal construction applied to *pro se* pleadings, the Court must accept plaintiff's allegation that Zantua was her supervisor for the purposes of evaluating plaintiff's hostile work environment claims.  Given that Zantua herself did not impose any "tangible employment action," the Knipfings "may escape liability by establishing, as an affirmative defense, that (1) [they] exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided."  *Lamarr-Arruz*, 271 F. Supp. 3d at 659 (quoting *Vance*, 570 U.S. at 424).

Defendants therefore contest whether the Knipfings should have known about this harassment, pointing out that, in her November 2 email, plaintiff stated the following: "I am writing to you this letter because I have not had the opportunity to speak or explain personally to you because of all the restrictions I have to communicate with you Mrs. Steffiana," arguing that this makes it "clear" that this was "the first time Plaintiff put the Knipfings on notice about any issues she may have been having with Zantua."  DE 22-3 at 23-24; DE 8 at 46.  Defendants conveniently omit the sentence immediately preceding this one, however, in which plaintiff states that "I am

writing to you and to Skylar as house manager, *about matters as I previously did on several occasions for different reasons* and which I will expose in this email." DE 8 at 46 (emphasis added). Thus, if anything, the November 2 email only further establishes the conclusion noted above, *i.e.*, that plaintiff had complained to the Knipfings about Zantua's abuse on multiple occasions prior to the email. Otherwise, defendants do not attempt to claim either that (a) the Knipfings exercise reasonable care to prevent or correct Zantua's harassment prior to November 2, or that (b) plaintiff failed to take advantage of corrective opportunities. Indeed, the allegations in the complaint clearly lead to the opposite conclusion on both counts. Accordingly, plaintiff has pleaded plausible claims for hostile work environment under § 1981 and the NYSHRL against Zantua, the Knipfings, and the corporate defendants. However, plaintiff fails to allege either that Savitsky either engaged in any harassment or that he functioned as plaintiff's employer; therefore, plaintiff's retaliation claims against Savitsky are dismissed.

16

**III. Conclusion**

Based on the foregoing, it is hereby Ordered that defendants' motion is GRANTED as to plaintiff's claims under the NYCHRL, the New York Labor Law, the New York Penal Law, and plaintiff's claims for discrimination under 42 U.S.C. § 1981 and the NYSHRL; additionally, defendants' motion is GRANTED as to plaintiff's retaliation claims against Savitsky and Zantua and plaintiff's hostile work environment claims against Savitsky.  Otherwise, defendants' motion is DENIED.


Dated: Central Islip, New York
       September 30, 2021

                                        /s/ Gary R. Brown_____
                                        Gary R. Brown
                                        United States District Judge

17