UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X

LIDIA M. ORREGO,

                       Plaintiff,

             - against -

KEVIN KNIPFING, *Employer, also known as Kevin James*; STEPHANIEANNA JAMES-KNIPFING, *Employer, also known as Steffiana de la Cruz*; OLD WESTBURY EDDIE LLC, *Company/Payroll owner Kevin Knipfing*; OLD WESTBURY LLC, *Unknown Entity under registration in NY State*, STEVE SAVITSKY, *Business Manager*, *Old Westbury LLC*; and TERESA A. ZANTUA,

                    Defendants.
-------------------------------------------------------------------- X

Case No.: 20-cv-03361 (SJB)(AYS)

**DEFENDANTS' STATEMENT OF MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1**

Pursuant to Rule 56.1(a) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, defendants, KEVIN KNIPFING (Mr. Knipfing"), STEPHANIEANNA JAMES-KNIPFING ("Ms. Knipfing"), OLD WESTBURY EDDIE LLC ("Old Westbury"), incorrectly also sued here as Old Westbury LLC, and TERESA A. ZANTUA (aka "Taz," hereafter "Ms. Zantua", and together with Mr. Knipfing, Ms. Knipfing, and Old Westbury, the "Defendants") set forth the following Statement of Material Facts as to which there are no genuine issues to be tried: [1] [2]

---

[1] All claims as against defendant Steve Savitsky were dismissed pursuant to the Court's Memorandum and Order dated September 30, 2021 ("09-30-2021 Decision"). *See* ECF Do No. 30.

[2] The statements of fact set forth herein are made solely for purposes of Defendants' Motion for Summary Judgment. As such, on a number of occasions, Defendants have herein conceded certain facts for purposes of the instant Motion. However, should any part of *pro se* plaintiff Lidia Orrego ("Plaintiff")'s Amended Complaint survive this Motion, Defendants reserve the right to dispute at trial Plaintiff's version of events, including those portions contained in this Statement of Material Facts.

## I.    OVERVIEW OF PAINTIFF & THE DEFENDANTS[3]

1.      Mr. Knipfing, known professionally as Kevin James, is a known comedian, actor, producer, and writer, who has starred in numerous movies and TV series (e.g., "The King of Queens").  **Exhibit A**, Plaintiff's Deposition Transcript ("Plaintiff's Dep.") at 23:7-10[4] [5]; Kevin James - IMDb.

2.      Ms. Knipfing is Mr. Knipfing's wife.

3.      The Knipfings have four minor children: S.K.; S.K.; K.K.; and S.K.   Ex. A, Plaintiff's Dep. at 136:16-137:18.

4.      Ms. Zantua is Ms. Knipfing's sister, and the aunt of the Knipfings' four children. Ex. A, Plaintiff's Dep. at 141:16-19.

5.      Ms. Knipfing and Ms. Zantua are from the Philippines.    Ex. A, Plaintiff's Dep. at 169:9-12.

6.      Steve Savitsky ("Mr. Savitsky"), against whom all claims in this lawsuit previously were dismissed, served as Mr. Knipfing's business manager during the time Plaintiff was employed by the Knipfings.  **Ex. B**. Excerpts from the Certified Transcript of Mr. Savitsky's sworn testimony from a hearing held on March 19, 2020, in connection with a claim for Workers' Compensation benefits Plaintiff filed with the State of New York Workers' Compensation Board ("WCB") on or about September 3, 2019 (hereafter "Savitsky 03-19-2020 WCB Testimony"), at pp. 27-28.

---

[3] Headings are used in this Statement of Material Facts solely for organizational purposes and the convenience of the Court; they are not intended to be, nor should they be construed as, assertions of fact.

[4] Unless noted otherwise, all exhibits referenced herein are annexed to the Declaration of Kuuku Minnah-Donkoh, Esq., dated August 8, 2025 ("Minnah-Donkoh Declaration").  All references to exhibits hereinafter shall be as "Ex. _".

[5] Plaintiff's deposition was completed over the course of two days – initially on February 27, 2023, and then on April 6, 2023.  For ease of reference, both transcripts have been combined.

7.      When the Knipfings moved to New York sometime in or around 2015, at the advice of labor counsel, Defendant Old Westbury (incorrectly also sued here as Old Westbury LLC) was created solely to serve as the employer of record for the Knipfings' domestic employees.  Ex. B, Savitsky 3-19-2020 WCB Testimony, at p. 28; **Ex. C**, State of New York Department of State's Record of Incorporation for Old Westbury Eddie, LLC.

8.      Plaintiff, who was born in Paraguay and is of Paraguayan national origin, was employed as a nanny in Mr. and Ms. Knipfing (the "Knipfings")'s home from February through November 2018.  Ex. A, Plaintiff's Dep. at 47:22-23, 105:19-22.

9.      Plaintiff is bilingual in English and Spanish and is able to read and write in English.  Ex. A, Plaintiff's Dep. at 48:15-20.

## II.      THE KNIPFINGS' FEBRUARY 2018 HIRING OF PLAINTIFF

1.      Prior to Plaintiff commencing her employment as a nanny for the Knipfings, the Knipfings already employed a staff of five people: (1) Skylar Testa ("Mr. Testa"); (2) Rebecca Uzcategui ("Ms. Uzcategui"); (3) Cristina Coimbra (aka Cristina Selga, and hereinafter "Ms. Coimbra"); (4) Gerardo Guarino ("Mr. Guarino"); and (5) Shannon Sha ("Ms. Sha").  Ex. A, Plaintiff's Dep. at 138:3-140:14.

2.      Mr. Testa, who held the dual positions of Mr. Knipfing's assistant and the Knipfings' house manager, is White.  Ex. A, Plaintiff's Dep. at 116:2-117:12, 138:14-19.

3.      Ms. Uzcategui, who was the primary nanny, is Venezuelan. Ex. A, Plaintiff's Dep. at 117:13-15, 140:2-8.

4.      Ms. Coimbra, who was the housekeeper, is Brazilian.  Ex. A, Plaintiff's Dep. at 138:10-25.

5.      Mr. Guarino, who was the chef, is Italian.  Ex. A, Plaintiff's Dep. at 140:9-17,

143:5-7.

6.    Ms. Sha, who homeschooled the Knipfings' children, is White. Ex. A, Plaintiff's Dep. at 140:18-141:4.

7.    Leslie's Helpers is a staffing agency that provides candidate referrals to individuals or families looking to hire a nanny or housekeeper.  Ex. A, Plaintiff's Dep. at 116:2-14; https://leslieshelpers.com/.

8.    In or around January 2018, the Knipfings were searching for a second nanny, and contacted Leslie's Helpers for a referral.  Leslie's Helpers referred Plaintiff to the Knipfings, and on January 30, 2018, Leslie's Helpers communicated via text message with Plaintiff and Mr. Testa to arrange a trial day for Plaintiff at the Knipfings' home on January 31, 2018. **Ex. D**, 01-30-2018 Text Message between Leslie's Helpers, Plaintiff, and Mr. Testa, PLA000004[6];  Ex. A, Plaintiff's Dep. at 116:2-117:12.

9.    On January 31, 2018, Plaintiff was interviewed at the Knipfings' home by Mr. Testa and Ms. Uzcategui.  Ex. A, Plaintiff's Dep. at 102:8-22; 116:21-117:15.

10.    Other than Mr. Testa and Ms. Uzcategui, Plaintiff does not recall meeting with anyone else at the Knipfings' home on January 31, 2018.  Ex. A, Plaintiff's Dep. at 117:16-22.

11.    Plaintiff ultimately was hired to work as a nanny for the Knipfings, effective February 19, 2018.  Ex. A, Plaintiff's Dep. at 23:3-6, 136:16-20; **Ex. E**, Job Offer Letter dated February 27, 2018 ("Job Offer Letter"), DEFS000001-000002.[7]

12.    The Job Offer Letter provided to Plaintiff states, among other things, that Plaintiff was "required to prepare and submit an accurate record of [her] hours worked on a daily basis to

---

[6] References to "PLAxxxxxx" are to the Bates numbers on documents Plaintiff produced in discovery.

[7] References to "DEFSxxxxx" are to the Bates numbers on documents Defendants produced in discovery.

4

the [Knipfings'] designee (Skylar Testa)." Ex. E, Job Offer Letter at DEFS000001.

13.     Prior to Plaintiff commencing her employment with the Knipfings, Mr. Testa provided Plaintiff with various documents to sign. Ex. A, Plaintiff's Dep. at 119:25-121:6.

14.     Among the documents Plaintiff signed was a Service Provider Confidentiality Agreement ("Non-Disclosure Agreement"). Ex. A, Plaintiff's Dep. at 124:7-125:8, 125:24-126-10, 130:4-9; **Ex. F**, Non-Disclosure Agreement, DEFS000003-9.

15.     The Non-Disclosure Agreement contains a section titled "**CONFIDENTIAL INFORMATION**," which provides in relevant part:

> Employee acknowledges and agrees that in connection with Employee's rendering services for the [Knipfings], Employee may obtain, overhear or otherwise become aware of information and/or documents constituting or concerning:
>
> (i) business and/or personal information about the [Knipfings], family members of the [Knipfings], the [Knipfings'] … past and present representatives and employees of the [Knipfings] and any companies the [Knipfings] own[ ] or control[ ] (including but not limited to Still Eddie, Inc.), whether individually or collectively, and the officers, directors, shareholders, members, managers, agents, and employees of any such companies (referred to collectively as the "Employer-Related Parties");
>
> (ii) private and confidential matters concerning [the Knipfings] and/or any of the Employer-Related Parties;
>
>       \*     \*     \*
>
> (v) business records, personal records, letters, memoranda, faxes, e-mails, contracts, photographs, films, videotapes, sound recordings, audio tracks or documents or other writings, including any negatives, prints, or copies thereof, pertaining in any way to [the Knipfings]
>
>       \*     \*     \*
>
> Employee further acknowledges and agrees that all of the information, documents and things described hereinabove which Employee obtains, overhears, learns, has access to and/or acquires [ ] (herein collectively referred to as "Confidential Information") is private and confidential, that the Employer-Related Parties have a reasonable expectation of privacy concerning that Confidential Information, and that all of said Confidential Information is solely and exclusively owned by the Employer Related Parties.

5

Ex. F, Non-Disclosure Agreement, at DEFS000003-4.

16.     The Non-Disclosure Agreement also contains a section titled "**AGREEMENT NOT TO DISCLOSE**," which provides in relevant part:

> Employee expressly agrees that **Employee shall not, directly or indirectly, verbally or in writing at any time after the execution of this Agreement, whether before, during or after the term of Employee's employment … publish, disseminate, discuss, disclose (collectively "disclose") or cause or induce to be disclosed any Confidential Information to any person … whatsoever, without Mr. Knipfing's express written consent**, except: (i) as necessary to carry out duties in the course of Employee's employment with the [Knipfings] …; (ii) if disclosure is required of Employee by Court Order, government decree, and/or subpoena; (iii) in accordance with Employee's rights under state, federal, or local law to communicate with or participate in a proceeding before government agencies or bodies, or to report possible violations of federal, state, or local law to such agencies[, in which case Employee] need not provide notice to the Employer prior to exercising such rights[ ]; (iv) to seek advice or information concerning Employee's rights and legal obligations relating to Employee's employment … from an attorney.

Ex. F, Non-Disclosure Agreement, at DEFS000004 (emphasis added).

17.     The Non-Disclosure Agreement also contains a section titled "**DISCLOSURE OF CONFIDENTIAL INFORMATION IS WRONGFUL**," which advised Plaintiff that her disclosure to any third party of any Confidential Information obtained as a result of or in connection with her employment with the Knipfings shall constitute a material breach of the terms of the Non-Disclosure Agreement.  Ex. F, Non-Disclosure Agreement, at DEFS000005.

18.     The Non-Disclosure Agreement also contains a section titled "**PROPERTY RIGHTS**," which provides, among other things, that Plaintiff "**shall not photograph, tape, film, or otherwise record any likenesses, performances or activities of the [Knipfings] or Employer-Related Parties, without express permission.**" Ex. F, Non-Disclosure Agreement, at DEFS000006 (emphasis added).

6

### III.    PLAINTIFF'S RELATIONSHIP WITH MS. ZANTUA

#### A.    Ms. Zantua Was Neither an Employee nor Plaintiff's Supervisor

19.    During her employment with the Knipfings, at the end of each week Plaintiff would have to email to Mr. Knipfing's "administrative people" time sheets reflecting the number of hours she worked that week.  Ex. A, Plaintiff's Dep. at 147:20-148:8.

20.    Plaintiff was neither required nor did she ever submit her timesheets to Ms. Zantua at any time during her employment with the Knipfings.  Ex. A, Plaintiff's Dep. at 149:11-18.

21.    Plaintiff does not know whether Ms. Zantua had the authority to change Plaintiff's position, to change Plaintiff's salary, to suspend Plaintiff, to demote Plaintiff, or to terminate Plaintiff's employment.  Ex. A, Plaintiff's Dep. at 152:24-153:14.

22.    Plaintiff does not know whether the Knipfings ever paid Ms. Zantua to perform any work.  Ex. A, Plaintiff's Dep. at 141:20-22.

23.    Notably, in Plaintiff's application for Workers' Compensation benefits she filed with WCB on or about September 3, 2019 ("Plaintiff's Workers' Compensation Application") – this was almost a year after Plaintiff's employment with the Knipfings was terminated – Plaintiff specifically identified Mr. Testa, not Ms. Zantua, as her supervisor. Ex. A, Plaintiff's Dep. at 174:20-25, 227:6-23; **Ex. G**, Plaintiff's Workers' Compensation Application, PLA000306-000310, at PLA000306 (item no. 5 under section titled "YOUR EMPLOYER(S)").

#### B.    Plaintiff's Allegations of Harassment by Ms. Zantua

24.    When Plaintiff was asked during her deposition to identify everything Ms. Zantua did or said that Plaintiff believed to be harassment based on Plaintiff's race and/or nation origin, Plaintiff testified in relevant part as follows:

> Q: Did Ms., Zantua, at any time during your employment, do anything or engage in any conduct that you believed to be harassment based on your race and/or Paraguayan national

origin?

A: Yes

Q: What did she do?

A: She would send text messages calling me stupid Mexican. She would send messages with a deformed face. **I would have to see the diary with all the text messages because there are many text messages**. She told me that Skylar Testa and her made fun of how I spoke.  She also sent me text messages saying that I could only speak in English. For example, if the kid hit me, she would say no, she's Mexican, she eats a lot of corn. And my bones are useless, that's why it doesn't matter if he hits you. She said that Mexicans eat a lot of corn, and that's why my bones are useless, that's why I felt a lot of pain. One time I asked her why did she call me Mexican if I'm from Paraguay and she said, "You're all Mexican to me. There's no difference."

Q: Anything else you can recall other than what you've testified to?

A: About what, specifically?

Q: Anything that Ms. Zantua did or said that you believed to be harassment based on your race and/or national origin.

A: **It's in all the diaries and all the text messages and the recordings.**

*       *       *

Q: Okay. Anything else you can recall, as you sit here, other than what you've testified to?

A: **No, just that. The rest is in evidence**.

Ex. A, Plaintiff's Dep. at 162:17-164:5, 166:2-6 (emphasis added).

### C.    Plaintiff's Text Messages with Ms. Zantua

25.    As part of discovery in this matter, Plaintiff produced a collage of text messages between Plaintiff and Ms. Zantua.  **Ex. H**, Plaintiff's Text Messages with Ms. Zantua, PLA000033-000080.

26.    Plaintiff, in her labeling of the text messages for production to Defendants, wrote "Teresa Zantua texted Plaintiff all the time with harassment and hostile work environment discrimination for being Hispanic, mocking due Plaintiff's accent, abuse physical and emotional

escalating through the months of February – November 2018." Ex. H, Plaintiff's Text Messages with Ms. Zantua, at PLA000033.

27.    The date stamps on the text messages, however, reflect that the text messages are only from the period August 17, 2018, through October 13, 2018. Ex. H, Plaintiff's Text Messages with Ms. Zantua, at PLA000033-000080.

28.    Plaintiff had Ms. Zantua saved as a contact in Plaintiff's phone as "Taz (aunt of S[ ])," one of the Knipfing's children. Ex. H, Plaintiff's Text Messages with Ms. Zantua, at PLA000033-000080.

29.    Sometime between August 22 and August 24, 2018, Ms. Zantua sent Plaintiff a text message with an image of a woman with her eyes half closed and mouth open, immediately followed by an image of a dog with the word "Realiy?" written on it. Ex. H, Plaintiff's Text Messages with Ms. Zantua, at PLA000037.[8]

30.    On August 24, 2018, at 8:54 a.m., in response to a text message from Plaintiff asking, "Taz, Ms[.] Steff is here?", Ms. Zantua responded with the same image of the woman with her eyes half closed and mouth open. Ex. H, Plaintiff's Text Messages with Ms. Zantua, at PLA000037.[9]

31.    On September 1, 2018, at 6:44 p.m., Ms. Zantua and Plaintiff had the following text message exchange:

Ms. Zantua: "What does your daughter say[,] ONLY English"

Plaintiff: "what?"

Ms. Zantua: "Do as your daughter says lol [laughing out loud]", (followed by the same

---

[8] Plaintiff produced this same text message exchange – the image of a woman with her eyes half closed and mouth open, immediately followed by an image of a dog with the word "Realiy?" written on it – again at PLA000041.

[9] Plaintiff produced this same text message exchange again at PLA000038.

aforementioned image of a woman with her eyes half closed and mouth open) Ex. H, Plaintiff's Text Messages with Ms. Zantua, at PLA000053.[10]  Plaintiff did not produce for context the text messages between her and Ms. Zantua immediately leading up to this exchange. *Id*.

32.     On September 12, 2018, at 10:32 p.m., Plaintiff and Ms. Zantua had the following text message:

> Plaintiff: "hellooo???"
>
> Plaintiff: "what??"
>
> Ms. Zantua: "Lol" … "My phone died"

Ms. Zantua's "My phone died" statement was immediately followed by an image of what appears to be a sunken-in face of a doll, followed by a photograph of Ms. Orrego.  Ex. H, Plaintiff's Text Messages with Ms. Zantua, at PLA000042-000043.[11]

33.     Between September 13 and September 22, 2018, Ms. Zantua inserted various photographs of Plaintiff's face in her text messages with Plaintiff.  Ex. H, Plaintiff's Text Messages with Ms. Zantua, at PLA000043-000052.

34.     On or about October 5, 2018, Plaintiff had the following text message exchange with Ms. Zantua:

> Plaintiff: "Sorry, I did not realize that this happened or even check the notification, I though [sic] it was someone else. You know I'm stupid Spanish from Paraguay or Mexico as you always said to me. Sorry [ ]"
>
> Ms. Zantua: "Omg [oh my god] I said Mexico when you said something about me … lol"
>
> Plaintiff: "I never said nothing about you lol"

Ex. H, Plaintiff's Text Messages with Ms. Zantua, at PLA00057.

---

[10] Plaintiff produced this same text message exchange at PLA000054, and again at PLA000055.
[11] Plaintiff produced this same image again at PLA000045.

35.    Nowhere in the text messages between Plaintiff and Ms. Zantua, generally, does Ms. Zantua actually call Plaintiff a Mexican, let alone a "stupid Mexican."  Ex. H, Plaintiff's Text Messages with Ms. Zantua, at PLA000033-000080.

36.    Nowhere in the text messages between Plaintiff and Ms. Zantua does Ms. Zantua ever mention corn, state that Plaintiff or Mexicans eat a lot of corn, or in any way reference Plaintiff's bones. Ex. H, Plaintiff's Text Messages with Ms. Zantua, at PLA000033-000080.

37.    Nowhere in the text messages between Plaintiff and Ms. Zantua does Ms. Zantua state any words to the effect of, "You're all Mexican to me. There's no difference."  Ex. H, Plaintiff's Text Messages with Ms. Zantua, at PLA000033-000080.

38.    Nowhere in the text messages between Plaintiff and Ms. Zantua does Ms. Zantua mock Plaintiff's accent.  Ex. H, Plaintiff's Text Messages with Ms. Zantua, at PLA000033-000080.

39.    Nowhere in the text messages between Plaintiff and Ms. Zantua is there evidence of Ms. Zantua physically abusing Plaintiff.  Ex. H, Plaintiff's Text Messages with Ms. Zantua, at PLA000033-000080.

40.    Plaintiff testified during her deposition in this matter that she could not recall whether she and Ms. Zantua ever joked around with each while Plaintiff was employed by the Knipfings.  Ex. A, Plaintiff's Dep. at 168:23-169:8.

41.    However, there are numerous instances in the text messages between Plaintiff and Ms. Zantua in which they both use the term "lol", which stands for "laughing out loud", and appear to be joking around with each other.  *See, e.g.,* Ex. H, Plaintiff's Text Messages with Ms. Zantua, at PLA000038-000039, 000040, 000052, 000057, 000065-000066, 000069, 000080.

**D.    Plaintiff's Purported Diary and Entries Regarding Ms. Zantua**

11

42.     As more fully discussed in Section IV.B. below, on November 16, 2018, Plaintiff sent Mr. Knipfing an email, attaching what she purported to be a diary (in Spanish) she had maintained during her employment with the Knipfings.  A copy of Plaintiff's November 16, 2018, email to Mr. Knipfing, together with Plaintiff's purported diary (in Spanish) attached thereto, is annexed as **Ex. I**. A certified copy of plaintiff's diary, translated from Spanish to English on or about November 1, 2023, by Lorraine Zopo, a New York State Court certified interpreter (hereafter, "Plaintiff's Diary"), DEFS000053-68, is annexed as **Ex. J**.

43.     Plaintiff frequently testified throughout her deposition in this lawsuit that she could not remember events and would need to refer to her diary.  *See generally,* Ex. A, Plaintiff's Dep.

44.     When Plaintiff was asked during her deposition when the entries in her diary were made, she testified as follows:

Q: The diary that you gave to Mr. Knipfing, when would you make entries in the diary, while you were at work or at some other time?

A: I started the diary because Teresa Zantua … **Teresas Zantua, she encouraged me to have a record because Rebecca Uzcategui started to harass me**. And she commented me, for instance, how an employee of Adam Sandler had a similar case and then they said to me to make notes on the phone and always be very careful because Rebecca is always taping conversations.

Q: That does not answer my question. My question was did you make the entries in your diary while you were working or would you have [made] those entries at some point later on when you went home?

A: I do not remember, but I believe I did, whenever I was able to write something.

Q: And you just testified that you would make those - - you would make entries in your phone?

A: Entries which would show the dates and time.

Q: And then at some point did you transfer whatever notes you had in your cell phone into a Microsoft Word document?

A: **No, I would make notes on any papers that I had and I had some sort of a file, as I**

12

**mentioned to Mr. Knipfing**.

Q: Would you at some point transfer the notes you made on papers into a Microsoft Word document?

A: After Mr. Knipfing asked me for my diary I reverified the notes and I sent them on the document that I sent.

Q: **Just so I understand, you had notes on pieces of paper, and after Mr. Knipfing asked you for documents, you took those notes and typed them up in a Microsoft Word document?**

A: **I do not remember exactly, but something like that.**

Q: **Where are those notes that you had on pieces of paper?**

A: **I do not know.**

Q: **Well, what do you mean by you don't know where they are?**

A: **Once I put all that on a piece of paper, I did not find them. I do not know where they are.**

Ex. A, Plaintiff's Dep. at 222:10-224:18 (emphasis added).

45.     Prior to Plaintiff commencing her employment with the Knipfings in February 2018, she worked as a nanny-housekeeper for a Cynthia Lessard, from February 2015 until January 2018. **Ex. K**, Plaintiff's Pavillion Agency Resume, DEFS000662-63; Ex. A, Plaintiff's Dep. at 103:7-20, 107:4-25.

46.     Prior to Plaintiff commencing her employment with the Knipfings, she also worked as a nanny-housekeeper for a Karen Skala, from January 2011 until January 2015. Ex. K, Plaintiff's Pavillion Agency Resume, at DEFS000662; Ex. A, Plaintiff's Dep. at 107:4-25, 111:5-7.

47.     Plaintiff apparently also worked as a nanny for an Emiliya Dor, from March 2018 through December 2018, which overlapped with the time Plaintiff worked for the Knipfings (from February through November 2018).  Ex. A, Plaintiff's Dep. at 107:4-109:9; Ex. K, Plaintiff's Pavillion Agency Resume, at DEFS000662.

48.    While employed by the Knipfings, Plaintiff never informed the Knipfings she was also working as a nanny for Emiliya Dor. Ex. A, Plaintiff's Dep. at 109:3-9.

49.    During sworn testimony Plaintiff gave during a hearing on March 5, 2021, in connection with the claim for Workers' Compensation benefits she filed almost a year after her employment with the Knipfings was terminated, Plaintiff falsely testified that she did not work for anyone else while employed by the Knipfings. **Ex. L**, Excerpts from Plaintiff's 03-05-2021 WCB Hearing Testimony ("Plaintiff's 03-05-2021 WCB Hearing Testimony"), DEF000651-661, at DEF000659.

50.    During her deposition in this lawsuit, Plaintiff initially claimed she could not recall whether she had worked for anyone else during the time she was employed by the Knipfings. Ex. A, Plaintiff's Dep. at 106:2-13.

51.    However, after being confronted with her own resume, Plaintiff acknowledged having worked as a nanny for Emiliya Dor during the same time period she worked for the Knipfings. Ex. A, Plaintiff's Dep. at 106:2-109:9; Ex. K, Plaintiff's Pavillion Agency Resume, DEFS000662-63.

52.    Neither Cynthia Lessard, Karen Skala, nor Emiliya Dor are celebrities.

53.    When Plaintiff was initially asked during her deposition in this matter whether she ever kept a diary while employed by Cynthia Lessard, Karen Skala, or Emiliya Dor, Plaintiff testified in no uncertain terms that she did not. Ex. A, Plaintiff's Dep. at 172:2-14.

54.    However, when Plaintiff was subsequently asked during her deposition whether she had ever kept a diary at any time prior to commencing her employment with the Knipfings, Plaintiff testified that she "cannot answer with a yes or no." Ex. A, Plaintiff's Dep. at 222:4-9.

55.    Plaintiff states at the very beginning of the diary, "I started this diary at Taz's

14

direction, because she saw the constant meddlings [sic], scoldings, and orders I received in an authoritarian way from Rebeca [Uzcategui], after several weeks of starting my job." Ex. J, Plaintiff's Diary at DEFS000053.

56.     Plaintiff's Diary contains a supposed entry on May 5, 2018, in which Plaintiff wrote:

> That day Taz does want me to peak in Spanish. She complains that she doesn't know why they hire nannies who only speak Spanish, and about why we "Mexicans" work for children from families who speak English. She and [sic] says that we shouldn't even be working here in this country if we don't speak English.

Ex. J, Plaintiff's Diary at DEFS000053.

57.     Plaintiff's Diary contains a supposed entry on September 5, 2018, in which Plaintiff wrote, "8:45 pm Bathing S [one of the Knipfings' children]. I speak to her in Spanish when Taz comes in and tells her that she doesn't have to speak in Spanish, just in English. On several occasions, Taz hit the wall uncontrollably when I spoke in Spanish with [S]."  Ex. J, Plaintiff's Diary at DEFS000059.

58.     Plaintiff's Diary contains a supposed entry on September 6, 2018, in which Plaintiff wrote:

> 9:30 am Rebecca [Uzcategui] tells me that the aunt [Ms. Zantua] apologized for the big fight they had last week in the garage and kitchen in front of the children … I told Taz that I was very happy that she took the first step with her apology, but she answered me angrily that she never apologized to the "Mexican" because she knows that Rebeca hates Mexicans.

Ex. J, Plaintiff's Diary at DEFS000059.

59.     Plaintiff's Diary contains a supposed entry on September 8, 2018, in which Plaintiff wrote, "2:45 pm Taz fights with the Panera Bread employee because she didn't speak English well. She tells me that she told them what she always tell me."

60.     Plaintiff's Diary contains a supposed entry on September 15, 2018, in which

15

Plaintiff wrote, "2:18 pm Taz complains about why his [sic] sister hires people who speak Spanish because this is America and about why the family can't be a normal family. Like always making her racial comments." Ex. J, Plaintiff's Diary at DEFS000060.

61.    Plaintiff's Diary contains a supposed entry on September 20, 2018, in which Plaintiff wrote:

> 5pm In the Kitchen: Taz told S[ ] that I am bad because, playing with [S] making voices like Taz does, I told her: I am Taz, and I am big. I was referring to the fact that she is tall, but upon hearing this, Taz reacted very badly saying to S[ ] "Ms Lidia is bad." She also told me: "stupid Mexican." I tried to explain to her that I wasn't referring to that, but to the height. She replied: "you are not in your country" "I don't care about you Mexicans" "You are in America and here that's a bad word. Everyone in Kevin's family is big. I don't want S [ ] to repeat that to them …

Ex. J, Plaintiff's Diary at DEFS000060.

62.    Plaintiff's Diary contains an entry on October 5, 2018, regarding the same text message exchange that day between Plaintiff and Ms. Zantua that is set forth above in paragraph 34 above. Ex. J, Plaintiff's Diary at DEFS000062.

63.    Plaintiff's Diary contains a supposed entry on October 19, 2018, in which Plaintiff wrote, "That same day Taz tells me all afternoon that I don't pronounce her name correctly, that I shouldn't pronounce as if it was Spanish but in English, since she always makes racist comments that's why the boy always made fun of my English pronunciation." Ex. J, Plaintiff's Diary at DEFS000065

64.    The aforementioned entries of May 5, September 5, September 6, September 8, September 15, September 20, October 5, and October 19, 2018, are the only entries in Plaintiff's Diary in which Ms. Zantua is alleged to have made offensive comments bearing on Plaintiff's race/national origin. Ex. J, Plaintiff's Diary at DEFS000053-000068.

65.    Nowhere in Plaintiff's Diary is there any mention of Plaintiff ever complaining to

16

Ms. Knipfing about Ms. Zantua's alleged discriminatory or harassing treatment of Plaintiff. Ex. J, Plaintiff's Diary at DEFS000053-000068.

66.    Nowhere in Plaintiff's Diary is there any mention of Plaintiff ever complaining to Mr. Knipfing about Ms. Zantua's alleged discriminatory or harassing treatment of Plaintiff. Ex. J, Plaintiff's Diary at DEFS000053-000068.

67.    Nowhere in Plaintiff's Diary is there any mention of Plaintiff ever complaining to Mr. Testa, the house manager and Plaintiff's supervisor, about Ms. Zantua's alleged discriminatory or harassing treatment of Plaintiff. Ex. J, Plaintiff's Diary at DEFS000053-000068.

## IV.    OCTOBER 31, 2018, REDUCTION IN PLAINTIFF'S HOURS, AND PLAINTIFF'S NOVEMBER 2, 2018 COMPLAINT

### A.    Plaintiff's Voluntary Assumption of Housekeeping Duties in August 2018

68.    Plaintiff's work schedule as a nanny was generally Tuesday through Friday from 3:00 p.m. to 9:00 p.m., and Saturday from 8:00 a.m. to 4:00 p.m. Ex. A, Plaintiff's Dep. at 145:19-146:14; Ex. E, Job Offer Letter; Ex. J, Plaintiff's Diary at DEFS000066-000067 (October 31, 2018, entry).

69.    Ms. Uzcategui, the primary nanny, would perform the nanny duties from the morning time until Plaintiff arrived for the start of her shift in the afternoon. Ex. A, Plaintiff's Dep. at 146:8-18.

70.    In or around late July 2018, the Knipfings were searching for a second housekeeper to assist Ms. Coimbra with the housekeeping duties in the Knipfings' home. Ex. A, Plaintiff's Dep. at 154:3-20; Ex. J, Plaintiff's Diary at DEFS000054 (July 26, 2018, entry).

71.    Accordingly, Plaintiff voluntarily requested that she be allowed to also serve as a housekeeper, in addition to performing her nanny duties. Ex. A, Plaintiff's Dep. at 155:6-25.

72.    With approval from Ms. Knipfing, on or about August 15, 2018, Mr. Testa

17

communicated to Plaintiff the Knipfings' acceptance of Plaintiff's request to also perform the duties of a housekeeper.  Ex. A, Plaintiff's Dep. at 155:6-25; Ex. J, Plaintiff's Diary at DEFS000056 (August 15, 2018, 9:00 p.m. entry).

73.     As a housekeeper, Plaintiff would report to the Knipfings' home in the morning to perform her housekeeping duties and then transition in the afternoon to performing her nanny duties.  Ex. A, Plaintiff's Dep. at 156:13-157:4.

74.     Plaintiff was paid for all hours worked during her employment with the Knipfings, including any overtime hours worked, and earned approximately $100,000 during just the approximately 9-month period she was employed by the Knipfings.  Ex. A, Plaintiff's Dep. at 157:12-24.

**B.      October 31, 2018, Removal of Plaintiff's Housekeeping Duties and Her Complaint Two Days Later**

75.     On October 31, 2018, Ms. Knipfing and Mr. Testa met with Plaintiff to inform her that moving forward she would no longer be serving as both a housekeeper and nanny; instead, Plaintiff would be working as just a nanny, the position for which she was originally hired.  Ex. J, Plaintiff's Diary at D000056 (entry on October 31, 2018, 12:00 p.m.).

76.     In text messages Ms. Knipfing had with Plaintiff on or about November 2, 2018, Ms. Knipfing provided the following explanation as to why the decision was made to no longer have Plaintiff performing the housekeeping duties:

> Also know your style of work did not make us feel most comfortable . . .
> I worried about you for a while. **Your want of both shifts was too much. My decision was out of mindfulness of your well-being, and it wasn't good to me for you to want housekeep hours and then try to be a nanny to my daughter after that. I could sense the exhaustion**.

**Ex. M**, 11-02-2018 Text Messages from Ms. Knipfing to Plaintiff, DEFS000049 (emphasis added).

18

77.     As of October 31, 2018, Plaintiff's year-to-date gross earnings from her employment with the Knipfings – for just 8 months of employment – were approximately $84,899.70, which comprised approximately $41,799.90 in gross wages and approximately $42,390.00 in overtime pay, as well as other relatively small payments (e.g., holiday pay and double-time pay). **Ex. N**, Plaintiff's 10-26-2018 Wage Statement.  Accordingly, the removal of Plaintiff's housekeeping duties consequently was going to result in a decrease in Plaintiff's hours and earnings moving forward.

78.     On November 2, 2018, just two days after Plaintiff was informed she would no longer be performing any housekeeping duties, Plaintiff sent Ms. Knipfing and Mr. Testa an email with the subject line, "MY SITUATION A [sic] WORK FOR 8 MONTHS" ("11-02-2018 Complaint"). **Ex. O**, 11-02-2018 Complaint, DEFS000012-15.; Ex. A, Plaintiff's Dep. at 184:12-185:3.

79.     Plaintiff's 11-02-2018 Complaint contained allegations about Ms. Uzcategui – the Knipfings' primary nanny who was already working as the nanny before Plaintiff was also hired, and who also interviewed Plaintiff prior to Plaintiff being hired – among other things, harassing Plaintiff and giving Plaintiff instructions about how to do her job.  Ex. O, 11-02-2018 Complaint; Ex. A, Plaintiff's Dep. at 102:8-22; 116:21-117:15.

80.     Plaintiff's 11-02-2018 Complaint also contained allegations about Ms. Zantua harassing Plaintiff with racial comments.  Ex. O, 11-02-2018 Complaint.

81.     Plaintiff's 11-02-2018 Complaint also contained allegations of Ms. Uzcategui mistreating and abusing the Knipfings' children, including an allegation that on at least one occasion Ms. Uzcategui was furious with one of the children and "shook [her] very hard" to the point that Plaintiff was "very concern [sic] and worried because [the child] can be hurt because

she wass [sic] shook in such a hard way!!" Ex. O, 11-02-2018 Complaint at DEFS000014; Ex. A, Plaintiff's Dep. at 188:20-25.

82. **Plaintiff testified during her deposition that prior to her 11-02-2018 Complaint, she had never informed the Knipfings about any of the Knipfings' children being abused**. Ex. A, Plaintiff's Dep. at 189:9-15.

83. Plaintiff testified during her deposition that she did not recall whether prior to her 11-02-2018 Complaint she had ever informed Ms. Knipfing about any alleged harassment by Ms. Zantua, and would need to review her diary. Ex. A, Plaintiff's Dep. at 185:14-20.

84. Nowhere in Plaintiff's Diary is there any mention of Plaintiff ever complaining to Ms. Knipfing about Ms. Zantua's alleged discriminatory or harassing treatment of Plaintiff. Ex. J, Plaintiff's Diary, DEFS000053-000068.

85. Plaintiff testified during her deposition that prior to her 11-02-2018 Complaint, she had never informed Mr. Knipfing about any alleged harassment by Ms. Zantua. Ex. A, Plaintiff's Dep. at 185:21-186:3.

86. Plaintiff testified during her deposition that prior to her 11-02-2018 Complaint, she had spoken to Mr. Testa about Ms. Zantua's alleged harassment of Plaintiff, but when asked for details regarding any such conversation(s) with Mr. Testa, Plaintiff testified she would have to check her diary. Ex. A, Plaintiff's Dep. at 186:4-187:15.

87. However, nowhere in Plaintiff's Diary is there any mention of Plaintiff ever complaining to Mr. Testa about Ms. Zantua's alleged harassment of Plaintiff. Ex. J, Plaintiff's Diary at DEFS000053-000068.

V. **INVESTIGATION OF PLAINTIFF'S 11-02-2018 COMPLAINT**

88. On November 02, 2018, the same day Plaintiff sent her 11-02-2018 Complaint to

20

Ms. Knipfing and Mr. Testa, Mr. Testa forwarded the 11-02-2018 Complaint to Mr. Knipfing.  Ex. O, 11-02-2018 Complaint at DEFS000012.

89.     On November 6, 2018, Mr. Knipfing met with Plaintiff to discuss Plaintiff's 11-02-2018 Complaint.  Ex. A, Plaintiff's Dep. at 219:20-220:2.

90.     In Plaintiff's 11-02-2018 Complaint, she stated, "[a]ll this that I write in this letter every word [sic], EVERYTHING, is supported by evidence, documents and witnesses, which are irrefutable, for which I am fully responsible."  Ex. O, 11-02-2018 Complaint at DEFS000015.

91.     Accordingly, during the meeting Mr. Knipfing had with Plaintiff on November 6, 2018, he requested that Plaintiff send him whatever evidence she had.  Ex. A, Plaintiff's Dep. at 220:8-17.

92.     Between November 8 and November 16, Plaintiff sent Mr. Knipfing seven (7) separate emails – the emails were titled "REPORT 1" through "REPORT 7" – attaching, among other things: (a) various text messages between Plaintiff on the one hand and Ms. Uzcategui, Ms. Knipfing, and Ms. Zantua, respectively, on the other hand; (b) Plaintiff's Diary (in Spanish); and (c) several recordings of conversations Plaintiff had with other employees, including, Ms. Uzcategui and Ms. Coimbra, which Plaintiff secretly recorded.  **Ex. P**, Email dated November 8, 2018, DEFS000014 ("Report 1"); **Ex. Q**, Email dated November 8, 2018, DEFS000026-29 ("Report 2"); **Ex. R**, Email dated November 15, 2018, DEFS000030-51 ("Report 3"); Ex. I, Email dated November 16, 2018, DEFS000052-72 ("Report 4"); **Ex. S**, Email dated November 16, 2018, DEFS000073-88 ("Report 5"); **Ex. T**, Email dated November 16, 2018, DEFS000089-108 ("Report 6"); and **Ex. U**, Email dated November 16, 2018, DEFS000109 ("Report 7").

93.     Notably, nowhere in the body of any of Plaintiff's aforementioned email Reports to Mr. Knipfing did Plaintiff specifically mention Ms. Zantua harassing Plaintiff, let alone

21

harassing Plaintiff because of her race and/or national origin.  Ex. P, Report 1 at DEFS000014; Ex. Q, Report 2 at DEFS000026; Ex. R, Report 3 at DEFS000030; Ex. I, Report 4 at DEFS000052; Ex. S, Report 5 at DEFS000073; Ex. T, Report 6 at DEFS000089-108; and Ex. U, Report 7 at DEFS000109.

94.     Rather, in Report 2, Plaintiff wrote, among other things:

Rebeca was always showing that she has the power to confront and fight with anyone there and I was afraid of her, I saw she was bossing around there and from the beginning she told me that [] hired me thanks to her…

If you wonder why I did my record of things that was going on I did because in many occasion Rebeca was on top of me giving me ordered, send me text after she left the house[.] [Y]our sister in law told [me] to keep track because something similar happens to Adam Sandler but my intention was never to get into that kind of situations.

Ex. Q, Report 2 at DEFS000026.

95.     In Report 7, which was the final "Report" Plaintiff sent to Mr. Knipfing, she wrote:

Mr. Kevin and Mrs Steffianna
With this recordings I finish, I want to thank you Mr Kevin and Mrs Steffianna for giving me the opportunity to let you know what was happenig [sic] around the kids all the time. I pray everyday as always por [sic] peace and love in your house because I was working as a part of team and no trying to compite [sic] with nobody or harm, I always tried to do my best doing my job **but I end up in the middle of this war between Rebeca and Taz and both side tried to use me unfortunaly [sic] for their purposes.** [ ]

Ex. U, Report 7 at DEFS000109 (emphasis added).

96.     Thus, while Plaintiff thought it important to mention allegedly being in a supposed war between Ms. Uzcategui and Ms. Zantua, and the latter two each using Plaintiff, nowhere in Report 7 did Plaintiff mention being harassed by Ms. Zantua because of her race and/or national origin. *Id.*

97.     In addition to Mr. Knipfing meeting with Plaintiff on November 6, 2018, and requesting that Plaintiff send him whatever evidence she had in support of her 11-02-2018 Complaint, the Knipfings, through their then personal attorney, John Kiel, Esq., of the law firm

Keil & Correa LLP (f/k/a Collazo Florentino & Keil LLP), retained a private security company, Rydan Security & Investigations ("Rydan"), to investigate the allegations raised in Plaintiff's 11-02-2018 Complaint. **Ex. V**, November 11, 2018, Text Message between Mr. Testa and Plaintiff about investigation, PLA001971; **Ex. W**, November 12, 2018, Email from Kevin Flanagan at Rydan, DEFS000017-19; RYDAN Security & Investigations | LinkedIn.

98.     On November 11, 2018, Mr. Testa sent Plaintiff a text message stating:

Lidia,

We have hired investigators to talk to you about the complaints you described in your email to Kevin and Steff. Their names are Tefta and Irma. They would like to meet with you tomorrow morning at 10:00am at [ ] Starbucks … They need you to help them understand the complaints you brought up with Steff and Kevin. It's important that you answer all their questions as best as you can. That will help Kevin figure out what he needs to do. After yo[u] speak with them, you can go back home and we'll reach out to you when we know what we're going to do next.

Ex. V, November 11, 2018, Text Message between Mr. Testa and Plaintiff about investigation, PLA001971.

99.     On November 12, 2018, the two investigators from Rydan, Tefta and Irma, met with and interviewed Plaintiff. Following that meeting, Kevin Flannagan, a Managing Partner at Rydan, sent an email to Mr. Testa and the Knipfings' then attorney, John Kiel, to provide a summary of Plaintiff's interview. Ex. W, November 12, 2018, Email from Kevin Flanagan at Rydan, DEFS000017-19; Kevin Flanagan - Managing Director at Flanagan Security & Investigations | LinkedIn.

100.    The November 12, 2018, email Kevin Flannagan sent to Mr. Testa and John Kiel included, but was not limited to, the following recitation of information Plaintiff had provided during her interview earlier that day by the two Rydan investigators:

- "LIDIA STATES FROM DAY ONE REBECAA WAS VERY BOSSY, AND WAS ALWAYS TELLING HER WHAT TO DO."

23

- "LIDIA STATES THAT REBECCA [UZCATEGUI] IS MANIPULATING [S,] [one of the Knipfings' daughters], BY GIVING HER CANDY FOR BRUSHING HER TEETH, WHICH REBECCA DENIES. ON ONE OCCASION LIDIA STATES THAT SHE OVERHEAD REBECCA TELLING [S] TO BRUSH HER TEECH AND SHE WILL GIVE HER GUM. A SHORT TIME LATER [S] EXISTS THE BATHROOM AND AS SHE COMES OUT [S] OPENS HER MOUTH AND SHOWS LIDIA A MOUTH FULL OF CHEWING GUM. AT THIAT POINT REBECCA GETS FURIOIUS AND GRABS [S] BY THE SHOULDER AND SHAKES HER AND TAKES HER INTO THE ROOM."

- OCTOBER 14, 2018 – THE REASON WHY SHE [LIDIA] AGREED TO MEET WITH REBECCA AT THE DINER ON 10/14/2018, WAS BECAUSE OF AN INCIDENT THAT OCCURRED WHEN LIDIA WAS AT A FARM APPLE PICKING AND THE KIDS WEREN'T LISTENING TO HER. IT WAS VERY UPSETTING TO HER SO SHE AGREED TO MEET REBECCA. SHE [LIDIA] ALONG WITH HER MOTHER AND DAUGHTER MET WITH REBECCA AT A DINER. **LIDIA RECORDED THEIR CONVERSATION AND FORWARDED THE RECORDING TO MR. JAMES ON 11/8/18.** DURING THIS MEETING REBECCA INFORMED HER THAT SHE AND OTHER EMPLOYEES WANTED TO FILE A LAWSUIT. SHE STATES THAT THE OTHER EMPLOYEES WANT TO SUE AND THAT SHE REBECCA HAS DOCUMENTATION AND THAT OTHER EMPLOYEES ARE ON BOARD. THE EMPLOYEES SHE SAID WERE ANNIE, GABY, SHANNO, TEACHERS, ETC.

- NOVEMBER 2, 2018 – LIDIA SENT THE LETTER [11-02-2018 Complaint] to STEFFIANA AND SKYLER VIA EMAIL. **THE REASON SHE WROTE THIS LETTER, WAS BECAUSE REBECCA HAD TOLD HER DURING THE MEETING ON OCTOBER 14, 2018, THAT SHE WAS GOING TO WRITE A LETTER AND GIVE IT TO KEVIN JAMES.** LIDIA KEPT ASKING REBECCA, "DID YOU WRITE THE LETTER," AND REBECCA KEPT ON STALLING AND STATING IT'S ALMOST DONE. IN THE MEANTIME, LIDIA STATES THAT SHE NOTICED STEFFIANA WAS ACTING DIFFERENT TOWARDS HER AND WAS WONDERING IF REBECCA WAS PLAYING BOTH SIDES.** SO LIDIA DECIDED TO SEND THE LETTER HERSELF. REBECCA ATTEMPTED TO CALL HER THIS DAY. LIDIA TEXTED HER AND TOLD HER SHE WAS AT THE DOCTOR AND COULDN'T SPEAK.

- **LIDIA STATES HER PURPOSE FOR COMING FORWARD IS BECAUSE SHE DOESNT TRUST REBECCA AND IS WORRIED THAT REBECCA MAY TRY AND MAKE HER A WITNESS ON THE LAWSUIT SHE IS PLANNING ON FILING. SHE DOESN'T WANT TO BE INVOLVED IN ANY LAWSUIT WITH THE JAMES FAMILY.** LIDIA IS ALSO CONCERNED HOW THE KIDS ARE BEING RAISED BY THE

24

NANNIES AND HOW THEIR BEHAVIOR IS A NEGATIVE INFLUENCE ON THEM. REBECCA TOLD HER THAT SHE PURPOSELY KEEPS THE CHILD OUT OF THE HOUSE ALL DAY SO THE CHILD DOESN'T ASK TO GO WITH HER MOTHER.

Ex. W, November 12, 2018, Email from Rydan's Kevin Flanagan, DEF000017-19 (emphasis added).

101.    Despite what Plaintiff told the Rydan investigators, neither Ms. Uzcategui nor any other person employed by the Knipfings ever filed a lawsuit against the Knipfings.

102.    The November 12, 2018, email Kevin Flannagan sent to Mr. Testa and John Kiel also included the following statement by Mr. Flannagan:

John [Kiel],

During my debrief with Tefta & Irma, this afternoon, they were clear with Lidia, when asking about actual physical abuse being inflicted upon the children. **Lidia confirmed that there is no physical abuse taking place.** Lidia did state that both Rebecca, and Taz, by design tried to keep the children out of the house and away from the CCTV system at the residence.

**Lidia stated that likes her job and wants to come back, but she did not want to come back if Rebecca [Uzcategui] was still going to be there.**

Ex. W, November 12, 2018, Email from Rydan's Kevin Flanagan, at DEF000019 (emphasis added).

## VI.    TERMINATION OF PLAINTIFF'S EMPLOYMENT

103.    At the conclusion of the investigation into Plaintiff's 11-02-2018 Complaint, Plaintiff was notified of the termination of her employment by letter dated November 27, 2018 ("Termination Letter").  **Ex. X**, Termination Letter, DEFS000110; Ex. A, Plaintiff's Dep. at 105:19-22.

104.    The Termination Letter advised Plaintiff of the following reasons for the termination of her employment:

1.  Breach of your Non-Disclosure Agreement, such as;

25

    a.   Recording a conversation with Rebecca Uzcategui in the presence of a member of the public, and

    b.   Taking recordings and photographs of the Knipfing's home.

2.   Your statement that you were unwilling to continue working with Rebecca Uzcategui.

3.   Our conclusion that you made statements in your complaint that you know to be false.

Ex. X, Termination Letter.

105.    As to Plaintiff's recording of a conversation with Ms. Uzcategui in the presence of a member of the public, it is undisputed that Plaintiff and her mother met with Ms. Uzcategui at a diner on October 14, 2018; Plaintiff and Ms. Uzcategui discussed their work with the Knipfings during that meeting; and Plaintiff secretly recorded the conversation without Ms. Uzcategui's knowledge.  Ex. A, Plaintiff's Dep. at 218:11-219:19.

106.    It is also undisputed that in addition to Plaintiff's recording of her meeting with Ms. Uzcategui on October 14, 2018, during Plaintiff's employment with the Knipfings she secretly recorded conversations she had with others in the Knipfings' home, including, but not limited to, Mr. Knipfing, Ms. Uzcategui, and Ms. Zantua.  Ex. A, Plaintiff's Dep. at 173:13-174:19.

107.    Notably, despite Plaintiff's claim of harassment by Ms. Zantua in this lawsuit, Plaintiff testified during her deposition that she recorded only one conversation with Ms. Zantua, and that conversation specifically concerned Plaintiff's then claim about one of the Knipfings' minor children hitting Plaintiff; the conversation did not concern any alleged harassment by Ms. Zantua nor did Ms. Zantua make any discriminatory or harassing comments during that conversation. Ex. A, Plaintiff's Dep. at 174:8-16.

108.    As to Plaintiff taking recordings and photographs of the Knipfings home, it is also undisputed Plaintiff took approximately 821 photographs and 172 videos during her employment with the Knipfings, including some that were taken or recorded inside the Knipfings' home.  **Ex.**

**Y**, image of electronic file folder Plaintiff produced during discovery, reflecting she took 821 photographs during her employment with the Knipfings, PLA000110; **Ex. Z**, image of electronic file folder Plaintiff produced during discovery, reflecting she recorded 172 videos during her employment with the Knipfings, PLA000115.

109. As to Plaintiff's unwillingness to continue working with Ms. Uzcategui, whom the Knipfings employed as their nanny before Plaintiff was even hired as a second nanny, Plaintiff apparently told the Rydan investigators who interviewed Plaintiff on November 12, 2018, that she did not want to continue working for the Knipfings if Ms. Uzcategui remained employed. Ex. W, November 12, 2018, Email from Rydan's Kevin Flanagan, at DEF000019.

110. Indeed, when Plaintiff was questioned during her deposition in this lawsuit about her working relationship with Ms. Uzcategui, she testified as follows:

Q: So let's try answering my question which was, did you like working with Ms. Uzcategui; yes or no?

A: I object to the form. I cannot answer a question during which you are also making a statement.

Q: As of November 2nd - - well, withdrawn. As of November 15, 2018, how would you describe your relationship with Ms. Uzcategui?

A: I object to the form. I cannot opine.

Q: You can't give an opinion as to how you would describe your relationship with Ms. Uzcategui?

A: I object because that is speculation. I do not know what kind of relationship I had with her since I did not have any contact with her.

Q: Ms. Orrego, your employment with the Knipfings was terminated on November 27th, correct, 2018?

A: Yes

Q: I am not asking you to speculate as to what Ms. Uzcategui's opinion is of your relationship. I am asking for your opinion.

A: I object to the form. I have no opinion whatsoever.

Ex. A, Plaintiff's Dep. at 225:13-226:17

111.   As to the Knipfings' conclusion that Plaintiff had made statements in her 11-02-2018 Complaint that she knew to be false, although Plaintiff alleged in her 11-02-2018 Complaint that the Knipfings' children were being mistreated and physically abused, according to the Rydan investigators who interviewed Plaintiff on November 12, 2018, Plaintiff confirmed there was no physical abuse taking place.  November 12, 2018.  Ex. W, November 12, 2018, Email from Rydan's Kevin Flanagan, at DEF000019.

## VII.   PLAINTIFF'S COMMENCEMENT OF THIS LAWSUIT & THE COURT'S PARTIAL DISMISS OF PLAINTIFF'S CLAIMS

112.   Plaintiff, proceeding *pro se*, commenced this lawsuit against Defendants and Mr. Savitsky by filing a complaint with this Court on July 23, 2020.  ECF Doc. No. 1.

113.   Plaintiff then filed an Amended Complaint on August 17, 2020.  ECF Doc. No. 8.

114.   In the Amended Complaint, Plaintiff asserted claims for: (1) discrimination (based on race and national origin); (2) hostile work environment (based on race and national origin); and (3) retaliation; under 42 U.S.C. § 1981 ("§ 1981"), the New York State Human Rights Law ("NYSHRL"), and New York City Human Rights Law ("NYCHRL").  *See* Amended Complaint, ECF Doc. No. 8.  Plaintiff also asserted claims for forgery under N.Y. Penal Law §170.00 and §170.05; a claim for perjury under New York Penal Law §210; and violations of Section 195(6) of the N.Y. Labor Law ("NYLL").  *Id*.

115.   Defendants and Mr. Savitsky moved to dismiss the Amended Complaint in its entirety, with the fully briefed motion being submitted to the Court on December 11, 2020.  ECF Doc. No. 22.

116.     The Court issued a decision on September 30, 2021 ("09-30-2021 Decision"), in which the Court dismissed Plaintiff's claims under the NYCHRL, the NYLL, the New York Penal Law, and Plaintiff's claims for discrimination under § 1981 and the NYSHRL, in their entirety. **Ex. AA**, 09-30-2021 Decision, at p. 1.  Additionally, the Court dismissed Plaintiff's retaliation claims against Mr. Savitsky and Ms. Zantua, and Plaintiff's hostile work environment claims against Mr. Savitsky.  *Id*.

117.     The Court, however, denied the motion to dismiss as to: (1) Plaintiff's claims against Ms. Zantua for race and national origin-based hostile work environment under § 1981 and the NYSHRL; (2) Plaintiff's § 1981 and the NYSHRL race and national origin-based hostile work environment claims against the Knipfings and Old Westbury, based on Ms. Zantua's alleged conduct; and (3) Plaintiff's claims for retaliation against the Knipfings and Old Westbury under § 1981 and the NYSHRL.  *See generally*, Ex. AA, 9-30-2021 Decision.  Accordingly, only these claims are left to be adjudicated in this Defendants' motion for summary judgment.  *Id*.

## VIII.   PLAINTIFF'S HARASSING AND VEXATIOUS CONDUCT[12]

### A.     Plaintiff's September 2019 Workers' Compensation Claim and Subsequent Related Complaints and State Court Lawsuits

118.     On or about September 3, 2019, almost a year after Plaintiff's employment with the Knipfings was terminated, Plaintiff filed a claim with the WCB, claiming to have sustained physical injuries during her employment with the Knipfings.  Ex. A, Plaintiff's Dep. at 174:20-25, 227:6-23. Ex. G, Plaintiff's Workers' Compensation Application, P000306-000310.

119.     After multiple hearing days, which included, but was not limited to, sworn testimony from Plaintiff and her medical providers, a final hearing was held on March 5, 221, before WCB Law Judge Barry Greenberg ("WCB Judge Greenberg").  Ex. L, Plaintiff's 3-5-2021

---

[12] The following is just a sample of all the various complaints, lawsuits, and appeals Plaintiff has filed since 2019.

WCB Hearing Testimony, DEF000651-661; **Ex. BB**, Decision by WCB Judge Greenberg, dated March 10, 2021 ("03-10-2021 WCB Decision"), DEFS000134-136.

120.    Plaintiff was represented in the WCB proceedings by the law firm Pasternack Tilker Ziegler Walsh Stanton & Romano LLP ("Pasternack Ziegler").  Ex. A, Plaintiff's Dep. at 179:14-20.

121.    On March 10, 2021, WCB Judge Greenberg issued the 3-10-2021 WCB Decision, disallowing Plaintiff's claim.  Ex. BB, 03-10-2021 WCB Decision, DEFS000134-136.  In the 03-10-2021 WCB Decision, **WCB Judge Greenberg specifically found that "[Plaintiff's] testimony that she was injured in the course of her employment was not credible."**  *Id*. (emphasis added).

122.    Plaintiff appealed the 03-10-2021 WCB Decision, and after reviewing the entire WCB record, a three-member WCB administrative review panel ("WCB Board Panel") issued a decision on June 21, 2021 ("06-21-2021 WCB Board Panel Decision"), unanimously affirming the 3-10-2021 WCB Decision.  **Ex. CC**, 06-21-2021 WCB Board Panel Decision, DEFS000138-143.

123.    In their decision, the WCB Board Panel stated:

> **The claimant's testimony was not credible that she sustained a back injury from a child hitting her on the back or that she lifted heavy furniture.** The testimony of the claimant's doctors on her injuries were based on complaints by claimant after she was terminated. **The testimony of the two employer witnesses, that the claimant never reported injuries suffered on the job, was credible. The Board Panel concurs with [WCB Judge Greenberg] that the claimant's testimony was not credible and that the claim was filed as an afterthought.**

Ex. CC, 06-21-2021 WCB Board Panel Decision, at DEFS000142 (emphasis added).

124.    Plaintiff sought reconsideration and/or full WCB review of the 06-21-2021 WCB Board Panel Decision, which the WCB denied in a decision issued on or about March 9, 2022.

30

Plaintiff then appealed to the New York State Appellate Division, Third Department, which affirmed the WCB's decision in a decision dated and entered on November 2, 2023. **Ex. DD**, 11-02-2023 Third Department Decision.

125.    On or about June 30, 2021, Plaintiff filed a complaint with the New York State Unified Court System Office of the Inspector General ("6-30-2021 Inspector General Complaint"), accusing, among others, WCB Judge Greenberg, the WCB Board Panel, and Pasternak Ziegler (the law firm that represented Plaintiff in the WCB proceedings, of engaging in judicial bias, conspiring against her, and discriminating against her because of her race and national origin. **Ex. EE**, Plaintiff's 06-30-2021 Inspector General Complaint, DEFS000149-152.

126.    On June 30, 2021, Plaintiff also filed a complaint with the New York State Department of Health, Office of Professional Medical Conduct ("NYSDOH"), against Vladimir Morgovsky, M.D., Plaintiff's own medical provider who testified on Plaintiff's behalf in the WCB proceeding, accusing Dr. Morgovsky of lying during the WCB proceeding and conspiring with Pasternak Ziegler. **Ex. FF**, Plaintiff's 06-30-2021 NYSDOH Complaint, DEFS000144-148.

127.    On July 2, 2021, Plaintiff filed another complaint against WCB Judge Greenberg, this time with the New York State Commission on Judicial Conduct ("NYSCJC"). **Ex. GG**, Plaintiff's 07-02-2021 NYSCJC Complaint, DEFS000153-156.

128.    On February 1, 2023, Plaintiff commenced a lawsuit in the Supreme Court of the State of New York, Queens County, against Dr. Morgovsky and two other defendants, accusing them of "medical malpractice, fraudulent misrepresentation, fraud, fraudulent concealment, spoliation of evidence." **Ex. HH**, Plaintiff's 02-01-2023 State Court Complaint in *Orrego v. Morgovsky, et al.*, Index No. 702511/2023.

129.    The court in the *Orrego v. Morgovsky, et al.* lawsuit held a proceeding on February

31

20, 2025, during which the court imposed a sanction of $2,500 against Plaintiff for attempting to intimidate one of the defendants' expert witnesses, and because of Plaintiff's frivolous and harassing conduct throughout the litigation. **Ex. II**, Transcript of 02-20-2025 Proceeding in *Orrego v. Morgovsky, et al.* During that proceeding on February 20, 2025, the presiding judge, Justice Kevin J. Kerrigan, stated in relevant part:

> We are here pursuant to an order that I issued on the February 3rd, 2025. My order directed all parties to appear today based on a letter that we received from Mr. Krajewski, his letter is dated January 31, 2025, indicating that a letter was sent by Ms. Orrego, dated December 25, 2024, to the defendant Dr. Morgovsky from Star Medical Offices, PC, counsel, I guess your firm itself, I don't know if it was directed specifically at you and the defendant expert Dr. Ella Winters. That letter was forwarded with Mr. Krajewski's cover letter to us. **That letter that Ms. Orrego sent to defen[s]e counsel and to the expert is nothing short of disgraceful, against, all ethics in litigation** …
>
> **This letter is nothing short, in my opinion, of not an attempt but a direct intimidation, um, maybe threat to defense expert witness which is disgraceful, it is not appropriate and that is why I need to address it now. I will not stand for it. It's an attempt to intimidate nothing short, that will not stand in this courtroom**. …
>
> In addressing Ms. Orrego's letter to, in particular, Dr. Winters, the proposed expert on behalf of the defendant, I believe that since that letter, um, in my opinion is the equivalent of something that applies under section 130 of the Court rules, costs and sanctions. **In reading this letter I believe that it demonstrates conduct that is the frivolous if under 130-1.1 costs and sanctions subsection C for purposes of this part conduct is frivolous if one it is completely without merit in law and cannot be supported by a reasonable argument for an extension, modification or reversible of this law. Two, it is undertaken primarily to delay or prolong the resolution of this litigation. But, importantly, or to harass or maliciously injure another and when somebody is threatened with a lawsuit for defamation, I believe that falls under that section. Or three, it is material factual statements that are false.**
>
> **I believe the contents of that letter rise to the level of frivolous conduct, such that I am prepared to impose a sanction against Ms. Orrego in the sum of $2,500** and that sanction is to be awarded, I'll follow it up with an order that I will issue. It is to be payable to the Clerk of the Court for transmittal to the Commissioner of Taxation and Finance.
>
> \*    \*    \*
>
> I will not even allow you [Plaintiff] to ask a question. Y**our conduct, not only here, with this letter but throughout the course of this litigation has been nothing short of disgraceful. I will not tolerate it anymore. You have attempted to intimidate me,**

**you've harassed me, you've harassed my staff -- and don't shake your head no, it clearly has been demonstrated and I will not stand for it any longer that goes beyond what I'm doing now.** I earlier by order issued -- I asked you not to speak. If you continue to speak throughout my order I will have you escorted from the courtroom. You better start taking all of this seriously.

\*     \*     \*

**Can you escort her [Plaintiff] out of the courtroom. Please leave the courtroom**. I've asked you several times not to speak. And if you continue to harass me or my staff I will go to the authorities. **So to continue this, not hearing but my dissertation, without her being present, I am going additionally send a letter to the Queens District Attorney's office based on the allegation that you indicated in your letter that there may be criminal conduct that arises from the contents of her letter. I'm going to send a letter today to the Queens District Attorney office without a recommendation on my part, because I don't think that's proper for me to do, but with a copy of your letter and her letter and a request that the District Attorney open an investigation into her [Plaintiff's] conduct. I will not tolerate this any longer.**

*Id.* **at pp. 3-7.**

130.    On April 17, 2025, the court in the *Orrego v. Morgovsky, et al.* lawsuit entered an order, granting two of the three defendants – Dr. Morgovsky and Star Medical Offices, P.C. – summary judgment on all of Plaintiff's claims, and denying Plaintiff's cross-motion for summary judgment. **Ex. JJ**, 04-17-2025 SJ Decision in *Orrego v. Morgovsky, et al.* The court in that case also entered a second decision that same day, on April 17, 2025, dismissing Plaintiff's case as against the third defendant, Democleia P. Gottesman, M.D. **Ex. KK**, 04-17-2025 Dismissal Decision in *Orrego v. Morgovsky, et al.*

131.    In addition to the *Orrego v. v. Morgovsky, et al.* lawsuit Plaintiff filed on February 1, 2023, Plaintiff commenced an action in the Supreme Court of the State of New York, Queens County, on July 8, 2024, against Pasternak Ziegler and several attorneys with that firm, accusing them of "professional malpractice, breach of contract, breach of duty, fraud, abetting and aiding, fraudulent misrepresentation, falsification business and insurance records, among others." **Ex. LL**, Plaintiff's 07-08-2024 State Court Complaint in *Orrego v. Pasternack, et al.*, Index No.

714097/2024.  The defendants in that action filed a motion to dismiss Plaintiff's complaint on November 20, 2024, which is still pending a decision from the court at this time.

**B.      Plaintiff's May 2020 and February 2024 Complaints of Child Abuse against Defendants & Subsequent Related Complaints and Petition**

132.    On or about May 28, 2020 – approximately eighteen (18) months after the Knipfings terminated Plaintiff's employment in November 2018, and a little less than two months before Plaintiff commenced this lawsuit in July 2020 – Plaintiff filed at least one complaint with the New York State Child Abuse and Maltreatment Register, accusing Ms. Knipfing, Ms. Zantua, and Ms. Uzcategui of causing injury, abuse or maltreatment to the Knipfings' children.  Ex. A, Plaintiff's Dep. at 189:16-22, 190:24-191:9; *see also* collectively annexed as **Ex. MM**, four separate notice letters from the Nassau County Department of Social ("NCDSS"), each dated June 3, 2020,  to Mr. Knipfing, Ms. Uzcategui, Ms. Knipfing, and Ms. Zantua, respectively, DEFS000119-126.

133.     As a result of Plaintiff's child abuse complaint(s), the Nassau County Child Protective Services ("NCCPS") conducted an investigation, which included, but was not limited to, an investigator going to the Knipfings home to interview the Knipfings' minor children.  Ex. A, Plaintiff's Dep. at 191:10-23.

134.    At the conclusion of its investigation, the NCCPS determined Plaintiff's complaint(s) to be "unfounded" because **the NCPPS "did not find believable proof (credible evidence) that a child was abused or maltreated."**  *See* collectively annexed as **Ex. NN**, four separate letters, each dated July 17, 2020, sent by the New York State Office of Children and Family Services ("NYS OCFS") to Mr. Knipfing, Ms. Uzcategui, Ms. Knipfing, and Ms. Zantua, respectively, DEFS000129-000133.

135.    On or around December 2, 2020, Plaintiff filed a complaint with the Nassau County

Office of the Inspector General against the NCCPS case worker, Debra Karpf, who investigated Plaintiff's complaint(s).  Ex. A, Plaintiff's Dep. at 193:13-194:2; **Ex. OO**, Plaintiff's 12-02-2020 Complaint against Debra Karpf.

136.    When Plaintiff was asked during her deposition in this lawsuit what the basis was for the complaint she filed against NCCPS case worker Karpf, Plaintiff testified, "I don't remember. I'd have to check it."  Ex. A, Plaintiff's Dep. at 194:3-8.

137.    On or around February 20, 2024, Plaintiff, who had not worked for the Knipfings since the termination of her employment in November 2018, filed yet another complaint of child abuse regarding the Knipfings' minor children. *See* **Ex. PP**, Plaintiff's 03-25-2024 Letter to NCDSS, dated March 25, 2024.  The NCPPS determined this 2024 child abuse complaint to also be "unfounded." *Id*.

138.    On or around December 15, 2024, Plaintiff filed a verified petition against New York State Governor Kathy Hochul ("Governor Hochul"), the NYS OCFS, and others, pursuant to CPLR Article 78, in the Supreme Court of the State of New York, County of Nassau (Index No. 622490/20204), seeking an order mandating the State to reopen its investigation into Plaintiff's 2020 and 2024 child abuse complaints regarding the Knipfings' children.  **Ex. QQ**, Plaintiff's 12-15-2024 Nassau County Article 78 Petition.

139.    The Nassau County Supreme Court entered a decision on Plaintiff's petition on April 16, 2025, denying and dismissing the petition.  **Ex. RR**, 04-16-2025 Nassau County Supreme Court Decision.

**C.    Plaintiff's March 2021 State Court Lawsuit Against the Knipfings, Ms. Uzcategui, and Cristina Coimbra**

140.    On March 18, 2021, while Defendants' motion to dismiss Plaintiff's Amended Complaint in this action was still pending, Plaintiff commenced an action in the Supreme Court of

the State of New York, County of Queens (Index No. 706324/2021), against the Knipfings, Ms. Uzcategui, and Ms. Coimbra, who was the Knipfings' primary housekeeper during the period of time Plaintiff was employed by the Knipfings. **Ex. SS**, Plaintiff's 03-18-2021 Queens County Supreme Court Complaint against the Knipfings, Ms. Uzcategui, and Ms. Coimbra.

141. Plaintiff's Queens County Supreme Court action against the Knipfings, Ms. Uzcategui, and Ms. Coimbra, in which Plaintiff asserted claims for, *inter alia*, negligent infliction of emotional distress and defamation, was dismissed in its entirety by the court in 2021, and on July 9, 2025, the Appellate Division for the Second Department issued a decision affirming the dismissal of the action. **Ex. TT**, 07-09-2025 Second Department Decision.

**D.      Plaintiff's August 2021 State Court Lawsuit against the Ley Family**

142. After Plaintiff's employment with the Knipfings was terminated in November 2018, Plaintiff next worked as a nanny for Kendall and Gregory Ley ("Ley Family"), starting in or January or February 2019. Ex. A, Plaintiff's Dep. at 76:5-25.

143. In January 2020, the Ley Family terminated Plaintiff's employment. Ex. A, Plaintiff's Dep. at 77:2-22.

144. On January 14, 2021, a year after the Ley Family terminated Plaintiff's employment, Plaintiff filed a complaint with the New York State Division of Human Rights ("NYS DHR") against the Ley Family, accusing them of race/color discrimination and retaliation in connection with her employment with them. **Ex. UU**, 03-23-2021 NYSDHR Determination and Order of Dismissal for Administrative Convenience.

145. During Plaintiff's deposition in this lawsuit against Defendants, Plaintiff initially denied having filed a complaint against the Ley Family for discrimination and retaliation after the Ley Family terminated her employment. Ex. A, Plaintiff's Dep. at 78:22-79:13.

36

146.     On August 24, 2021, Plaintiff commenced an action against the Ley Family and their attorneys, in the Supreme Court of the State of New York, County of Queens (Index No. 719137/2021), asserting claims for unequal pay, discrimination, retaliation, extortion, defamation, fraudulent misrepresentation, negligent infliction of emotional distress, among other claims. **Ex. VV**, Plaintiff's 8-24-2021 Queens County Supreme Court Complaint against the Ley Family.  That action is still pending.

147.     Plaintiff testified during her deposition in this lawsuit against Defendants that she could not recall anything about any of the claims she asserted in her lawsuit against the Ley Family. Ex. A, Plaintiff's Dep. at 85:8-88:9.

**E.     Plaintiff's August 2023 Federal Lawsuit against Pasternak Ziegler and Others**

148.     As the Court is aware, on August 31, 2023, Plaintiff commenced an action in this Court against Pasternak Ziegler and others, alleging, among other things, claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), stemming from the workers compensation claim Plaintiff filed in September 2019 (and lost) in connection with her employment with the Knipfings.  *See* Plaintiff's Complaint and Amended Complaint in *Orrego v. Pasternack, et al*., 23-CV-6507 (SJB)(AYS).

149.     The defendants in that federal action have served Plaintiff with a motion to discuss her Amended Complaint.  *See Orrego v. Pasternack, et al*., 23-CV-6507 (SJB)(AYS), at ECF Doc. Nos. 61 and 62.

**F.     Plaintiff's November 2024 Federal Lawsuit against Mr. Savitsky**

150.     As the Court is also aware, on November 27, 2024, Plaintiff commenced an action in this Court against Mr. Savitsky and "Old Westbury LLC," alleging, among other things, claims for identity theft and fraud, in connection with her employment with the Knipfings.  *See* Plaintiff's

Complaint in *Orrego v. Savitsky, et al.*, 24-CV-07247 (SJB)(AYS), at ECF Doc. No. 1.

151. Upon information and belief, Plaintiff at this time has not yet served Mr. Savitsky with a copy of the Complaint.

**G.    Plaintiff's February 2025 Federal Lawsuit against Justice Kerrigan and Others**

152. As the Court is also aware, on February 3, 2025, Plaintiff commenced an action in this Court against several defendants, including, but not limited to: New York State Court Justice Kevin J. Kerrigan, who sanctioned Plaintiff in the *Orrego v. Morgovsky, et al.*, matter (Index No. 702511/2023) discussed in Section VIII.A. above; several members of Justice Kerrigan's staff; and several staff members of the New York State Attorney Grievance Committee for the First Judicial Department. *See* Plaintiff's Complaint in *Orrego v. Savitsky, et al.*, 24-CV-07247 (SJB)(AYS), at ECF Doc. No. 1.

153. In that action, Plaintiff purported to assert claims for, among things, violations of 42 U.S.C. § 1983, violations of her due process and equal protection rights under the Fourteenth Amendment, and RICO violations. *Id*.

154. The Court dismissed Plaintiff's action on July 2, 2025, for failure to pay the initial filing fee by the deadline set by the Court, and Plaintiff has appealed from the Court's dismissal of the action. *See Orrego v. Kerrigan, et al.*, 25-CV-0736 (SJB)(AYS), at ECF Docket Entries on July 2 and July 21, 2025.

**H.    Plaintiff's February 2025 Federal Lawsuit against Justices of the New York State Court of Appeals and Others**

155. As the Court is also aware, on February 3, 2025, Plaintiff commenced another action in this Court against several defendants, including, but not limited to: several Justices of the New York State Court of Appeals; Governor Hochul; and New York State Attorney General

Letitia James. *See* Plaintiff's Complaint in *Orrego v. Wilson, et al.*, 25-CV-00769 (SJB)(AYS), at ECF Doc. No. 1.

156.     Plaintiff in that action also purported to assert claims for, among things, violations of 42 U.S.C. § 1983, violations of her due process and equal protection rights under the Fourteenth Amendment, and RICO violations. *Id*.

157.     The Court dismissed Plaintiff's action on July 2, 2025, for failure to pay the initial filing fee by the deadline set by the Court, and Plaintiff has appealed from the Court's dismissal of the action. *See Orrego v. Wilson, et al.*, 25-CV-00769 (SJB)(AYS), at ECF Docket Entries on July 2 and July 21, 2025.

## I.     Plaintiff's Complaints Against Every Attorney Who Previously Represented or Consulted with Her in Connection with Her Claims in This Lawsuit

158.     The first set of attorneys Plaintiff retained in connection with her claims in this lawsuit against Defendants was the Derek Smith Law Group, PLLC, sometime in late 2018 or early 2019,. Ex. A, Plaintiff's Dep. at 16:23-18:4.

159.     In or around October 2019, Plaintiff fired the Derek Smith Law Group, and accused them, among other things, of violating the American Bar Association ("ABA") Model Rules of Professional Conduct ("MRPC"). **Ex. WW**, Plaintiff's 06-15-2020 Letter to the Derek Smith Law Group, PLLC, dated June 15, 2020.[13]

160.     Plaintiff also filed a complaint against the Derek Smith Law Group with one of the New York State Attorney Grievance Committees ("AGC"). Ex. A, Plaintiff's Dep. at 18:5-19:6.

161.     When Plaintiff was asked during her deposition in this lawsuit what she alleged in the complaint she filed against the Derek Smith Law Group with an AGC, Plaintiff testified she

---

[13] This document was attached as part of Exhibit 6 to the Amended Complaint Plaintiff publicly filed in this lawsuit. ECF Doc. No. 8, at ECF pp. 58-60 of 145.

could not remember anything about the complaint.  Ex. A, Plaintiff's Dep. at 19:7-13, 20:20-21:3.

162.    After the Derek Smith Law Group, Plaintiff next retained the law firm Borrelli & Associates, PLLC, and, in or around June 4, 2020, she fired Borrelli & Associates and accused them as well of violating the ABA's MRPC.  Ex. A, Plaintiff's Dep. at 19:14-17; **Ex. XX**, Plaintiff's 06-15-2020 Letter to Borrelli & Associates, PLLC.[14]

163.    As with the Derek Smith Law Group, Plaintiff also filed a complaint against Borrelli & Associates with an AGC, but testified during her deposition that she could not remember anything about the complaint she filed.  Ex. A, Plaintiff's Dep. at 20:9-19, 21:17-22:16.

164.    Plaintiff's termination of her representation by Borrelli & Associates apparently was due in part to the lawyers at **Borrelli & Associates specifically accusing Plaintiff, in an email dated March 4, 2020, of trying to extort Defendants**.  Ex.  , Plaintiff's Letter to Borrelli & Associates, PLLC, dated June 15, 2020, at p.1.

165.    While Plaintiff was still being represented by Borrelli & Associates, Plaintiff also consulted with the Law Office of Peter A. Romero about potentially replacing Borrelli & Associates as her counsel, but the Law Office of Peter A. Romero apparently declined to represent Plaintiff.  Ex. A, Plaintiff's Dep. at 29:3-13; **Ex. YY**, Plaintiff's 04-06-2020 Letter to Law Office of Peter A. Romero, dated April 6, 2020.[15]

166.    As with the Derek Smith Law Group, and Borrelli & Associates, Plaintiff also accused the attorneys at the Law Office of Peter A. Romero of violating the ABA's MRPC, and filed a complaint against them with an AGC.  Ex. A, Plaintiff's Dep. at 29:14-30:5; Ex. YY,

---

[14] This document was also attached as part of Exhibit 6 to the Amended Complaint Plaintiff publicly filed in this lawsuit.  ECF Doc. No. 8, at ECF pp. 61-62 of 145.

[15] This document was also attached as part of Exhibit 6 to the Amended Complaint Plaintiff publicly filed in this lawsuit.  ECF Doc. No. 8, at ECF p. 63 of 145.

Plaintiff's 04-06-2020 Letter to Law Office of Peter A. Romano.

167. As with Plaintiff's AGC complaints against the Derek Smith Law Group and Borrelli & Associates, Plaintiff testified during her deposition that she could not remember anything about the complaint she filed against the Law Office of Peter A. Romero. Ex. A, Plaintiff's Dep. at 30:8-31:3.

168. After commencing this lawsuit *pro se* in July 2020, Plaintiff made at least two applications to the Court – on July 23, 20220, and September 18, 2020, respectively – requesting that the Court appoint her counsel. *See* ECF Doc. Nos. 3, 15.

169. Although the Court on September 22, 2020, initially denied Plaintiff's applications to be appointed counsel, on November 16, 2021, the Court reconsidered and reversed its prior decision and the Court's *Pro Se* Department appointed The Dratch Law Firm, PC, to represent Plaintiff. *See* ECF Docket Entries on 9/22/2020, 11/16/2021, and 11/22/2021.

170. However, just three months later – on February 14, 2022 – Plaintiff filed an application with the Court to terminate her representation by The Dratch Law Firm, which the Court granted. *See* ECF Docket Entries on 2/14/2022 and 03/08/2022.

**J.      Plaintiff's Conduct in This Lawsuit**

171. As the Court is aware, Plaintiff throughout the course of this litigation has made several applications seeking the disqualification or recusal of all the District and Magistrate Judges who have been assigned to this matter (*i.e.*, The Honorable Gary R. Brown ("Judge Brown"), The Honorable Joan M. Azrack ("Judge Azrack"), The Honorable Anne Y. Shields ("Judge Shields"), and The Honorable Sanket J. Bulsara), as well as disqualification of the undersigned counsel for Defendants. *See, e.g.,* ECF Doc. Nos. 77, 109, 132, 190, 194, 196, 203, 205.

172. While all of Plaintiff's applications in this regard have been denied as having no

41

merit – *see, e.g.,* ECF Docket Entries on 04/10/2023, 07/08/2025, 07/24/2025 – Judge Brown, who issued the 9-30-2021 Decision declining to dismiss Defendants motion to dismiss Plaintiff's Amended Complaint in its entirety, recused himself without any explanation on May 18, 2023. ECF Doc. No. 119.

173.    In Plaintiff's various applications seeking disqualification/refusal of each of the Judges who have been assigned to this matter, Plaintiff, without any basis, has accused each Judge of being biased.  *See, e.g.,* ECF Doc. Nos. 77, 109, 132, 190, 194, 196, 203, 205.

174.    By way of example, Plaintiff filed a letter motion with the Court on the morning of February 27, 2023 – this was the same day Plaintiff was initially deposed in this lawsuit – seeking a change of venue, and specifically accusing Judge Brown and Judge Shields of being impartial and biased.  ECF Doc. No. 77, at pp. 1-7.

175.    However, **at her deposition later that same morning**, Plaintiff testified as follows when questioned about her accusations against Judges Brown and Shields:

Q: Now, earlier you testified about a motion you submitted to the court this morning, correct?

A: Yes.

Q: When did you draft that motion?

A: On the weekend.

Q: And in that letter you filed with the court, you accused the district judge in this matter, Gary Brown, and the magistrate judge, Anne Shields, of being biased, correct?

A: **I didn't accuse anyone of anything**.

Q: Is it your testimony that in the motion you submitted to the court today, which you sent to me by e-mail, you did not accuse the district judge and the magistrate judge assigned to this case of being biased?

A: **I didn't accuse anyone of anything** …

Ex. A, Plaintiff's Dep. at 32:23-33.

176.    As the Court is aware, Plaintiff in this lawsuit – as well as in her other related lawsuits before this Court – has filed several interlocutory appeals, with all such appeals that have been considered to date by the Second Circuit Court of Appeals and/or United States Supreme Court, being denied. *See, e.g.,* ECF Doc. Nos. 180, 183, 184

177.    As the Court is also aware, Plaintiff has continued to file bloated and wholly unsupported motions in this lawsuit, despite the Court on several prior occasions admonishing and warning her that her continued filing of such motions may subject her to the imposition of sanctions for engaging in frivolous litigation conduct. *See, e.g.,* ECF Docket Entries on March 28, 2023; November 14, 2023; July 8, 2025; and ECF Doc Nos. 205 and 207.

178.    Additionally, despite the Court, in an electronic Order issued on November 14, 2023, directing Plaintiff not to file any papers in this action or in *Orrego v. Pasternack, et al.*, 23-CV-6507 (SJB)(AYS) while both matters were stayed due to Plaintiff's then pending interlocutory appeals in both matters, Plaintiff continued to do so. *See* ECF Docket Entries on November 14, 2024, and February 27, 2024.

Dated: New York, New York
        August 8, 2025

                                    GORDON REES SCULLY
                                    MANSUKHANI, LLP

                                    By:    /s/ *Kuuku Minnah-Donkoh*
                                           Kuuku Minnah-Donkoh, Esq.
                                    1 Battery Park Plaza
                                    New York, New York 10004
                                    Telephone: 212-269-5500
                                    kminnahdonkoh@grsm.com

                                    *Attorneys for Defendants*